DAVID L. PINKSTON (#6630)
KEITH A. CALL (#6708)
P. MATTHEW COX (#9879)
ROBERT T. DENNY (#13687)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145-5000
Telephone: (801) 521-9000
Fax: (801) 363-0400

*Counsel for Defendant David J. Richards, LLC d/b/a Western US Mineral Investors, LLC*

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>CS MINING, LLC,<br><br>     Debtor, | Bankruptcy Case No. 16-24818<br>     (Chapter 11)<br><br>Judge William T. Thurman |
| CS MINING, LLC, a Delaware limited<br>liability company,<br><br>     Plaintiffs,<br><br>v.<br><br>DAVID J. RICHARDS, LLC, d/b/a<br>WESTERN US MINERAL INVESTORS,<br>LLC, SKYE MINERAL INVESTORS, LLC,<br>an Ohio limited liability company;<br><br>     Defendants. | Adv. Proc. No.: 17-02024<br><br><br>**MOTION FOR PARTIAL SUMMARY<br>JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, and Local Rule 7056-1, David J.

Richards, LLC d/b/a Western US Mineral Investors, LLC ("WUMI") moves for partial summary

judgment.  WUMI asks the Court to dismiss, with prejudice, Counts II (recharacterization of

WUMI loan) and IV (breach of contract) of CS Mining's Complaint.

## INTRODUCTION

After acquiring copper mining assets in Milford, Utah, CS Mining initiated a two-part

plan to operate and expand its mining operation. To execute its plan, CS Mining secured loans

from several lenders, including WUMI and Noble Americas Corp., ("Noble"). In a series of

draws, CS Mining first borrowed approximately $20.5 million from WUMI. In exchange, WUMI

obtained a senior lien over substantially all of CS Mining's assets. Noble subsequently agreed to

loan an additional $30 million to CS Mining, paying $15 million dollars initially and agreeing to

provide the remaining funds when CS Mining raised matching equity financing. In connection

with Noble's loan, the parties entered into an Intercreditor Agreement by which WUMI agreed to

subordinate its liens with respect to the Phase II mining assets while retaining a first position

with respect to Phase I assets. In addition to the subordination provisions, the Intercreditor

Agreement includes a conversion clause that would have required WUMI to convert its

remaining lien interests to equity, if certain conditions precedent were met. But the requisite

conditions were not met.

In particular, the conversion clause applies only if there are no "Events of Default" under

CS Mining's loan agreement with Noble and Noble's successor, Waterloo Street Limited

("Waterloo"), or in connection with full payment of the $30 million loaned by Noble/Waterloo.

It is undisputed that multiple Events of Default occurred, and CS Mining, Noble, and Waterloo

have explicitly recognized as much. Yet CS Mining now asks this court to extinguish WUMI's

rights as a creditor by invoking the conversion clause, based on a purported waiver of default by

2

Waterloo. This waiver, however, cannot alter the fact that Events of Default existed. Even if

Waterloo waived its enforcement rights stemming from the undisputed Events of Default, the

Events of Default occurred. Because multiple Events of Default indisputably occurred in this

case, CS Mining cannot invoke the conversion clause as a basis for its claims against WUMI.

Summary judgment should therefore be granted with respect to any claims based on this

provision.

Alternatively, the court should grant summary judgment based on CS Mining's failure to

fulfill its contractual obligations owed to WUMI. Perhaps most relevant here, CS Mining and

WUMI agreed that CS Mining would provide notice to WUMI before drawing down the full

amount of the Noble/Waterloo loan. CS Mining breached this agreement and drew down the loan

in an effort to implicate the conversion clause and extinguish WUMI's lien rights. With this

breach, CS Mining cannot establish a necessary element of its breach of contract claim—the

element requiring proof that it fulfilled its own contractual obligations.

## STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

In Count II of its Complaint, CS Mining "seeks an order recharacterizing the amounts

allegedly due and owing to WUMI as equity contributions." Compl. ¶ 104.  To analyze these

claims, the court must apply a multi-factor test to "distinguish true debt from camouflaged

equity." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1298 (10th Cir. 2004).  In the context

of these factors, CS Mining alleges four grounds for recharacterization.  *See* Compl. ¶¶ 98-101.

For purposes of this motion, WUMI seeks summary judgment as to one of the factors or grounds

identified by CS Mining in its complaint. In particular, CS Mining alleges that WUMI was

required to convert its debt to equity under the terms of the Intercreditor Agreement.  *See* Compl.

3

¶ 101. The undisputed facts demonstrate that WUMI had no obligation to convert its debt to equity under that agreement.

In Count IV, CS Mining similarly asserts WUMI breached the Intercreditor Agreement by failing to convert its loan to equity. To establish this breach of contract claim, CS Mining must prove (1) a contract existed between CS Mining and WUMI; (2) CS Mining performed under the contract; (3) WUMI breached the contract; and (4) damages. *See Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1214, 1226 (D. Utah. 2015). Because CS Mining cannot establish either the second or the third elements, the Court should grant summary judgment on Count IV.

The following undisputed facts support summary judgment:

1.      On August 10, 2012, CS Mining and WUMI entered into the WUMI Loan Agreement, which "gave WUMI a senior lien over substantially all of CS Mining's assets." Compl. ¶¶ 41–42, Dkt. No. 1; WUMI Loan Agreement, attached as Ex. 1.

2.      WUMI initially loaned $1 million to CS Mining and loaned several million dollars more to CS Mining over the next two years. As CS Mining describes, "From 2012 through 2014, WUMI lent CS Mining a total of $20.5 million in a series of draws as additional funding was requested and approved by the Board of CS Mining." Compl. ¶ 44.

3.      The ongoing draws were memorialized in a series of Amendments to the WUMI Loan Agreement. *Id.* ¶¶ 45–52.

4.      On August 12, 2014, Noble agreed to loan CS Mining an additional $30 million, paying $15 million dollars initially and agreeing to pay the remaining $15 million when CS Mining raised matching equity financing.  Noble/Waterloo Agreement, attached as Ex. 2.

5.      The same day, CS Mining, WUMI, and Noble entered into a contract titled the

Intercreditor Agreement, in which WUMI agreed to subordinate its lien interests in the Phase II

assets held by CS Mining at its Milford mine. WUMI, however, retained a first priority lien in

CS Mining's Phase I assets. Intercreditor Agreement at 2–3, attached as Ex. 3.

6.      Paragraph 5.2 of the Intercreditor Agreement provides,

> 5.2    <u>Mandatory Conversion</u>        In the event that Project Completion
> Date (as defined in the Noble Loan Agreement) occurs or Noble loans the Borrower
> the Full Facility Amount pursuant to the Noble Loan Agreement, and there are no
> existing defaults under the Noble Loan Agreement or that occur in connection with
> lending the Full Facility Amount, WUMI hereby agrees to promptly (but in any
> event within 5 business days) convert the WUMI Obligations in full into the equity
> . . . . In connection with such conversion, the WUMI obligations will be
> extinguished all Liens held by WUMI on Collateral shall be released.

*Id.* at 4.

7.      On March 10, 2015, WUMI and CS Mining agreed to the Tenth Amendment to

the WUMI Loan Agreement, which states that "[p]rior to drawing down more than $29,750,000

of the loan facility pursuant to the [Noble/Waterloo Loan Agreement], dated August 12, 2014,

[CS Mining] shall notify [WUMI] . . . and obtain [WUMI's] consent and approval from the

following, not to be unreasonable withheld." Tenth Amendment to Loan & Security Agreement,

attached as Ex. 4.

8.      As of July 8, 2015, Noble had paid $29,750,000 of the $30 million available

under the Noble/Waterloo Loan Agreement. Compl. ¶ 66.

9.      On November 10, 2015, Noble sent a letter to CS Mining stating, "We hereby

notify you that the failure by [CS Mining] to pay interest in cash within seven (7) days of the

date when due pursuant to Section 2.07 of the [Noble/Waterloo Loan Agreement] constitutes

Events of Default under the Agreement. Letter from Noble to CS Mining (Nov. 10, 2015), attached as Ex. 5; *see also* Compl. ¶ 68; Answer ¶ 68.

10.    On December 30, 2015, Noble sent another letter to CS Mining stating, "You are aware that Events of Default have occurred and as of this date are continuing under the Agreement." Letter from Noble to CS Mining (Dec. 30, 2015), attached as Ex. 6; *see also* Compl. ¶ 69; Answer ¶ 69.

11.    On December 31, 2015, Waterloo acquired the Noble Loan. Compl. ¶ 70.

12.    In a January 1, 2016 announcement to its shareholders regarding the acquisition of the Noble/Waterloo Loan Agreement, Waterloo's parent company acknowledged that CS Mining was "currently in default under the existing loan agreements." Joint Announcement at 2, attached as Ex. 7.

13.    On January 7, 2016, Waterloo sent a letter to CS Mining.  The letter stated that it would "serve as notice that one of more Events of Default have occurred and are continuing, as [CS Mining] was previously notified by [Noble] in its letters of November 10, 2015 and December 30, 2015." Letter from Waterloo to CS Mining (Jan. 7, 2016), attached as Ex. 8.

14.    On January 13, 2016, Waterloo's attorney sent a letter to WUMI demanding that WUMI convert its debt to equity. Letter from Stuart A. Shanus to WUMI (Jan. 13, 2016), attached as Ex. 9.

15.    WUMI responded by explaining that several Events of Default had occurred, and as a result, WUMI was not required to convert its loans to equity. Letter from WUMI to Waterloo and CS Mining (Jan. 15, 2016), attached as Ex. 10.

16.     On February 2, 2016, WUMI sent another letter to Waterloo again explaining that Events of Default had occurred under the WUMI Loan Agreement. Letter from WUMI to Waterloo and CS Mining (Feb. 2, 2016), attached as Ex. 11; *see also* Compl. ¶ 71; Answer ¶ 71.

17.     The next day, "[o]n February 3, 2016, CS Mining drew down the last installment under the Noble/Waterloo Loan Agreement, bringing the total amount loaned to CS Mining under the Noble/Waterloo Agreement to $30 million." Compl. ¶ 72. CS Mining did not provide notice to WUMI of the final draw from the Noble/Waterloo Loan.  Declaration of Robert Lautz, attached as Ex. 12.

18.     Also on February 3, 2016, Waterloo signed a waiver acknowledging that it had "been informed that certain Events of Default have occurred and are continuing" but purporting to waive any defaults that existed as of that date. Waiver, attached as Ex. 13.

19.     On February 17, 2017, CS Mining filed this adversary proceeding, alleging that "[a]s of February 4, 2016, Noble/Waterloo had fulfilled the obligation to fully fund $30 million, and no defaults existed as described in Section 8.01 in the Noble/Waterloo Loan Agreement, as any events of default that may have existed had been waived by Waterloo. . . . Thus, under the Intercreditor Agreement, WUMI was obligated to convert its debt into equity and release its remaining liens by no later than February 11, 2016. . . . Despite being obligated to convert its loan into SMP equity and to take steps to release its liens, WUMI has refused to do so." Compl. ¶¶ 74–76.

20.     But, in discovery in this case, Noble admitted it sent letters to CS Mining dated November 10, and December 30, 2015, in which Noble informed CS Mining that one or more Events of Default had occurred under the Noble/Waterloo Loan Agreement. Noble Americas

Corp.'s Resps. To WUMI's 4/7/17 Reqs. for Admission & Interrogs. at p. 4, attached as Ex. 14.

Noble further admits that as of December 30, 2015, one more Events of Default had in fact

occurred under the Noble/Waterloo Loan Agreement. *Id.*

21.      Waterloo's Rule 30(b)(6) witness similarly admitted that "[t]here was a default"

with respect to the Noble/Waterloo Loan prior to February 3, 2016. Norohna Dep. at 139:11–

140:3, cited portions of rough draft transcript attached as Ex. 15. Waterloo's deponent further

confirmed Waterloo's position that the Noble/Waterloo Loan continues to be in default. *Id.* at

140:20–142:7.

## **ARGUMENT**

### I.     **THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THE EXISTENCE OF DEFAULTS UNDER THE WATERLOO LOAN MEAN WUMI IS NOT REQUIRED TO CONVERT ITS DEBT TO EQUITY.**

#### A.     **The Absence of Default under the Waterloo Loan Is a Condition Precedent for WUMI's Obligation to Convert.**

In Counts II and IV of this adversary proceeding, CS Mining asserts that WUMI must

convert its loan to equity pursuant to Section 5.2 of the Intercreditor Agreement. In Count II, CS

Mining describes conversion as "mandatory" and seeks recharacterization of its loan based on

WUMI's refusal to convert. (Compl. ¶ 101.) In its breach of contract claim asserted in Count IV,

CS Mining alleges Noble/Waterloo fulfilled the obligation under the Intercreditor Agreement to

fully fund $30 million, and any default by CS Mining had been waived by Waterloo. (*Id.* ¶ 115.)

Based on the completed $30 million payment from Noble/Waterloo, CS Mining again asserts,

"WUMI was obligated to convert its debt into equity and release its remaining liens." (*Id.* ¶ 116.)

These allegations, however, overlook the failure of a condition precedent set forth in the

conversion provision itself.

Under Section 5.2 of the Intercreditor Agreement, WUMI must convert CS Mining's debt into an equity interest only if "the Project Completion Date (as defined in the Noble Loan Agreement) occurs or Noble [succeeded here by Waterloo] loans the Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, *and there are no existing defaults under the Noble Loan Agreement or that occur in connection with lending the Full Facility Amount . . . .*" (Intercreditor Agreement at 4, Ex. 3 (emphasis added).) Thus, even if Noble/Waterloo loaned the full amount under the Noble/Waterloo Loan Agreement, the payment alone does not trigger the conversion clause. Rather, under the plain language of Section 5.2, if a single default exists under either the Noble/Waterloo Loan Agreement or in connection with payment of the $30 million dollars by Noble/Waterloo, WUMI is not required to convert its interest to equity. And the undisputed facts establish that multiple defaults existed, each of which eliminated WUMI's conversion obligation.

**B.        It Is Undisputed that the Waterloo Loan Was in Default.**

The Noble/Waterloo Loan Agreement defines "Default" as "any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default."[1] (Noble/Waterloo Loan Agreement at 4, Ex. 2.) It is undisputed that CS committed a series of defaults under the terms of the Noble/Waterloo Loan Agreement. Noble first provided written notice of an Event of Default on November 10, 2015. (Letter from Noble to CS Mining (Nov. 10, 2015), Ex. 5; *see also* Compl. ¶ 68; Answer ¶ 68.)

---

[1] The agreement also provides a list of several specific "Events of Default." (Noble/Waterloo Loan Agreement at 42–46, Ex. 2.) The circumstances surrounding each of CS Mining's defaults are not material because it is undisputed that "Events of Default" occurred, which is the relevant inquiry for purposes of this motion.

Then, on December 30, 2015, Noble sent another letter stating that Events of Default had

occurred and were continuing as of that date. (Letter from Noble to CS Mining (Dec. 30, 2015),

Ex. 6; *see also* Compl. ¶ 69; Answer ¶ 69.) After Waterloo acquired the Noble Loan, Waterloo's

parent company sent an announcement to shareholders again acknowledging CS Mining was

"currently in default under the existing loan agreements." (Joint Announcement at 2, Ex. 7.) The

next week, Waterloo itself sent a letter to CS Mining, serving "as notice that one of more Events

of Default have occurred and are continuing." (Letter from Waterloo to CS Mining (Jan. 7,

2016), Ex. 8.) Even after CS Mining filed this adversary proceeding, Noble and Waterloo again

confirmed that Events of Default had occurred. In response to WUMI's requests for admission,

Noble admitted (1) it sent letters to CS Mining stating that Events of Default had occurred, and

(2) as of December 30, 2015, one more Events of Default had in fact occurred. (Noble Americas

Corp.'s Resps. to WUMI's 4/7/17 Reqs. for Admission & Interrogs. at p. 4, Ex. 14.) Waterloo's

Rule 30(b)(6) witness also admitted "[t]here was a default" with respect to the Noble/Waterloo

Loan prior to February 3, 2016, the date it signed the waiver form, and the default continues to

the present. (Norohna Dep. at 139:11–142:7, Ex. 15.)

## C.      It Is Impossible to "Waive" the Fact that Defaults Exisited.

CS Mining does not dispute these unequivocal admissions by both Noble and Waterloo

that Events of Default occurred and continue to occur under the Noble/Waterloo Loan

Agreement. Rather, CS Mining maintains that Waterloo's waiver effectively eliminated any

defaults as of February 3, 2016. Waterloo first demanded that WUMI convert its loan to equity

upon acquiring the Noble Loan. And when WUMI responded on February 2, 2016, by

confirming that Events of Default had occurred which eliminated the requirement to convert,

Waterloo signed a waiver the next day purporting to waive any and all Events of Default that may have existed as of that date. CS Mining maintains that with this signed waiver, "no defaults existed as described in Section 8.01 in the Noble/Waterloo Loan Agreement, as any events of default that may have existed had been waived by Waterloo." (Compl. ¶ 115.)

These allegations reflect a fundamental misunderstanding of the concept of waiver. "Waiver is the voluntary relinquishment or surrender of some known *right*. Its constituent elements are an existing *right*; knowledge of such *right*; and an intention to relinquish or surrender it." *Yates v. Am. Republics Corp.*, 163 F.2d 178, 179 (10th Cir. 1947) (emphases added). Thus, only *rights* may be waived. And a default, by definition, is not a right. A default is an "omission or failure to perform a contractual obligation." Black's Law Dictionary 507 (10th ed. 2009). In the Noble/Waterloo Loan Agreement, "default" is more specifically defined as "any event or condition that constitutes an Event of Default," with "Event of Default" being further identified as including any one of several enumerated events that would constitute a failure to perform under the contract. (Noble/Waterloo Loan Agreement at 4, 42–46, Ex. 2.)

As explained above, it is undisputed that certain events or conditions have occurred that constitute Events of Default by CS Mining under the Noble/Waterloo Loan Agreement. For example, on November 10, 2015, Noble first informed CS Mining that an Event of Default had occurred, based on CS Mining's failure to make interest payments when due. (Letter from Noble to CS Mining (Nov. 10, 2015), Ex. 5.) The occurrence of this event and all other Events of Default triggered Waterloo's enforcement rights against CS Mining. While Waterloo may choose to waive those rights, any such waiver cannot change the existence of the underlying defaults. Using the nonpayment example, Waterloo may waive it right to collect the amounts owed, but

the fact that CS Mining failed to pay—i.e., the Event of Default—still exists. An Event of

Default cannot disappear merely because Waterloo waives its rights related to that default.

A simple hypothetical demonstrates that a litigant can waive a *right*, but not the existence

of a *past event* or *fact*. Assume an automobile passenger, "P," sues two different drivers, "D1"

and "D2," for injuries sustained in an automobile accident at an intersection. A key issue in

apportioning fault to D1 and D2 is whether the light was red or green. P settles with D1, and

stipulates with D1 that the light was red at the time of the accident. In doing so, P may waive her

right to sue D1 based on a theory that the light was green, but it cannot change the fact that the

light may in fact have been green. Whether the light was red or green is a fact; it is not a right

that can be waived.

Similarly, in this case, all parties agree that several Events of Default existed under the

Noble/Waterloo Loan. This is an undisputed fact. Waterloo's attempt to waive those defaults

does not change the fact that those defaults existed. At most, such waiver could only waive

Waterloo's rights as a result of those defaults. But it did not waive WUMI's rights, and it

certainly did not change the fact that defaults existed and continue to exist.

Courts have confirmed this distinction, recognizing both explicitly and implicitly that

facts or events may not be waived. *See, e.g.*, *Republic of Iraq v. Beaty*, 556 U.S. 848, 862 (2009)

("Respondent Beaty objects that the President cannot waive a *fact*. But neither can Congress

legislate a *fact*."); *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 143–44 (D.C. Cir. 2011)

(citing *Beaty* as "assuming the correctness of the proposition that 'the President cannot waive a

fact'" and explaining that even if legal arguments have been waived or forfeited, a court may

consider the underlying facts); *Mattingly v. Integris Health, Inc.*, No. CIV-08-1208-C, 2009 WL

3923625, at *2 (W.D. Okl. Nov. 17, 2009) (unpublished) ("[U]nder the clear unambiguous language of the retirement plan, Defendant is the beneficiary and the waiver cannot alter that fact."); *Commonwealth v. Wright*, 99 A.3d 565, 576 (Pa. 2014) ("An appellant cannot waive facts. Issues are waived, not record evidence.").

Cases suggesting to the contrary either involve circumstances significantly different than those present here, or the courts and parties in such cases use imprecise language without addressing the issue raised in this motion. For example, in *Citibank, N.A. v. United Subcontractors, Inc.*, a proposed amendment to the relevant contract purported to "waive the default" caused by a borrower's failure to comply with financial covenants in the contract. 581 F. Supp. 2d 640, 643 (S.D.NY. 2008). But the decision does not address whether the above language would have actually waived the existence of default, because the court concluded the contract was terminated before the amendment was executed. *Id.* at 644–45; *see also In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 238 (S.D.N.Y. 2006) (stating that Polaroid "need[ed] to obtain temporary waivers of defaults on financial covenants contained in important short-term credit agreements" without discussing the scope or effect of such waivers). In *Lasalle Bank Nat'l Ass'n, v. Citicorp Real Estate, Inc.*, the court dismissed a breach of contract claim where the contract allowed for waiver of "an 'existing' breach of default." No. 01 CIV. 4389(AGS), 2002 WL 181703, at *6 (S.D.N.Y. 2002) (unpublished). Although the court and parties stated the plaintiff had "waived" a default, *Lasalle* does not support the proposition that a party's waiver removes the existence of a default event. In *Lasalle*, the plaintiff had a contractual ability to waive or defer payments from the defendant, and the plaintiff granted a waiver of three payments prior to the time the payments were due. Thus, the plaintiff did not waive a default of

the contract; the plaintiff waived its right to collect three payments that the defendant would owe

in the future. Accordingly, when the defendant later failed to make the payments that otherwise

would have been due, the plaintiff could not assert breach of contract because it had waived its

rights to such a claim. *Id.*

WUMI has not found a case or any other legal authority supporting the proposition that a

party may sign a waiver and effectively eliminate the existence of underlying facts that constitute

an event of default. To the contrary, as a matter of law, although a party may waive rights related

to a default, the default itself does not disappear as a result of the waiver. Here, Waterloo

purported to waive "any and all Events of Default" existing as of February 3, 2016, but Waterloo

could waive only its *rights* related to those Events of Default; it is impossible for Waterloo to

waive the existence of a fact or event constituting default, particularly where Waterloo and

Noble both have repeatedly acknowledged that Events of Default occurred. And with the

undisputed Events of Default, WUMI has no duty to convert its loan to equity.

Because CS Mining cannot establish WUMI's obligation to convert, CS Mining also

cannot rely on WUMI's failure to convert as a factor weighing in favor of the recharacterization

claim. Similarly, CS Mining cannot prove WUMI breached the Intercreditor Agreement by

refusing to convert its loan to equity. Summary judgment is therefore appropriate with respect to

the allegations related to conversion in Count II and based on CS Mining's failure to prove a

necessary element of its breach of contract action in Count IV.

### D. __Waterloo's Purported Waiver Was an Ineffective Sham.__

Waterloo's purported waiver of defaults was ineffective to waive WUMI's rights.  The

waiver language reads, "[T]he Lender [Waterloo] hereby waives any and all Events of Default

that may exist as of the date hereof . . ." *See* Ex. 13. But this language is then qualified as

follows:

> [P]rovided, <u>however</u>, that . . . in no event shall this waiver be deemed to be a
> waiver of enforcement of any of the Lender's rights or remedies under the Loan
> Agreement and the other Loan Documents . . ., and in no event shall this waiver
> be deemed to be a cancellation or forgiveness of the indebtedness due but unpaid
> by the Borrower to the Lender as of the date hereof . . . Except as expressly
> provided herein, the Lender hereby reserves and preserves all of its rights and
> remedies against the Borrower . . .
>
> This waiver shall be effective only in this specific instance and for the specific
> purposes set forth herein and does not allow for any other or further departure
> from the terms and conditions of the Loan Agreement, or any other Loan
> Document, which terms and conditions shall remain in full force and effect.

Ex. 13.

In other words, "We are notifying you that we waive all Events of Default, but we're

really just kidding. We reserve everything." This is not effective to waive existing defaults, and

it is certainly not effective to waive WUMI's rights that arose from the facts of default. This was

nothing more than a futile attempt by Waterloo to force WUMI to convert, contrary to the

agreed-upon terms and conditions of Section 5.2 of the Intercreditor Agreement.

Waterloo cannot seriously argue otherwise. If Waterloo's waiver was a sincere and

genuine waiver of known rights, then Waterloo has forfeited its rights to repayment of its loan.

One of the defaults Waterloo's predecessor identified in its November 10, 2015 was non-

payment. *See* Ex. 5. If Waterloo is sincere in its attempted waiver, then it must be forced to

acknowledge it has waived is right to payment under the loan. Anything short of this would not

be a real waiver.

In reality, Waterloo's purported waiver was an ineffective sham attempt to "waive"

defaults—without really waiving them—in order to manufacture an argument that WUMI must

convert.  The waiver was not a genuine waiver.  It did not waive WUMI's rights.  And it did not

change past or existing facts.  The Court should grant summary judgment on these grounds.

## II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE CS MINING HAS NOT PERFORMED ITS CONTRACTUAL OBLIGATIONS.

In addition, the Court may grant summary judgment on CS Mining's breach of contract

claim because CS Mining did not perform its obligations under its contracts with WUMI. To

support this element, CS Mining alleges only that *Waterloo* fulfilled its obligations under the

Intercreditor Agreement. CS Mining does not allege that it fulfilled its own contractual

obligations to WUMI. And the undisputed evidence shows to the contrary: It is undisputed that

CS Mining failed to meet its obligations under the WUMI Loan Agreement.  *See* Ex. 12.  In

addition, in Section 2 of the Tenth Amendment to the WUMI Loan Agreement, CS Mining

agreed it would notify WUMI and obtain WUMI's consent prior to drawing down more than

$29,750,000 of the loan from Waterloo. (Tenth Amendment to Loan and Security Agreement,

Ex. 4.)  CS Mining did neither. CS Mining instead drew down the full amount of the

Noble/Waterloo Loan without notifying WUMI and then attempted to use this breach as a means

to compel WUMI to convert its loan to equity. Thus, rather than comply with the Intercreditor

Agreement and its other contracts with WUMI, CS Mining breached its contractual obligations

in nearly every material way. With its own contractual breaches, CS Mining cannot assert a

breach of contract claim against WUMI.

## CONCLUSION

As a matter of law, CS Mining cannot invoke Section 5.2 of the Intercreditor Agreement

as the basis for its claims because a necessary condition precedent has not been satisfied where

Events of Default indisputably existed and continue to exist. Waterloo's waiver of its contractual

16

rights does not alter the fact that Events of Default occurred. And with these undisputed Events of Default, WUMI was never and still is not obligated to convert its debt into equity. Accordingly, summary judgment should be granted with respect to any of CS Mining's claims relying on the conversion clause, including Count II and IV. Summary judgment may also be granted as to Count IV based on the undisputed evidence showing CS Mining did not fulfill its own contractual obligations to WUMI.

DATED this 19th day of June, 2017

SNOW, CHRISTENSEN & MARTINEAU

/s/ P. Matthew Cox
David L. Pinkston
Keith A. Call
P. Matthew Cox
Robert T. Denny
*Attorneys for David J. Richards, LLC d/b/a*
*Western US Mineral Investors, LLC*

## CERTIFICATE OF MAILING

I, P. Matthew Cox, attorney for David J. Richards, LLC d/b/a Western US Mineral

Investors, LLC, hereby certify that on the <u>19th</u> day of June, 2017, I caused to be served a true

and correct copy of the foregoing **MOTION FOR PARTIAL SUMMARY JUDGMENT**,

Adversary Proceeding No. 17-02024, which was filed electronically, and electronically served

upon the parties in the manner indicated:

|  |  |
|---|---|
| David Leta<br>Troy Aramburu<br>Jeff Tuttle<br>SNELL & WILMER, L.L.P.<br>15 West South Temple, Suite 1200<br>Salt Lake City, Utah 84101 | (via ECF) |
| Donald J. Detweiler<br>Francis J. Lawall<br>Joanna J. Cline<br>PEPPER HAMILTON LLP<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street<br>Wilmington, DE 19899-1709 | (via ECF) |
| Adelaide Maudsley<br>KIRTON MCCONKIE<br>50 East South Temple<br>Suite 400<br>Salt Lake City, UT 84111 | (via ECF) |

/s/ P. Matthew Cox

4851-0422-0233, v. 1

# EXHIBIT 1

# David J. Richards, LLC

# Loan and Security Agreement

**Borrower:** CS Mining, LLC

**Address:** P.O. Box 608
1208 South 200 West
Milford, Utah 84751

**Date:** August 10, 2012

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is entered into as of the above date between David J. Richards, LLC, an Ohio limited liability company ("Lender"), whose address is 500 South Front Street, Suite 1200, Columbus, Ohio 43215, and the borrower(s) named above (jointly and severally, the "Borrower"), whose chief executive office is located at the above address ("Borrower's Address"). The Schedule to this Agreement (the "Schedule") shall for all purposes be deemed to be a part of this Agreement, and the same is an integral part of this Agreement. (Definitions of certain terms used in this Agreement are set forth in Section 8 below.)

## 1. LOAN.

*1.1 Loan.* Lender will make a loan to Borrower (the "Loan"), in the amount shown on the Schedule, provided no Default or Event of Default has occurred and is continuing.

*1.2 Interest.* The Loan and all other monetary Obligations shall bear interest at the rate shown on the Schedule, except where expressly set forth to the contrary in this Agreement.

*1.3 Fees.* Borrower shall pay Lender the fees shown on the Schedule, which are in addition to all interest and other sums payable to Lender and are not refundable.

## 2. SECURITY INTEREST. To secure the payment and

performance of all of the Obligations when due, Borrower hereby grants to Lender a security interest in all of the Specific Equipment listed in Exhibit A and Exhibit B to the Schedule to Loan and Security Agreement (collectively, the "Collateral"); and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Borrower's books relating to any and all of the above.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER.

*3.1* In order to induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows, and Borrower covenants that the following representations will to the best of Borrower's knowledge continue to be true, and that Borrower will at all times comply, in all material respects with all of the following covenants, throughout the term of this Agreement and until all Obligations have been paid and performed in full, except as disclosed in the Disclosure Schedule:

*3.1.1 Corporate Existence and Authority.* Borrower is and will continue to be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization. Borrower is and will continue to be qualified and licensed to do business in all jurisdictions in which any failure to do so would result in a Material Adverse Change. The execution, delivery and performance by Borrower of this Agreement, and all other documents contemplated hereby (i) have been duly and validly authorized, (ii) are enforceable against Borrower in accordance with their terms (except as enforcement may be limited by equitable principles and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to creditors' rights generally), and (iii) do not violate Borrower's articles or certificate of incorporation, or Borrower's by-laws, or Borrower's partnership

-1-

WUMI003672

agreement or operating agreement (as the case may be) or any law or any material agreement or instrument which is binding upon Borrower or its property, and (iv) do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property.

*3.1.2  Name; Trade Names and Styles.*  The name of Borrower set forth in the heading to this Agreement is its correct name. Listed in the Representations are all prior names of Borrower and all of Borrower's present and prior trade names. Borrower shall give Lender 30 days' prior written notice before changing its name or doing business under any other name. Borrower has complied, and will in the future comply, in all material respects, with all laws relating to the conduct of business under a fictitious business name.

*3.1.3  Place of Business; Location of Collateral.*  The address set forth in the heading to this Agreement is Borrower's chief executive office. In addition, Borrower has places of business and Collateral is located only at the locations set forth in the Representations, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity or area of its office address. Borrower will give Lender at least 30 days prior written notice before opening any additional place of business outside its current properties or holdings or changing its chief executive office. Borrower shall not move any of the Collateral to a location other than Borrower's Address or one of the locations set forth in the Representations or listed on Exhibit A, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity or area of its office address or listed on Exhibit A, without Lender's prior written consent. Notwithstanding anything to the contrary contained herein, Borrower shall not be obligated to notify Lender prior to exploring, drilling or mining in new locations unless the Collateral will be attached or affixed upon any such new locations.

*3.1.4  Title to Collateral; Perfection; Permitted Liens.*

(a)  Borrower is now, and will at all times in the future be, the sole owner of all the Collateral. The Collateral now is and will remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims. Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, and Borrower will at all times defend Lender and the Collateral against all claims of others.

(c)  In the event that Borrower shall at any time after the date hereof have any commercial tort claims against others relating to the Collateral, which it is asserting or intends to assert, and in which the potential recovery exceeds $50,000, Borrower shall promptly notify Lender thereof in writing and provide Lender with such information regarding the same as Lender shall request.

Such notification to Lender shall constitute a grant of a security interest in the commercial tort claim relating to the Collateral and all proceeds thereof to Lender, and Borrower shall execute and deliver all such documents and take all such actions as Lender shall request in connection therewith.

(d)  None of the Collateral now is or will be affixed to any real property, except in the case of: (i) the Collateral listed in Exhibit B to the Schedule to Loan and Security Agreement, which may only be affixed, if necessary, to land held in fee simple or patented mining claims owned by Borrower, and for which a first priority fixture filing for the benefit of Lender will be filed, such that Lender shall retain its first priority Lien on such Collateral; or (ii) following notice and consent of Lender and filing of a valid fixture filing covering the affixed Collateral for the benefit of Lender, such that Lender shall retain its first priority Lien on such Collateral.

*3.1.5  Maintenance of Collateral.*  Borrower will maintain the Collateral in good working condition (ordinary wear and tear excepted), and Borrower will not use the Collateral for any unlawful purpose. Borrower will immediately advise Lender in writing of any material loss or damage to the Collateral.

*3.1.6  Taxes affecting Collateral.*  Borrower has timely filed, and will timely file, all required tax returns and reports, and Borrower has timely paid, and will timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions now or in the future owed by Borrower with respect to, or that may encumber, the Collateral. Borrower not allow, regardless of whether such taxes are being contested taxes from becoming a lien upon any of the Collateral.

*3.1.7  Collateral's Maintenance and Compliance with Law.*  Borrower shall maintain and operate the Collateral in good working order, normal wear and tear excepted, and in compliance with laws applicable to the Collateral.

*3.1.8  Litigation involving Collateral.*  There is no claim, suit, litigation, proceeding or investigation pending or threatened against or affecting the Collateral. Should any third-party suit or proceeding be instituted by or against the Collateral or, Borrower shall, without expense to Lender, make reasonably available Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

*3.1.9  Use of Proceeds.*  All proceeds of the Loan shall be used solely for legal purposes and as may be shown on the Schedule or Exhibit B thereto. Borrower is not purchasing or carrying any "margin stock" (as defined in Regulation G of the Board of Governors of the Federal Reserve System) and no part of the proceeds of the Loan will be used to purchase or carry any "margin stock" or to

WUMI003673

David J. Richards, LLC

CS Mining Loan and Security Agreement

extend credit to others for the purpose of purchasing or carrying any "margin stock".

In order to induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows, and Borrower covenants that the following representations will to the best of Borrower's knowledge continue to be true, and that Borrower will at all times comply, in all material respects with all of the following covenants, following any Change of Control and until all Obligations have been paid and performed in full, except as disclosed in the Disclosure Schedule:

**3.2.1 Books and Records.** From Borrower has maintained and will maintain at Borrower's Address complete and accurate books and records consistent with past practice and as required by Borrower's Members and Board, comprising an accounting system in accordance with GAAP.

**3.2.2 Financial Condition, Statements and Reports.** All quarterly and annual financial statements delivered to Lender will be, to Borrower's knowledge, prepared in material conformity with GAAP and now and in the future will fairly present the results of operations and financial condition of Borrower, in accordance with GAAP.

**3.2.3 Reports.** Borrower, at its expense, shall provide Lender with the written reports set forth in the Schedule.

**3.2.4 Access to Collateral, Books and Records.** At reasonable times, and on one Business Day's notice, Lender, or its agents, shall have the right to inspect the Collateral, and the right to audit and copy Borrower's books and records. Any audits conducted by Lender beyond Borrower's normal audits shall be incurred at the expense of Lender.

**3.2.5. Litigation Cooperation.** Should any third-party suit or proceeding be instituted by or against Lender in connection herewith or that relates to Borrower and could be reasonably anticipated to cause a Material Adverse Change, Borrower shall, without expense to Lender, make reasonably available Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

**3.2.6 Notification of Changes.** Borrower will promptly notify Lender in writing of (i) any change in its officers or directors, and (ii) any Material Adverse Change.

**3.2.7. Certain Items.** Borrower shall not permit: (a) any default or event of default under any obligation secured by a Permitted Lien, which is not cured within any applicable cure period or waived in writing by the holder of the Permitted Lien, and which has resulted or may reasonably be expected to result in a Material Adverse Change; or (b) breach of any material contract or obligation, or other event, which has resulted or may reasonably be expected to result in a Material Adverse Change.

**4.   [INTENTIONALLY OMITTED]**

**5. ADDITIONAL DUTIES OF BORROWER.**

**5.1 Insurance.** Borrower shall, at all times insure all of the tangible personal property Collateral and carry such other business insurance, with insurers reasonably acceptable to Lender and disclosed to Lender in connection herewith, in such form and amounts disclosed to Lender, and Borrower shall provide evidence of such insurance to Lender. In the event of a loss of Collateral resulting in the payment of insurance proceeds to Borrower, Borrower shall provide written notice to Lender and, at Lender's request, Borrower shall instruct the applicable insurer to pay all applicable insurance proceeds directly to Lender. Upon receipt of the proceeds of any such insurance with respect to loss on the Collateral, Lender shall apply such proceeds in reduction of the Obligations as Lender shall determine in its good faith business judgment. If Borrower fails to provide or pay for any insurance, Lender may, but is not obligated to, obtain the same at Borrower's expense. Borrower shall promptly deliver to Lender copies of all material reports made to insurance companies with respect to the insurance required hereunder.

**5.2 Negative Covenants.** Except as may be permitted in the Schedule, Borrower shall not, without Lender's prior written consent (which shall be a matter of its good faith business judgment), do any of the following on or after the date hereof:

(i) sell, transfer or in any way encumber any Collateral;

(ii) store any Collateral with any warehouseman or other third party;

(iii) create, incur, assume or permit to be outstanding any material Indebtedness that may encumber the Collateral;

(iv) guarantee or otherwise become liable with respect to any material obligations of another party or entity in a manner that encumbers the Collateral;

(v) dissolve or elect to dissolve.

Transactions permitted by the foregoing provisions of this Section are only permitted if no Default or Event of Default has occurred and is continuing, or would occur as a result of such transaction. Notwithstanding anything to the contrary contained herein, the transfer or sale of equity among the Parent Members and their Affiliates are expressly permitted pursuant to the Agreement.

**5.3 Further Assurances.** Borrower agrees, at its expense, on request by Lender, to execute all documents and take all actions, as Lender, may, in its good faith business

-3-

David J. Richards, LLC                                                    CS Mining Loan and Security Agreement

judgment, deem necessary or useful in order to perfect and maintain Lender's perfected first-priority security interest in the Collateral (subject only to Permitted Liens), and in order to fully consummate the transactions contemplated by this Agreement in accordance with the parties intentions.

## 6.  TERM.

**6.1  Term.** This Agreement shall continue in full force and effect until all Obligations have been paid and performed in full; provided that if the only remaining Obligations hereunder are potential future indemnification Obligations, then this Agreement shall terminate except with respect to such provisions applicable to such indemnification obligations.

**6.2  Prepayment.** Borrower shall have the option of prepaying the unpaid principal balance of the Loan, in whole but not in part, prior to the date payment is due as provided in the Schedule, subject to any limitations set forth in the Schedule, and provided that Borrower pays the prepayment fees set forth in the Schedule; *provided, however,* that notwithstanding the foregoing, Borrower may prepay the Obligations at any time if Lender declares an Event of Default and/or acceleration.

**6.3  Termination Statements.** Upon payment and performance in full of all the Obligations, and execution and delivery by Borrower to Lender of a general release in a form reasonably acceptable to Borrower and Lender, Lender shall promptly terminate its financing statements and any other filings with respect to the Borrower and deliver to Borrower such other documents as may be required to fully terminate Lender's security interests and liens.   Notwithstanding any such termination, the indemnity provisions of this Agreement shall continue in full force and effect.

## 7.  EVENTS OF DEFAULT AND REMEDIES.

**7.1  Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement, and Borrower shall give Lender, and Lender shall provide Borrower, immediate written notice thereof upon becoming aware of any such Event of Default:

(a) Any material warranty, representation, statement, report or certificate made or delivered to Lender by Borrower or any of Borrower's officers, employees or agents, now or in the future, shall be untrue or misleading in a material respect, when made or deemed to be made; or

(b) Borrower shall fail to pay when due any Loan or any interest thereon or any other monetary Obligation owed to Lender; or

(c) Borrower shall fail to comply, in all material respects, with any of the financial covenants set forth in the Schedule, or shall fail to perform, in all material

respects, any other material non-monetary Obligation or covenant which by its nature cannot be cured; or

(d) Borrower shall fail to perform or correct any other material non-monetary Obligation or covenant, which failure is not cured within ten Business Days after the earlier of Borrower's (i) discovery of such failure, or (ii) receipt of notice of such failure from Lender; or

(e) any levy, assessment, attachment, seizure, lien or encumbrance (other than a Permitted Lien) is made on all or any part of the Collateral, which is not cured within 10 days after the occurrence of the same; or

(f) Dissolution, termination of existence, insolvency or business failure of Borrower or any Guarantor, if applicable; or appointment of a receiver, trustee or custodian, for all or any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding by Borrower or any Guarantor, if applicable, under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, which is not cured by the dismissal thereof within 45 days after the date of appointment or assignment; *provided, however,* that the foregoing shall not apply to temporary suspensions of mining or milling operations of Borrower that are not expected to have a Material Adverse Change; or

(g) the commencement of any proceeding against Borrower or any Guarantor, if applicable, under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, which is not cured by the dismissal thereof within 45 days after the date commenced; or

(l) Borrower makes any payment on account of any indebtedness or obligation which has been subordinated to the Obligations other than as permitted in the applicable subordination agreement, or if any Person, who has subordinated such indebtedness or obligations, terminates or in any way limits his subordination agreement; or

(l) there shall be a change in the authorized agents of the Borrower as disclosed in the Disclosure Schedule, and such person is not replaced with another person reasonably acceptable to Lender in its good faith business judgment within 30 days thereafter; or

(n) Borrower shall generally not pay its debts as they become due, or Borrower shall conceal, remove or transfer any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law.

-4-

WUMI003675

David J. Richards, LLC          CS Mining Loan and Security Agreement

Lender may cease making any disbursements of the Loan hereunder during the Cure Period (as defined below), and thereafter if an Event of Default has occurred and is continuing.

Upon providing or receiving notice of any Event of Default hereunder, Borrower shall have a period (the "Cure Period") equal to thirty (30) days, or if such Event of Default is not capable of cure within thirty (30) days, such longer period as is necessary to cure such Event of Default, provided that the latter case of extension beyond the 30-day cure period shall only continue to apply if (i) Borrower continues to diligently pursue the cure of such Event of Default and (ii) the continuance of such Event of Default has not caused, and would not be reasonably be anticipated to cause, a Material Adverse Change due to such continuance beyond a 30-day Cure Period; *provided, however*, that (a) the Borrower shall not be provided a Cure Period for Events of Default that are not capable for cure or remedy, through the payment of damages or otherwise, and (b) if a shorter time period that the foregoing Cure Period is specified in this Agreement, such shorter period shall control as the required time period for cure of the Event of Default.

*7.2 Remedies.* Upon the occurrence and during the continuance of any Event of Default, and at any time thereafter when such Event of Default is not cured, Lender, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower), may cease extending credit to Borrower under this Agreement or any other Loan Document. Upon the occurrence and during the continuance of any Event of Default, and the expiration of the Cure Period, Lender, at its option, may do any one or more of the following: (a) Accelerate and declare all or any part of the Obligations to be immediately due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument or agreement evidencing or relating to any Obligation; (b) Take possession of any or all of the Collateral wherever it may be found, and for that purpose Borrower hereby authorizes Lender without judicial process to enter onto any of Borrower's premises without interference to search for, take possession of, keep, store, or remove any of the Collateral, and remain on the premises or cause a custodian to remain on the premises in exclusive control thereof, without charge for so long as Lender deems it necessary, in its good faith business judgment, in order to complete the enforcement of its rights under this Agreement or any other agreement; provided, however, that should Lender seek to take possession of any of the Collateral by court process, Borrower hereby irrevocably waives: (i) any bond and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession; (ii) any demand for possession prior to the commencement of any suit or action to recover possession thereof, other than notice hereunder; and (iii) any

requirement that Lender retain possession of, and not dispose of, any such Collateral until after trial or final judgment; (c) Require Borrower to assemble any or all of the Collateral and make it available to Lender at places designated by Lender which are reasonably convenient to Lender and Borrower, and to remove the Collateral to such locations as Lender may deem advisable; (d) Complete reasonable processing, manufacturing or repair of any Collateral prior to a disposition thereof and, for such purpose and for the purpose of removal, Lender shall have the right to use Borrower's premises, vehicles, hoists, lifts, cranes, and other Equipment and all other property without charge; and (e) Sell, lease or otherwise dispose of any of the Collateral, in its condition at the time Lender obtains possession of it or after further manufacturing, processing or repair, at one or more public and/or private sales, in lots or in bulk, for cash, exchange or other property, or on credit, and to adjourn any such sale from time to time without notice other than oral announcement at the time scheduled for sale; *provided, however*, that in all cases Lender (I) shall exercise reasonable care in any use of Borrower's Equipment and only use Borrower's Equipment if Lender's use would not be reasonably expected to damage such Equipment, (II) if Lender uses Borrower's Equipment or enters upon Borrower's premises, Lender shall comply with all applicable laws, rules and regulations regarding the use of, or entrance upon, Borrower's Equipment or premises, or that are applicable to Borrower, including all safety and hazard rules and regulations applicable to Borrower's premises and work areas. Lender shall have the right to conduct such disposition on Borrower's premises without charge and following notice hereunder, for such time or times as Lender deems reasonable, or on Lender's premises, or elsewhere and the Collateral need not be located at the place of disposition. Lender may directly or through any affiliated company purchase or lease any Collateral at any such public disposition, and if permissible under applicable law, at any private disposition. Any sale or other disposition of Collateral shall not relieve Borrower of any liability Borrower may have if any Collateral is defective as to title or physical condition or otherwise at the time of sale, unless (i) such title defect or physical condition was directly caused by Lender's actions, or (ii) such title defect or physical condition is remedied by Borrower within the Cure Period. All reasonable attorneys' fees, expenses, costs, liabilities and obligations incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.

*7.3 Standards for Determining Commercial Reasonableness.* Borrower and Lender agree that a sale or other disposition (collectively, "sale") of any Collateral which complies with the following standards will conclusively be deemed to be commercially reasonable: (i)

WUMI003676

**David J. Richards, LLC**                                    **CS Mining Loan and Security Agreement**

Notice of the sale is given to Borrower at least ten days prior to the sale, and, in the case of a public sale, notice of the sale is published at least five days before the sale in a newspaper of general circulation in the county where the sale is to be conducted; (ii) Notice of the sale describes the collateral in general, non-specific terms; (iii) The sale is conducted at a place designated by Lender, with or without the Collateral being present; (iv) The sale commences at any time between 8:00 a.m. and 6:00 p.m; (v) Payment of the purchase price in cash or by cashier's check or wire transfer, or by deferred payment obligation acceptable to Lender in its discretion, is required; (vi) With respect to any sale of any of the Collateral, Lender may (but is not obligated to) direct any prospective purchaser to ascertain directly from Borrower any and all information concerning the same. Lender shall be free to employ other methods of noticing and selling the Collateral, in its discretion, if they are commercially reasonable.

*7.4 Power of Attorney.* Upon the occurrence and during the continuance of any Event of Default and the expiration of the Cure Period, without limiting Lender's other rights and remedies, Borrower grants to Lender an irrevocable power of attorney coupled with an interest, authorizing and permitting Lender (acting through any of its employees, attorneys or agents) at any time, at its option, but without obligation, with notice to Borrower, and at Borrower's expense, to do any or all of the following, in Borrower's name or otherwise, but Lender agrees that if it exercises any right hereunder, it will do so in good faith and in a commercially reasonable manner: (a) Execute on behalf of Borrower any documents that Lender may, in its good faith business judgment, deem advisable in order to perfect and maintain Lender's security interest in the Collateral, or in order to exercise a right of Borrower or Lender, or in order to fully consummate all the transactions contemplated under this Agreement, and all other Loan Documents; (b) Pay, contest or settle any lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (c) Pay any sums required on account of Borrower's taxes or to secure the release of any liens therefor, or both; (d) Settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefor; (e) endorse the name of Borrower upon any instruments, or documents, as evidence of payment or collateral that may come into Lender's possession, (f) Instruct any third party having custody or control of any books or records belonging to, or relating to, Borrower to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement; and (g) Take any action or pay any sum required of Borrower pursuant to this Agreement and any other Loan Documents. Any and all reasonable sums paid and any and all reasonable costs, expenses, liabilities, obligations and attorneys' fees

incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. In no event shall Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement be deemed to indicate that Lender is in control of the business, management or properties of Borrower.

*7.5 Application of Proceeds.* All proceeds realized as the result of any sale of the Collateral shall be applied by Lender to the Obligations in such order as Lender shall determine in its sole discretion. Any surplus shall be paid to Borrower or other persons legally entitled thereto; Borrower shall remain liable to Lender for any deficiency. If, Lender, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Lender shall have the option, exercisable at any time, in its good faith business judgment, of either reducing the Obligations by the principal amount of purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of the cash therefore; *provided, however,* that if Lender chooses to accept a deferred payment obligation, such deferred payment obligation shall be deemed paid when accepted by Lender.

*7.6 Remedies Cumulative.* In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded a secured party under the Ohio Uniform Commercial Code and under all other applicable laws, and under any other instrument or agreement now or in the future entered into between Lender and Borrower, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies, if the Obligations have not been satisfied and performed in full. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed.

**8. *DEFINITIONS.*** As used in this Agreement, the following terms have the following meanings:

"Account Debtor" means the obligor on an Account.

"Accounts" means all present and future "accounts" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable and other sums owing to Borrower.

"Affiliate" means, with respect to any Person, a relative, partner, shareholder, director, officer, or employee of such Person, or any parent or subsidiary of

-6-

WUMI003677

David J. Richards, LLC                                          CS Mining Loan and Security Agreement

such Person, or any Person controlling, controlled by or under common control with such Person.

"Business Day" means a day on which Lender is open for business.

"Capital Expenditures" means all expenditures made and liabilities incurred for the acquisition of any fixed asset or improvement, replacement, substitution or addition thereto which has a useful life of more than one year and including, without limitation, those arising in connection with any lease of property by Borrower that, in accordance with GAAP, should be capitalized for financial reporting purposes and reflected as a liability on the balance sheet of Borrower.

"Change of Control" shall mean: (a) a change in the record or beneficial ownership of an aggregate of more than 50% of the outstanding shares of stock of, or equity ownership interest in, Borrower or Borrower's Parent, in one or more transactions, compared to the ownership of the same in effect on the date hereof, without the prior written consent of Lender; or (b) a change in composition of the equity or operating agreement of Borrower such that a current Member of Borrower's Parent loses the right to appoint any managers to the Borrower's Parent's board of managers.

"Code" means the Uniform Commercial Code as adopted and in effect in the State of Ohio from time to time.

"Collateral" has the meaning set forth in Section 2 above.

"continuing" and "during the continuance of" when used with reference to a Default or Event of Default means that the Default or Event of Default has occurred and has not been either waived in writing by Lender or cured within any applicable cure period.

"Cure Period" is defined in Section 7.1.

"Default" means any event which with notice would constitute an Event of Default.

"Default Rate" has the meaning set forth in the Schedule.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Disbursement Date" is defined in Section 1 of the Schedule.

"Disclosure Schedule" means that certain schedule attached hereto, with section numbers corresponding to the Sections of this Agreement, that sets forth exceptions

or qualifications to the representations, warranties, and covenants set forth herein. Items provided to Lender through Borrower's electronic document data room provided to Lender shall be deemed disclosed in the Disclosure Schedule, and items disclosed in one Section of the Disclosure Schedule, shall be deemed disclosed in other Section(s) of the Disclosure Schedule and with respect to other Section(s) of this Agreement to the extent reasonably evident that such disclosure applies to such other Section(s).

"Equipment" means all present and future "equipment" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"Event of Default" means any of the events set forth in Section 7.1 of this Agreement.

"GAAP" means generally accepted accounting principles consistently applied.

"good faith business judgment" means honesty in fact and good faith (as defined in Section 1201 of the Code) in the exercise of Lender's business judgment.

"Guarantor" means any Person who has guaranteed, or in the future guarantees, any of the Obligations.

"including" means including (but not limited to).

"Indebtedness" means all of Borrower's present and future obligations, liabilities, debts, claims and indebtedness, contingent, fixed or otherwise, however evidenced, created, incurred, acquired, owing or arising, whether under written or oral agreement, operation of law or otherwise to any Person, and includes, without limiting the foregoing (i) the Obligations, (ii) obligations and liabilities of any Person secured by a lien, claim, encumbrance or security interest upon property owned by Borrower, even though Borrower has not assumed or become liable therefor, (iii) obligations and liabilities created or arising under any lease (including capital leases) or conditional sales contract or other title retention agreement with respect to property used or acquired by Borrower, even though the rights and remedies of the lessor, seller or lender are limited to repossession, (iv) all unfunded pension fund obligations and liabilities, and (v) deferred taxes.

"Inventory" means all present and future "inventory" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in

WUMI003678

David J. Richards, LLC

CS Mining Loan and Security Agreement

transit, and including any returned goods and any documents of title representing any of the above.

"Investment" means any beneficial ownership interest in any Person (including stock, securities, partnership interest, limited liability company interest, or other interests), and any material loan, advance or capital contribution to any Person (including the creation or capital contribution to any wholly-owned or partially-owned subsidiary).

"Loan Documents" means, collectively, this Agreement, the Representations, and all other present and future documents, instruments and agreements between Lender and Borrower, including, but not limited to those relating to this Agreement, and all amendments and modifications thereto and replacements therefor.

"Material Adverse Change" means any of the following: (i) a material and significant adverse change in the business, operations, or financial or other significant condition of the Borrower, or (ii) a material and significant impairment of the prospect of repayment of any portion of the Obligations; or (iii) a material and significatn impairment of the value or priority of Lender's security interests in the Collateral.

"Obligations" means the Loan and all other present and future loans, advances, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any note or other instrument or document, or otherwise, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Borrower's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, reasonable expenses, fees, and reasonable attorney's fees, expert witness fees, audit fees, letter of credit fees, collateral monitoring fees, closing fees, facility fees, equipment liquidation fees, auction fees, appraisal fees, termination fees, minimum interest charges and any other sums chargeable to Borrower under, and in each case subject to the terms and conditions of, this Agreement or under any other Loan Documents.

"Parent" or "Borrower's Parent" means Skye Mineral Partners, LLC.

"Payment" means all checks, wire transfers and other items of payment received by Lender for credit to Borrower's outstanding Obligations.

"Permitted Investments" means:

(i)  Investments in Subsidiaries shown on the Representations and existing on the date hereof;

(ii)  cash and cash equivalents;

(iii) Investments consisting of Deposit Accounts;

(iv) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(v) Investments in accordance with the Borrower's business plan, disclosed on the Disclosure Schedule, or necessary for bonding or permitting; and

(vi) Investments in new Subsidiaries created for specific business reasons or in accordance with Borrower's business plan.

"Permitted Liens" means the following:

(i) purchase money security interests, or security interests for vendor financing, in specific items of Equipment that are not Collateral;

(ii) leases of specific items of Equipment that are not Collateral;

(iii) liens for taxes or assessments not yet payable;

(iv) additional security interests and liens which are subordinate to the security interest of Lender in the Collateral and are consented to in writing by Lender, which consent may be withheld in its good faith business judgment;

(iv) security interests and liens that do not encumber the Collateral;

(vi) security interests being terminated substantially concurrently with this Agreement;

(vii) liens existing as of the date hereof and disclosed in the Disclosure Schedule; and

(viii) liens disclosed in the Borrower's business plan or associated with any required bonding for Borrower's activities or operations.

Lender will have the right to require, as a condition to its consent under subparagraph (iv) above, that the holder of the additional security interest or lien sign an intercreditor agreement on Lender's then standard and customary form, acknowledge that the security interest is subordinate to the security interest in favor of Lender, and agree not to take any action to enforce its subordinate security interest so long as any Obligations remain outstanding, and that Borrower agree that any uncured default in any obligation secured by the subordinate security interest shall also constitute an Event of Default under this Agreement.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, government, or any agency or political division thereof, or any other entity.

WUMI003679

David J. Richards, LLC                                            CS Mining Loan and Security Agreement

"Representations" means the written Representations and Warranties provided by Borrower to Lender referred to in the Schedule.

Other Terms. All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP, consistently applied. All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the Code, to the extent such terms are defined therein.

## 9. GENERAL PROVISIONS.

*9.1 Computations.* Payments received by Lender (including payment of the Obligations in full) shall be deemed applied by Lender on account of the Obligations on receipt by Lender of immediately available funds; provided that immediately available funds received after 12:00 Noon Pacific Time on any day shall be deemed received on the next Business Day. Lender shall not be required to credit Borrower's account for the amount of any item of payment which is unsatisfactory to Lender in its reasonable and good faith business judgment.

*9.2 Application of Payments.* All payments with respect to the Obligations may be applied, and in Lender's good faith business judgment reversed and re-applied, to the Obligations, in such order and manner as Lender shall determine in its reasonable and good faith business judgment.

*9.3 Monthly Accountings.* Lender shall provide Borrower monthly with a Statement of Account. Such account shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless (a) Borrower notifies Lender in writing to the contrary within 60 days after such account is rendered, describing the nature of any alleged errors or omissions, or (b) the Statement of Account contained a material error or miscalculation.

*9.4 Notices.* All notices to be given under this Agreement shall be in writing and shall be given either personally or by reputable private delivery service or by regular first-class mail, or certified mail return receipt requested, addressed (i) to Borrower at the address shown in the heading to this Agreement, or (ii) to Lender at the address shown in the heading to this Agreement, or (iii) for either party at any other address designated in writing by one party to the other party. All notices shall be deemed to have been given upon delivery in the case of notices personally delivered, or at the expiration of one Business Day following delivery to the private delivery service, or two Business Days following the deposit thereof in the United States mail, with postage prepaid.

*9.5 Severability.* Should any provision of this Agreement be held by any court of competent jurisdiction to be void or unenforceable, such defect shall not affect the remainder of this Agreement, which shall continue in full force and effect.

*9.6 Integration.* This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith are the final, entire and complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated in this Agreement. There are no oral understandings, representations or agreements between the parties which are not set forth in this Agreement or in other written agreements signed by the parties in connection herewith.

*9.7 Waivers; Indemnity.* The failure of Lender at any time or times to require Borrower to strictly comply with any of the provisions of this Agreement or any other Loan Document shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith. Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar. None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower. Borrower waives the benefit of all statutes of limitations relating to any of the Obligations or this Agreement or any other Loan Document, and Borrower waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, instrument, account, General Intangible, document or guaranty at any time held by Lender on which Borrower is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement. Borrower hereby agrees to indemnify Lender and its affiliates, subsidiaries, parent, directors, officers, employees, agents, and attorneys, and to hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every kind, which they may sustain or incur based upon or arising out of any of the Obligations, or any relationship or agreement between Lender and Borrower, or any other matter, relating to Borrower or the Obligations created hereunder; provided that this indemnity shall not extend to damages proximately caused by the indemnitee's own gross negligence, unlawful actions or omissions, willful or intentional misconduct. Notwithstanding any provision in this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive any termination of this Agreement and shall for all purposes continue in full force and effect.

*9.8 Liability.* NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES,

WUMI003680

David J. Richards, LLC                                       CS Mining Loan and Security Agreement

DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE LIABLE FOR ANY CLAIMS, DEMANDS, LOSSES OR DAMAGES, OF ANY KIND WHATSOEVER, MADE, CLAIMED, INCURRED OR SUFFERED BY BORROWER OR ANY OTHER PARTY THROUGH THE ORDINARY NEGLIGENCE OF LENDER, OR ITS PARENT OR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS, BUT NOTHING HEREIN SHALL RELIEVE LENDER FROM LIABILITY FOR ITS OWN GROSS NEGLIGENCE, UNLAWFUL ACTIONS OR OMISSIONS, WILLFUL OR INTENTIONAL MISCONDUCT. NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE RESPONSIBLE OR LIABLE TO BORROWER OR TO ANY OTHER PARTY FOR ANY INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF ANY FINANCIAL ACCOMMODATION HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR AS A RESULT OF ANY OTHER ACT, OMISSION OR TRANSACTION THAT IS NOT THE RESULT OF WILLFUL OR INTENTIONAL MISCONDUCT. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, Lender (I) shall exercise reasonable care in any use, handling, foreclosure upon or sale of the Collateral and any use of Borrower's Equipment, and only use Borrower's Equipment if Lender's use would not be reasonably expected to damage such Equipment, (II) if Lender uses Borrower's Equipment or enters upon Borrower's premises, Lender shall comply with all applicable laws, rules and regulations regarding the use of, or entrance upon, Borrower's Equipment or premises, or that are applicable to Borrower, including all safety and hazard rules and regulations applicable to Borrower's premises and work areas.

*9.9   Amendment.*   The terms and provisions of this Agreement may not be waived or amended, except in a writing executed by Borrower and a duly authorized officer of Lender.

*9.10   Time of Essence.*   Time is of the essence in the performance by Borrower of each and every obligation under this Agreement.

*9.11   Attorneys Fees and Costs.*   Borrower shall reimburse Lender for all reasonable attorneys' fees and all reasonable filing, recording, search, title insurance, appraisal, audit, and other reasonable costs incurred by Lender, pursuant to, or in connection with, or relating to this Agreement (whether or not a lawsuit is filed), including, but not limited to, any reasonable attorneys' fees and costs Lender incurs in order to do the following:

prepare and negotiate this Agreement and all present and future documents relating to this Agreement; obtain legal advice in connection with this Agreement or Borrower; enforce, or seek to enforce, any of its rights; prosecute actions against, or defend actions by, Account Debtors; commence, intervene in, or defend any action or proceeding; initiate any complaint to be relieved of the automatic stay in bankruptcy; file or prosecute any probate claim, bankruptcy claim, third-party claim, or other claim; examine, audit, copy, and inspect any of the Collateral or any of Borrower's books and records; protect, obtain possession of, lease, dispose of, or otherwise enforce Lender's security interest in, the Collateral; and otherwise represent Lender in any litigation relating to Borrower that is material to Lender or the Collateral; in each case, however, subject to the following: (i) all such expenses shall be subject to the terms set forth in this Agreement and any Schedules attached hereto, (ii) while an Event of Default is not continuing, Lender shall, if possible, notify Borrower prior to incurring expenses that exceed $1,000; (iii) Lender's attorney's fees in connection with the preparation of this Agreement and related agreements shall not exceed $10,000 without Borrower's consent; and (iv) the following terms of this Section and the terms of Section 9.18. If either Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and attorneys' fees, including (but not limited to) reasonable attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Lender may be entitled pursuant to this Paragraph shall immediately become part of Borrower's Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.

*9.12   Benefit of Agreement.*   The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; provided, however, that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void. No consent by Lender to any assignment shall release Borrower from its liability for the Obligations. Lender shall not sell, transfer or assign this Agreement or any Loans without providing notice to Borrower and obtaining Borrower's consent, not to be unreasonably withheld.

*9.13   Intentionally Omitted.*

*9.14   Limitation of Actions.*   Any claim or cause of action by Borrower against Lender, its directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Loan Agreement, or any other Loan Document, or any other transaction contemplated hereby or thereby or relating hereto or

-10-

WUMI003681

David J. Richards, LLC                                          CS Mining Loan and Security Agreement

thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Lender, its directors, officers, employees, agents, accountants or attorneys, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one year after Borrower should have discovered, based on reasonable due diligence, the first act, occurrence or omission upon which such claim or cause of action, or any material part thereof, is based, and the service of a summons and complaint on an officer of Lender, or on any other person authorized to accept service on behalf of Lender, within thirty (30) days thereafter. Borrower agrees that such one-year period is a reasonable and sufficient time for Borrower to investigate and act upon any such claim or cause of action. The one-year period provided herein shall not be waived, tolled, or extended except by the written consent of Lender in its sole discretion. This provision shall survive any termination of this Loan Agreement or any other Loan Document.

*9.15 Paragraph Headings; Construction.* Paragraph headings are only used in this Agreement for convenience. Borrower and Lender acknowledge that the headings may not describe completely the subject matter of the applicable paragraph, and the headings shall not be used in any manner to construe, limit, define or interpret any term or provision of this Agreement. This Agreement has been fully reviewed and negotiated between the parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

*9.16 Public Announcement.* Borrower hereby agrees that Lender may make a public announcement of the transactions contemplated by this Agreement, without disclosing the specific terms of the transactions contemplated hereunder, and may publicize the same in marketing materials, newspapers and other publications, and otherwise, and in connection therewith may use "private equity owned Utah-based mining company" to describe Borrower.

*9.17 Governing Law; Jurisdiction; Venue.* This Agreement and all acts, transactions disputes and controversies arising hereunder or relating hereto, and all rights and obligations of the parties shall be governed by, and construed in accordance with, the internal laws (and not the conflict of laws rules) of the State of Ohio. Each party consents to the jurisdiction of courts located within Franklin County, Ohio and the referee referred to in Section 9.18 below, and agrees that the exclusive venue for all actions and proceedings relating directly or indirectly to this Agreement shall be Franklin County, Ohio, and each party waives any and all rights the party may have to object to the jurisdiction of any such court or said referee, or to transfer or change the venue of any

such action or proceeding, including, without limitation, any objection to venue or request for change in venue based on the doctrine of *forum non conveniens*. Borrower consents to service of process in any action or proceeding brought against it by Lender, by personal delivery, or by mail addressed as set forth in this Agreement or by any other method permitted by law.

*9.18 Intentionally Omitted.*

*9.19 Mutual Waiver of Jury Trial.* **BORROWER AND LENDER EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO, THIS AGREEMENT OR ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND BORROWER, OR ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN ALL OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.**

**Borrower:**


**CS MINING, LLC**

Tax ID # 45-3088341

By _____
     **Russell D. Alley, CEO**


**Lender:**

**David J. Richards, LLC**


By _____
     **David J. Richards, Manager**

-11-

WUMI003682

# David J. Richards, LLC

# Schedule #1 to

# Loan and Security Agreement

**Borrower:**   **CS Mining, LLC**

**Address:**    **P.O. Box 608**
                **1208 South 200 West**
                **Milford, Utah 84751**

**Date:**       **August 10, 2012**

This Schedule #1 forms an integral part of the Loan and Security Agreement between David J. Richards, LLC and the above-borrower of even date.

1. **LOAN AMOUNT** (Section 1.1):

   Capital Expenditures Line ("Capex Line"): **$ 3,500,000**

   Advances under the Capex Line shall be limited to $1,000,000 until Borrower reports a Debt Service Coverage of at least 1.0x for at least 3 consecutive months after commencing operations. Additionally, at the time of any advance after the initial $1,000,000 of advances, Borrower shall be required to have a collateral coverage ratio of at least 1.2x based on the Net Orderly Liquidation Value ("NOLV") of existing Collateral plus the estimated NOLV of equipment purchased under the Capex Line. Borrower may be required to pledge additional unencumbered equipment as Collateral at the time of future advances to meet this requirement, if any new Collateral purchased with future advances is not sufficiently valuable to maintain this coverage ratio, and subject to the below.

   Borrower may request up to 4 Loans under the Capex Line per quarter for up to 4 quarters after the date of this Agreement upon satisfaction of the conditions set forth in this Agreement. In addition to satisfaction of the Conditions set forth in this Agreement, Borrower's right to draw advances under the Capex Line in excess of $1,000,000 shall be subject to Lender's prior approval, which may be withheld in Lender's sole discretion. Advances under the Capex Line may be used to purchase 100% of the hard cost of Eligible Equipment. Eligible Equipment may include both new and used equipment and

-1-

WUMI003683

David J. Richards, LLC                     Schedule #1 to CS Mining Loan and Security Agreement

shall exclude any soft costs (such as installation, service contracts, warranties, delivery fees and other such expenses outside of the cost of the actual equipment). At the end of each quarter, the sum of the disbursements shall be aggregated into a schedule.

Advances under the Capex Line shall be repaid as follows:

Prior to the aggregating of the individual advances under the Capex Line into a schedule at the end of each quarter, Borrower shall pay interest monthly payable on the 1st day of each month on the average monthly balance during the prior month. Payments on the aggregate amount of disbursements evidenced by the schedules shall be due on the 1st day of each month subsequent to the creation of the schedule in equal payments of principal and interest based on a 48-month amortization and the interest rate stated below. On the Maturity Date, Borrower shall make a balloon payment which shall include all outstanding principal and accrued interest.

If any payment of principal or accrued interest is not made within ten days after the date due, Borrower shall pay Lender a late payment fee equal to 5% of the amount of such late payment. The provisions of this paragraph shall not be construed as Lender's consent to Borrower's failure to pay any amounts when due, and Lender's acceptance of any such late payments shall not restrict Lender's exercise of any remedies arising out of any such failure.

## 2. INTEREST.

**Interest Rate** (Section 1.2):

During the period from the closing date until Borrower reports a Debt Service Coverage of at least 1.0x for at least one full month of operations, the Loans shall bear a fixed interest rate of 1.35% per month on the average outstanding balance. Starting on the 1st of the month following Lender's receipt of financial reports showing Debt Service Coverage of at least 1.0x for at least one full month, advances under the Capex Line shall bear interest at a floating interest rate equal to the sum of the Prime Index Rate, plus 9.25% per annum, currently at 12.5%, but will have a fixed / set monthly payment for the entire term for cash flow and accounting purposes. If the Prime Index Rate, currently 3.25%, should increase, the interest due will be billed accordingly on a quarterly basis. Conversely, if the prime rate should go down, the Borrower will benefit on this as well, but never lower than the initial interest rate at funding of 12.5%.

WUMI003684

David J. Richards, LLC

Schedule #1 to CS Mining Loan and Security Agreement

Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. Without limiting any of Lender's rights and remedies, from and after the occurrence and during the continuance of any Event of Default and the expiration of the Cure Period or other applicable cure period, the interest rate applicable to the Obligations shall be increased by an additional five percent (5.0%) per annum (the "Default Rate").

**3. FEES** (Section 1.4):

Facility Fee:

A Facility Fee of one and three-fourths of one percent (1.75%) of the initial $1,000,000 in advances under the Capex Line ($ 17,500) will be paid from the proceeds of the funding due at close.   A Facility Fee of one percent (1.0%) on all subsequent advances under the Capex Line shall be earned at the time of each advance, but payable from the proceeds of the funding at the time that advances are bundled into schedules at the end of each quarter.

Prepayment and Prepayment Fees:

In months 1-24 of the Loans a two percent (2.0%) prepayment fee will be assessed. All prepayment penalties will be assessed against the original principal amount of aggregate advances under the Capex Line. Notwithstanding the foregoing, Borrower may prepay the Obligations at any time if Lender declares an Event of Default and/or acceleration.

Said prepayment fee shall be due from Borrower to Lender upon any prepayment of the principal of any Loan, including without limitation any prepayment as a result of an Event of Default or the exercise of any rights or remedies by Lender following the same.  Prepayments of the principal amount of any Loan shall be applied to the payments set forth herein in the inverse order of their maturity.

Wire Fee:

$25.00 per wire.

**4. MATURITY DATE**
(Section 6.1):

The earliest of the following dates ("Maturity Date"): (i) the date that all advances under the Capex Line have been paid in full; or (ii) July 31, 2017; or (iii) the date this Agreement terminates by its terms or is terminated, as provided in this Agreement. On the Maturity Date (or, if earlier, upon acceleration of the Obligations in accordance with the terms of this Agreement), the entire unpaid principal balance of the Term Loan, plus all other Obligations relating to the Term Loan (including accrued and unpaid interest thereon) shall be due and payable.

WUMI003685

David J. Richards, LLC                  Schedule #1 to CS Mining Loan and Security Agreement

## 5. FINANCIAL COVENANTS
(Section 5.1):

Borrower shall comply with each of the following covenants. Compliance shall be determined as of the end of each fiscal month:

_Minimum Cash Balance._ Borrower shall maintain a minimum Cash Balance of at least $500,000 until Borrower reports a Debt Service Coverage of at least 1.0x for at least 3 consecutive months after commencing flotation mill operations and processing.

## 6. REPORTING.
(Section 5.3):

Following any Change of Control, Borrower shall provide Lender with the following:

(a) Borrower shall provide Lender with copies of CPA-audited annual business financial statements within 120 days of the company's fiscal year end for the year ending December 31, 2012 and each year thereafter, which shall be prepared in accordance with GAAP.

(b) Borrower shall provide Lender with copies of internally prepared monthly business financial statements within 30 days of the company's fiscal month end; Borrower's balance sheet, profit & loss statement, and cash flow statement contained in Borrower's Monthly Operating Reports and periodic statements will be prepared, to the best of Borrower's knowledge, in accordance with GAAP. Borrower's Monthly Operating Reports shall be true and correct to the best of Borrower's knowledge.

(c) Each of the financial statements in subsections (a), and (b) above shall be accompanied by Compliance Certificates, signed by the Chief Executive Officer of Borrower, certifying that, to the best of his knowledge, as of the end of such period Borrower was in full compliance with all of the terms and conditions of this Agreement. Borrower's quarterly financial statements shall be prepared in accordance with GAAP, to the best of Borrower's knowledge.

(d) Borrower shall provide Lender with copies of corporate income tax returns, or its extension, within 10 days of their filing, but in no event later than 10 months after its fiscal year end.

(e) Annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower no later than 30 days prior to the end of each fiscal year of Borrower, beginning with year 2013.

-4-

WUMI003686

(f) Other information requested by Lender in its reasonable and good faith business judgment.

## 7. BORROWER INFORMATION:

Borrower represents and warrants that the information set forth in the Representations and Warranties of the Borrower dated March 27, 2012 previously submitted to Lender (the "Representations") is true and correct as of the date hereof.

## 8. ADDITIONAL PROVISIONS

(a) **Specified Equipment.** As used herein, "Specified Equipment" means the following:

  1. the Equipment listed on Exhibit A hereto.

  2. the New Equipment listed on Exhibit B hereto.

  3. all present and future additions, attachments, accessions, accessories, and accessions to the foregoing, and any and all substitutions, replacements or exchanges therefore, and any and all insurance and other proceeds of the foregoing, and all warranty claims and all other claims and rights of every kind relating to any of the foregoing. (Any mistake in any serial number listed on Exhibit A or Exhibit B shall not affect the above equipment's status as "Specified Equipment").

(b) **Subordination of Inside Debt.** All present and future indebtedness of Borrower to its officers, directors and shareholders ("Inside Debt") shall, at all times, be subordinated to this Loan and Security Agreement and any liens with respect to the Inside Debt shall be, and hereby are, subordinated to Lender's liens and Security Interests in the Collateral. The foregoing subordination shall not apply, however, to Inside Debt that is secured by separate collateral distinct from the Collateral. Borrower represents and warrants that there is no Inside Debt presently outstanding other than those certain loans held by and due to the parent company of Borrower Skye Mineral Partners, LLC in the amount of $24,025,346.66 as of November 10, 2011. Prior to incurring any additional Inside Debt in the future, Borrower shall cause the person to whom such Inside Debt will be owed to execute and deliver to Lender a subordination agreement on Lender's standard form. The foregoing shall not prohibit or prevent the Company from obtaining third-party debt that encumbers assets separate and distinct from the Collateral.

WUMI003687

David J. Richards, LLC                    Schedule #1 to CS Mining Loan and Security Agreement

Borrower:                                 Lender:

**CS MINING, LLC**                        **David J. Richards, LLC**

By_____       By_____
    Russell Alley - CEO                         David J. Richards, Manager

-6-

WUMI003688

**David J. Richards, LLC**                    **Schedule #1 to CS Mining Loan and Security Agreement**

Borrower:                          Lender:

  **CS MINING, LLC**                 **David J. Richards, LLC**

By_____      By_____
    Russell Alley - CEO                 David J. Richards, Manager

WUMI003689

## EXHIBIT A

### SPECIFIC EQUIPMENT

CATERPILLAR® 14G MOTOR ROAD GRADER (1985), S/N: 96U06420

CATERPILLAR® 16G MOTOR ROAD GRADER (1988-1989), S/N: 93U02885

CATERPILLAR® 330CL TRACK HOE, S/N: DKY02492

CATERPILLAR® 385BL EXCAVATOR (2003), S/N: ANS00295

CATERPILLAR® 773B HAUL TRUCK (1995), S/N: 63W03899

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N: 63W04504

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N: 63W04509

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N: 63W04374

CATERPILLAR® 966G WHEEL LOADER (2000), S/N: 3SW00823

CATERPILLAR® 988G LOADER (2002), S/N: BNH00506

CATERPILLAR® 992C WHEEL LOADER (1991), S/N: 49Z01839

CATERPILLAR® D10R TRACK DOZER (1999), S/N: 3KR01362

CATERPILLAR® D8H DOZER, (1974), S/N: 46A34012

That Certain New Equipment listed on Exhibit B, which the initial $1 million Capex Line proceeds will be utilized to purchase or reimburse the purchase by the Company.

**Equipment locations:**

Borrower's Address or one of the locations set forth in the Representations, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity of its office address. For purposes of clarity, none of Borrower's mining claims or real properties are including as Collateral under this Agreement.

**BORROWER:**

**CS MINING, LLC**

By _____

Russell Alley - CEO

## EXHIBIT B

### USE OF PROCEEDS AND NEW EQUIPMENT

| Item | Quantity | S/N | Cost |
|---|---|---|---|
| S70 Bobcat Skid-Steer Loader | 1 | | $19,330.15 |
| Magnetite Circuit Screens, Machine: Model 2SG48-60W-5STK Stack-Sizer™ of carbon steel construction | 2 | | $357,458.00 |
| FLOW DIVIDER: 72" Diameter 10-Way Flow Divider of carbon steel construction and vulcanized rubber lining | 1 | | $43,930.00 |
| SINGLE ROUGHER WET DRUM MAGNETIC SEPARATOR | 1 | | $110,000.00 |
| DOUBLE CLEANER WET DRUM MAGNETIC SEPARATOR | 1 | | $209,000.00 |
| Other Equipment Approved by Lender | | | $260,281.85 |
| **TOTAL** | | | **$1,000,000** |

AZ Mining 159,000
A& Electric 56,000
215000
Vehicles
1. 19,000 DC. Truck
2. 13,000

Phone: (801) 798-8676 / Fax (801) 798-3605

WUMI003691

# DISCLOSURE SCHEDULE TO

# LOAN AND SECURITY AGREEMENT

**Section 3.4**

Skye Mineral Partners, LLC, the parent of Borrower, hold liens on substantially all of Borrower's assets.

The State of Utah Division of Oil, Gas and Mining has a security interest in $1.6 million in U.S. Treasury Notes held by C.S. Mining pursuant to that certain pledge agreement dated 11/8/2011 between CS Mining, LLC, a Delaware limited liability company and the State of Utah, Division Of Oil, Gas And Mining.

H & E Equipment Services, Inc. has a security interest in the following equipment:

1.   One (1) 2012 Manitou M50-4T Forklift, S/N 796173 together with all present and future attachments, accessories, replacement parts, repairs and additions thereto and proceeds thereof.

2.   One (1) 2012 JG-JLG 600AJ BOOM, S/N 0300154821 together with all present and future attachments, accessories, replacement parts, repairs and additions thereto and proceeds thereof.

Revo Leasing Company holds a security interest in the following equipment: HP-Laser Jet M601n Workgroup Printer SN:Cnbl312yz HP-Laser Jet M601n Workgroup Printer SN:Cnbc312yx Sharp Mx-B402s Digital Copeir SN:19009249 Sharp Mx-Ds14 Stackable Cabinets Sharp Mx-Ds13 Base Sharp Mx-Fxx3 Fax Expansion Sharp Mx-2610 Digital Color Copier Sn:15088158 Sharp Mx-De12 Paper Feed Desk.

Pursuant to that certain Settlement & Release Agreement entered into by and among Borrower and Nevada Star Resource Corp. (US), a Nevada corporation ("**NS**"), and Pure Nickel, Inc. ("**PN**", and collectively with NS, "**Nevada Star**") as of October 26, 2011 ("**NS Settlement Agreement**"), Borrower delivered and granted to Nevada Star that certain Deed of Trust, Assignment of Leases And Rents, Security Agreement, Financing Statement, and Fixture Filing executed as of November 16th, 2011 with respect to Borrower's properties and assets described therein, to secure obligations under the 1st Promissory Note delivered thereunder.

Items disclosed in Lender's UCC and other lien searches with respect to Borrower.

The New Equipment will be attached and/or utilized in connection with Borrower's existing flotation mill facility.

**Section 5.5**

Borrower has existing, and will post additional bonds, pledges and reclamation obligations in connection with permitting for its operations, mining and milling.  In connection therewith, Borrower may post cash bonds or may purchase investment securities and pledge such investment securities to the relevant permitting or state entity.

Borrower may enter into "cost plus" agreements with contractors or service providers in which Borrower reimburses or guarantees the costs and expenses of such service providers or contractors.

Borrower is obligated to indemnify Borrower's officers, directors and Members in connection with their engagement and/or involvement with Borrower.

**Section 7.1**

*See* Sections 3 and 5.

The agents authorized to deal with Borrower are Russell Alley and David McMullin, provided that matters involving greater than $100,000 require board consent.

WUMI003692

# EXHIBIT 2

Execution Version

# LOAN AND SECURITY AGREEMENT

Dated as of August 12, 2014

## CS MINING LLC

and

## NOBLE AMERICAS CORP

CONFIDENTIAL

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| ARTICLE I. | DEFINITIONS AND ACCOUNTING TERMS | 1 |
| 1.01 | Defined Terms. | 1 |
| 1.02 | Other Interpretive Provisions. | 17 |
| 1.03 | Accounting Terms. | 17 |
| 1.04 | Rounding. | 18 |
| 1.05 | References to Agreements and Laws. | 18 |
| 1.06 | Times of Day. | 18 |
| ARTICLE II. | THE COMMITMENT AND LOANS | 18 |
| 2.01 | Loans. | 18 |
| 2.02 | Borrowings of Loans. | 18 |
| 2.03 | Project Account. | 19 |
| 2.04 | Prepayments. | 19 |
| 2.05 | Termination of Commitment. | 20 |
| 2.06 | Repayment of Loans. | 20 |
| 2.07 | Interest. | 20 |
| 2.08 | Evidence of Debt. | 21 |
| 2.09 | Payments Generally. | 21 |
| 2.10 | Taxes. | 21 |
| 2.11 | Warrants. | 22 |
| ARTICLE III. | COLLATERAL | 23 |
| 3.01 | Grant of Security Interest. | 23 |
| 3.02 | Representations, Warranties and Covenants. | 23 |
| 3.03 | Further Assurances. | 24 |
| 3.04 | Bank Accounts. | 24 |
| 3.05 | Remedies. | 25 |
| 3.06 | Financing Statements. | 25 |
| 3.07 | Power-of-Attorney. | 25 |
| 3.08 | Release. | 26 |
| ARTICLE IV. | CONDITIONS PRECEDENT TO BORROWINGS OF LOANS | 26 |
| 4.01 | Conditions of Initial Loans. | 26 |
| 4.02 | Conditions to all Loans. | 28 |
| ARTICLE V. | REPRESENTATIONS AND WARRANTIES | 29 |
| 5.01 | Existence, Qualification and Power; Compliance with Laws. | 30 |
| 5.02 | Authorization; No Contravention. | 30 |
| 5.03 | Governmental Authorization; Other Consents. | 30 |
| 5.04 | Binding Effect. | 30 |
| 5.05 | Financial Statements; No Material Adverse Effect. | 30 |
| 5.06 | Litigation. | 31 |
| 5.07 | No Default. | 31 |
| 5.08 | Ownership of Property; Liens. | 31 |
| 5.09 | Environmental Compliance. | 32 |
| 5.10 | Insurance. | 32 |
| 5.11 | Taxes. | 32 |
| 5.12 | ERISA Compliance. | 32 |

| | | |
|---|---|---|
| 5.13 | Subsidiaries. | 32 |
| 5.14 | Margin Regulations; Investment Company Act; Public Utility Holding Company Act. | 32 |
| 5.15 | Disclosure. | 33 |
| 5.16 | Compliance with Laws. | 33 |
| 5.17 | Good Title, Use of Site, Easements, Property Interests, Utilities, Etc. | 33 |
| 5.18 | Environmental, Health and Safety Matters. | 33 |
| 5.19 | Project Cost and Completion. | 34 |
| ARTICLE VI. | AFFIRMATIVE COVENANTS | 35 |
| 6.01 | Financial Statements. | 35 |
| 6.02 | Certificates; Other Information. | 35 |
| 6.03 | Notices. | 36 |
| 6.04 | Payment of Obligations. | 36 |
| 6.05 | Preservation of Existence, Etc. | 36 |
| 6.06 | Maintenance of Properties. | 36 |
| 6.07 | Maintenance of Insurance. | 37 |
| 6.08 | Compliance with Laws. | 37 |
| 6.09 | Books and Records. | 37 |
| 6.10 | Inspection Rights. | 37 |
| 6.11 | Use of Proceeds. | 38 |
| ARTICLE VII. | NEGATIVE COVENANTS | 38 |
| 7.01 | Liens. | 38 |
| 7.02 | Investments. | 39 |
| 7.03 | Indebtedness. | 40 |
| 7.04 | Fundamental Changes. | 41 |
| 7.05 | Dispositions. | 41 |
| 7.06 | Restricted Payments. | 41 |
| 7.07 | Change in Nature of Business. | 41 |
| 7.08 | Transactions with Affiliates. | 41 |
| 7.09 | Burdensome Agreements. | 42 |
| 7.10 | Use of Proceeds. | 42 |
| 7.11 | Financial Covenants. | 42 |
| 7.12 | Capital Expenditures. | 42 |
| ARTICLE VIII. | EVENTS OF DEFAULT AND REMEDIES | 42 |
| 8.01 | Events of Default. | 42 |
| 8.02 | Remedies Upon Event of Default. | 46 |
| 8.03 | Application of Funds. | 47 |
| ARTICLE IX. | MISCELLANEOUS | 47 |
| 9.01 | Amendments; Etc. | 47 |
| 9.02 | Notices and Other Communications; Facsimile Copies. | 47 |
| 9.03 | No Waiver; Cumulative Remedies. | 48 |
| 9.04 | Attorney Costs, Expenses and Taxes. | 48 |
| 9.05 | Indemnification by the Borrower. | 49 |
| 9.06 | Payments Set Aside. | 49 |
| 9.07 | Successors and Assigns. | 49 |
| 9.08 | Confidentiality. | 51 |
| 9.09 | Set-off. | 51 |
| 9.10 | Interest Rate Limitation. | 52 |

CONFIDENTIAL

| 9.11 | Counterparts. | 52 |
| 9.12 | Integration. | 52 |
| 9.13 | Survival of Representations and Warranties. | 53 |
| 9.14 | Severability. | 53 |
| 9.15 | Governing Law. | 53 |
| 9.16 | Waiver of Right to Trial by Jury | 53 |

SIGNATURES...........................................................................................S-1

**SCHEDULES**

| 3.01 | Excluded Collateral |
| 3.09 | Lender Priority Collateral |
| 4.01(a)(x)(i) | Project Budget |
| 4.01(a)(x)(ii) | Projections |
| 5.17 | Applicable Permits |
| 7.01 | Existing Liens |
| 7.03 | Existing Indebtedness |
| 9.02 | Lending Office, Addresses for Notices |

**EXHIBITS**

*Form of*

| A | Loan Request |
| B | Note |
| C | Compliance Certificate |
| D | Disbursement Request |
| E | Opinion Matters |
| F | Unit Warrant |

CONFIDENTIAL

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT ("Agreement") is entered into as of August 12, 2014 by and between CS MINING LLC, a Delaware limited liability company (the "Borrower") and NOBLE AMERICAS CORP., a Delaware corporation (the "Lender").

The Borrower has requested that the Lender provide a term loan, and the Lender is willing to do so on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I.
### DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms.** As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounts" means all "accounts," as such term is defined in the UCC.

"Account Bank" means Wells Fargo Bank, N.A., or any one or more successor securities intermediaries or depository banks approved by the Lender.

"Account Control Agreement" means an account control agreement, between the Account Bank, the Borrower and the Lender.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Agreement" means this Loan and Security Agreement.

"All Property Deed of Trust" means Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing (All Property) made as of August 12, 2014, by and among the Borrower, as trustor, First American Title Insurance Company, as trustee, and the Lender, as beneficiary.

"Applicable Permits" means, with respect to the Project, all Permits that are required for the performance of the design, development, site preparation, construction (including off-site work), repair, equipping (including fixtures), leasing, opening and operation of the Project.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external counsel.

WAT-001481

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower for the fiscal year ended December 31, 2013, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower, including the notes thereto.

"Availability Period" means the period from and including the Closing Date to the earlier of (a) the date that is 240 days after the Closing Date and (b) the date of termination of the Commitment.

"Books and Records" means all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the UCC Collateral or the Borrower's business.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lending Office is located and, as used in the definition of LIBOR Reset Date, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Expenditures" means, in any period, the sum of, without duplication, all expenditures made, directly or indirectly, during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefore or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a consolidated balance sheet of such Person or have a useful life of more than one year.

"Capitalized Interest" has the meaning provide in Section 2.07(c).

"Cash Available for Debt Service" means, for any period, (a) EBITDA increased or reduced for any change (negative or positive) in Net Working Capital from the first day of such period to the last day of such period, minus (b) total Capital Expenditures made by the Borrower during such period (but excluding therefrom any portion of such Capital Expenditures made by the Borrower in such period from the proceeds of Indebtedness incurred by the Borrower), plus (c) net proceeds from fixed assets Dispositions and minus (d) income taxes paid or payable by the Borrower for such period (but without double counting of income taxes payable during a prior period but paid during the current period).

"Cash Available for Debt Service to Debt Service Ratio" means, as of any date of determination, the ratio of (a) Cash Available for Debt Service to (b) Debt Service.

"Cathode Agreement" means the Copper Cathode Sales and Purchase Agreement, dated as of August 12, 2014, is by and between CS Mining, LLC, a Delaware limited liability company and Noble Americas Corp.

2

WAT-001482

"Chattel Paper" means all "chattel paper," as such term is defined in the UCC, including electronic chattel paper, now owned or hereafter acquired by any Person

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied by the Borrower or waived by the Lender.

"Code" means the Internal Revenue Code of 1986.

"Collateral" any asset subject to a Lien or required to be subject to a Lien created by a Security Document.

"Commitment" means the obligation of the Lender to make Loans hereunder in an aggregate principal amount at any one time not to exceed $30,000,000 (excluding Capitalized Interest), as such amount may be adjusted from time to time in accordance with this Agreement.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Concentrate Agreement" means Copper Concentrate Sales and Purchase Agreement, dated as of August 12, 2014, is by and between CS Mining, LLC, a Delaware limited liability company and Noble Americas Corp.

"Conditions Subsequent" means each of the following:

(a) completion of a NI 43-101 Form F compliant Resource and Reserve statement or equivalent (JORC, SAMREC) for the Borrower's Copper Ranch deposit by a third party qualified person identified by the Borrower and reasonably acceptable to the Lender who has sufficient experience to comply with the requirements of the NI 43-101 F1 guidelines;

(b) completion of a revised mine plan for the Borrower's Copper Ranch deposits reviewed by a third party reasonably acceptable to the Borrower and the Lender;

(c) the In-Balance Test shall continue to be satisfied at all times; and

(d) receipt of all environmental and government approvals for the engineering and construction of the SX/EW plant, intermediate tailings pond and associated equipment.

"Construction Contracts" means collectively, the contracts entered into from time to time between the Borrower and any Contractor in connection with the design, engineering, installation and construction of the Project or the supply of materials, fixtures, equipment or services in connection with the construction of the Project.

"Construction Observer" means any qualified Person designated from time to time by the Lender, and reasonably acceptable to the Borrower, to serve as the Lender's Construction Observer under the Loan Documents.

3

CONFIDENTIAL                                    WAT-001483

"Contractor" means any architects, consultants, designers, contractors, suppliers or other Persons engaged by the Borrower in connection with the design, engineering, installation and construction of the Project.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate."

"Copyright License" means rights under any written agreement granting the right to use any Copyright or Copyright registration.

"Copyrights" means all of the following: (i) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed, all registrations and applications for registration of any such copyrights in the United States or any other country, including registrations, recordings and applications, and supplemental registrations, recordings, and applications in the United States Copyright Office; and (ii) all Proceeds of the foregoing, including license royalties and proceeds of infringement suits, the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all renewals and extensions thereof.

"Debt Service" means, for any period, the sum of all payments of principal, interest, and fees made or required to be made by the Borrower in respect of its Indebtedness during such period.

"Debt to Equity Ratio" means, as of any date of determination, the ratio of (a) Indebtedness as of such date (including the current portion of long term debt), *excluding* (i) the debt owed pursuant to the Skye Credit Agreement and (ii) items specified on Schedule 7.03 with respect to the Bonding Companies (as defined in Schedule 7.03), to (b) the Shareholders' Equity on such date.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Deeds of Trust" means Project Deed of Trust and the All Property Deed of Trust.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the interest rate (including Margin) otherwise applicable to the Loans at such time plus 2% per annum, in each case to the fullest extent permitted by applicable Laws.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the UCC.

4

WAT-001484

"<u>Disbursement Request</u>" means a Disbursement Request in the form of Exhibit D.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Documents</u>" means all "documents," as such term is defined in the UCC, including all bills of lading, dock warrants, <u>dock</u> receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>EBITDA</u>" means, for any period, the sum, of Net Income (or net loss), plus (a) to the extent deducted in calculating such Net Income (or net loss), (i) interest expense, amortization or write-off of debt discount, debt issuance, warrant and other equity issuance costs and commissions, discounts, redemption premium and other fees and charges associated with the Loans, letters of credit permitted hereunder, capitalized leases, Synthetic Lease Obligations and any other Indebtedness permitted hereunder (including commitment fees and other periodic bank charges) or the acquisition or repayment of any debt securities of Affiliates permitted hereunder, and net costs associated with any hedge agreements to which the Borrower is a party in respect of the Loans, (ii) depreciation and amortization expense, (iii) non-cash amortization of capitalized leases, (iv) any extraordinary or non-recurring charges or expenses, (v) charges or expenses attributable to the Loan Documents or Loans and any actual or proposed acquisitions or joint ventures (and integration costs related thereto, including, but not limited to transition labor and training costs, breakage fees for systems, licenses and network services, costs associated with switch shutdowns, costs associated with lease terminations and severance and retention payments), equity offerings, issuances and retirements of Indebtedness and divestitures of assets, whether or not any such acquisition, equity offering, issuance, retirement or divestiture is actually consummated, (vi) management fees paid, (vii) income tax expense, (viii) franchise tax expense, (ix) amortization of deferred revenue adjustment or other non-cash adjustments required under Statement of Financial Accounting Standards No. 141 - Business Combinations, amortization of intangibles (including, but not limited to, goodwill and costs of interest-rate caps and the cost of non-competition agreements) and organization costs including any non-cash charges associated with any impairment analysis required under Statement of Financial Accounting Standards No. 142 - Goodwill and other Intangible Assets, (x) any non-cash charges (other than the write-down of current assets) for such period, (xi) to the extent not added back as interest expense, the rental expense relating to Synthetic Lease Obligation, (xii) expense incurred in connection with retention or compensation bonuses, *minus* (b) (i) to the extent included in calculating such net income (or net loss), any extraordinary or non-recurring gains or items of income, (ii) all non-cash items of income for such period, (iii) any net after-tax income (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and (iv) all cash payments made during such period on account of non-cash charges added to EBITDA pursuant to clause (a)(x) in a previous period; provided that the cumulative effect of a change in accounting principles (effected either through cumulative effect adjustment or a retroactive application) shall be excluded.

5

WAT-001485

"Eligible Assignee" has the meaning specified in Section 9.07(f).

"Enforceability Exceptions" means any limitation to the enforceability of a contract or obligation resulting from Debtor Relief Laws and by general equitable principles.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" means all "equipment" as such term is defined in the UCC.

"Equity Contribution" has the meaning specified in Section 2.03.

"Equity Interests" means shares, options, warrants, membership interests, general, limited or preferred partnership interests or units or other equivalents (regardless of how designated) of or in a corporation, limited liability company, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"Event of Abandonment" means a formal, public announcement by Skye or the Borrower a decision to abandon or indefinitely defer, or the abandonment of, the construction, completion or operation of any material portion of the Project.

"Event of Default" has the meaning specified in Section 8.01.

"Event of Loss" means, with respect to any property of the Borrower, any loss of, destruction of or damage to, such property.

6

CONFIDENTIAL

WAT-001486

"Excluded Collateral" means the assets of the Borrower listed on Schedule 3.01; provided that the assets listed in items 1, 2, 3, 4, and the applicable portion of 13 on Schedule 3.01 shall not constitute "Excluded Collateral" unless and until the Lender so agrees, acting reasonably, and the item listed in 12 shall not constitute "Excluded Collateral" unless and until the conditions specified therein are satisfied.

"Existing Credit Agreement" means that certain Loan and Security Agreement initially entered into as of August 2, 2012 between the Borrower and David J. Richards, LLC d/b/a Western US Mineral Investors, LLC, as amended, and all associated agreements, documents and filings.

"Existing Lender Inter-Creditor Agreement" has the meaning specified in Section 3.09(a).

"Exploration Properties" means properties not used or included in the Project or assumed to be mined for purposes of preparing the Projections.

"Force Majeure" means an act, event or circumstance or combination of such acts, events or circumstances that prevent, impede or delay the Borrower and which are beyond the reasonable control of a Borrower. Force Majeure shall include the following acts, events and circumstances: strike or lockout or stoppage or restraint of labor (in each case involving an enterprise other than that of the affected party or its agents or sub-contractors in connection with this agreement), war, hostilities (whether declared or not), invasion, armed conflict, act of foreign enemies, rebellion, revolution, insurrection, military or usurped power, civil war, civil commotion, act of terrorism, ionizing radiations or contamination by radioactivity from any nuclear waste, from the combustion of nuclear fuel, radioactive toxic explosive or other hazardous properties of any explosive, nuclear assembly or nuclear component thereof, aviation disasters, explosions, natural catastrophe including earthquake, flood, subterranean spontaneous combustion and any other operation of the forces of nature of catastrophic proportion. Force Majeure Events do not include the non-availability or lack of funds or failure to pay money when due.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"General Intangibles" means all "general intangibles," as such term is defined in the UCC.

"Goods" means all "goods," as such term is defined in the UCC.

"Goodwill" means all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements.

7

WAT-001487

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

> (a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

> (b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

> (c)    net obligations of such Person under any Swap Contract;

8

WAT-001488

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    capital leases and Synthetic Lease Obligations; and

(g)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount on such date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Indemnified Liabilities" has the meaning specified in Section 9.05.

"Indemnitees" has the meaning specified in Section 9.05.

"Inter-Creditor Agreements" has the meaning specified in Section 3.04(b).

"Interest Expense" means, for any period, with respect to the Borrower, the sum of all interest in respect of Indebtedness of the Borrower accrued or capitalized during such period (whether or not actually paid during such period).

"Interest Payment Date" means, (i) the first Business Day of each calendar month occurring after the Closing Date and (ii) the Maturity Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

9

                                                                                      WAT-001489

"In-Balance Test" shall be satisfied as of any date of determination if, as of such date, the aggregate amount of Equity Contributions deposited in the Project Account after the Closing Date equals or exceeds the aggregate principal amount of Loans advanced in excess of $15,000,000; provided that if Equity Contributions in the amount at least $12,500,000 have been (or simultaneously with receipt of the proceeds of Permitted Project Debt (as defined below) will be) deposited in the Project Account then the Borrower may substitute Indebtedness having terms, collateral consistent with the requirements of this Agreement, and intercreditor arrangements reasonably satisfactory to the Lender ("Permitted Project Debt") for Equity Contributions in excess of $12,500,000.

"Instruments" means all "instruments," as such term is defined in the UCC.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, trade secrets and customer lists.

"Intermediate Tailings Dam" means that certain new tailings dam for the Project to be constructed with Loan proceeds as specified in the Project Budget and Projections.

"Inventory" means all "inventory," as such term is defined in the UCC.

"Investment Property" means all "investment property," as such term is defined in the UCC, now or hereafter acquired by any Person, wherever located.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender Priority Collateral" means the properties upon which the Project are built, where the Intermediate Tailings Dam will be constructed, and an interest in certain properties projected to be mined pursuant to the Projections (all of which properties are as identified and specified on Schedule 3.09) and all fixtures, assets and minerals located on, in or under such properties, as well as the Project Account and all properties and assets purchased with proceeds of the Loans or with amounts required hereby to be deposited in the Project Account and applied to pay Project Costs and all proceeds of the foregoing.

"Lending Office" means the office or offices of the Lender described as such on Schedule 9.02, or such other office or offices as the Lender may from time to time notify the Borrower.

"Letter-of-Credit Rights" means "letter-of-credit rights" as such term is defined in the UCC.

10

WAT-001490

"Leverage Ratio" means, as of any date of determination, the ratio of (a) Indebtedness as of such date, *excluding* the debt owed pursuant to the Skye Credit Agreement, to (b) EBITDA for the period of the four prior fiscal quarters ending on such date.

"LIBOR" means, for each day, an interest rate per annum as calculated by ICE Benchmark Administration (or the successor thereto if ICE Benchmark Administration is no longer making such a rate available) and appearing on a nationally recognized service selected by the Lender such as Reuters (the "Service") (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Lender from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) as of 11:00 A.M. (London time) on the most recent LIBOR Reset Date.

"LIBOR Reset Date" means the Closing Date and the first Business Day of each calendar month thereafter.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" has the meaning specified in Section 2.01.

"Loan Documents" means this Agreement, any Note, the Warrant, any Security Document and any Inter-Creditor Agreement.

"Loan Parties" means Borrower and Skye.

"Loan Request" means a notice of a borrowing of a Loan to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Borrower or the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"Material Contractor" means any Contractor to be paid, paid or owed greater than $200,000.

"Material Contracts" means Contracts involving the payment of greater than $200,000.

11

CONFIDENTIAL

WAT-001491

"<u>Material Guarantee</u>" means a Guarantee in excess of $500,000.

"<u>Material Indebtedness</u>" means Indebtedness of the Borrower in excess of $500,000.

"<u>Material Lien</u>" means a Lien in excess of $200,000.

"<u>Margin</u>" means 10.0% per annum; provided that for each day from (and including) the first date on which (a) the Conditions Subsequent are satisfied and (b) the Lender has obtained financing recourse only to the Loans and the Collateral for at least 90% of the outstanding principal amount of the Loans and undrawn Commitment (which financing the Lender agrees to diligently seek to obtain within 90 days of the Conditions Subsequent becoming satisfied), the Margin will be reduced to the greater of (i) 6.0% per annum and (ii) the lesser of (x) 10.0% per annum and (y) the highest per annum margin required for the Lender to obtain such financing.

"<u>Maturity Date</u>" means the fifth anniversary of the Closing Date.

"<u>Mortgaged Property</u>" means the real property interests listed in <u>Exhibit A</u> of the Deeds of Trust.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Income</u>" means, for any period of determination, for the Borrower, the net income of the Borrower for that period.

"<u>Net Working Capital</u>" means the result obtained at the end of the four quarters most recently ended by subtracting current liabilities and cash from current assets of the Borrower.

"<u>Note</u>" means a promissory note made by the Borrower in favor of the Lender evidencing Loans made by the Lender, substantially in the form of <u>Exhibit B</u>.

"<u>Obligations</u>" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or

12

                                                    WAT-001492

organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Outstanding Amount" means with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Participant" has the meaning specified in Section 9.07(c).

"Patent License" means rights under any written agreement granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following: (i) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory thereof, or any other country; and (ii) all reissues, continuations, continuations-in-part or extensions thereof.

"Payment Intangibles" means all "payment intangibles" as such term is defined in the UCC.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permits" means all permits, entitlements or other approvals issued under applicable law required to be obtained at such time.

"Permitted Project Debt" has the meaning specified in the definition of In-Balance Test.

"Permitted Lien" has the meaning specified in Section 7.01.

"Permitted Preferred Equity" means (i) preferred equity of the Borrower that provides by its terms that for so long as any Obligations are outstanding such preferred equity shall (a) not be redeemable for any reason, (b) not require the payment of any dividend or distribution, or liquidation preference ahead of the Obligations, in cash or property other than common equity of the Borrower or shares of Permitted Preferred Equity, (c) not contain any covenant or restriction that restricts the ability of the Borrower to comply with the Loan Documents and (d) prohibit the issuance or transfer thereof to a direct competitor of the Lender; and (ii) any equity interests of the Borrower of a type outstanding on the Closing Date.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

13

CONFIDENTIAL
WAT-001493

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Proceeds" means "proceeds," as such term is defined in the UCC.

"Project" means the resource development and exploration activities and Phase II project and all other items described or set forth in the Project Budget, including the engineering and construction of an SX/EW and leaching plant and construction of a new intermediate tailings pond.

"Project Account" means the Borrower's account no. 5424757648 at the Account Bank, established, maintained and administered in accordance with Section 2.03.

"Project Budget" has the meaning specified in Section 4.01(a)(x)(i).

"Project Completion Date" means the date on which each of the following conditions has been satisfied and the Borrower shall have delivered to the Lender an Officers' Certificate certifying that such conditions have been satisfied:

(a)     the Project is commissioned and operational and the Project has been operating uninterrupted at at least 90% of designed capacity during each day a period of at least 15 consecutive days prior to the date of such Officer's Certificate;

(b)     all material Applicable Permits with respect to the operation of the Project have been issued and are in full force and effect;

(c)     all utilities reasonably necessary for the operation of the Project are available for use to the Project on a permanent, uninterrupted availability basis;

(d)     all amounts required to be paid to Material Contractors in connection with completing the Project have been paid; and

(e)     the Borrower has received Lien releases and waivers from each Material Contractor and laborer or materialman reasonably satisfactory to the Lender covering all material work on the Project.

"Project Costs" means, with respect to the Project, all costs incurred or to be incurred in connection with the acquisition, financing, design, development, permitting, site preparation, construction (including off-site work), repair, equipping (including fixtures), commissioning and testing of the Project, including the costs reflected in the Project Budget.

"Project Deed of Trust" means Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing (Project) made as of August 12, 2014, by and among the Borrower, as trustor, First American Title Insurance Company, as trustee, and the Lender, as beneficiary.

14

WAT-001494

"Project Documents" means the Construction Contracts, and each other agreement entered into relating to the development, construction, maintenance or operation of the Project

"Projections" has the meaning specified in Section 4.01(a)(x)(ii), with such changes therein as may from time to time be approved by the Borrower and the Lender.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other equity interest of the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other equity interest or of any option, warrant or other right to acquire any such capital stock or other equity interest.

"Security Document" means this Agreement, the Deeds of Trust, any Account Control Agreement and any other agreement creating a Lien to secure the Obligations.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower as of that date determined in accordance with GAAP.

"Skye" means Skye Mineral Partners, LLC.

"Skye Credit Agreement" shall mean that certain consolidated convertible secured loan to the Borrower from Skye as described in that certain Joint Loan Modification Agreement between Borrower and Skye dated as of November 10, 2011, as amended.

"Skye Inter-Creditor Agreement" has the meaning specified in Section 3.09(b).

"Software" means all "software" as such term is defined in the UCC, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"Supporting Obligations" means all "supporting obligations" as such term is defined in the UCC, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

15

WAT-001495

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include the Lender or any Affiliate of the Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Threshold Amount" means $500,000.

"Trademark License" means rights under any written agreement granting any right to use any Trademark or Trademark registration.

"Trademarks" means all of the following:  (i) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory thereof, or any other country or any political subdivision thereof; (ii) all reissues, extensions or renewals thereof; and (iii) all goodwill associated with or symbolized by any of the foregoing.

16

WAT-001496

"Uniform Commercial Code" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"Warrants" means the Unit Purchase Warrant, dated the date hereof, issued by Skye to Lender or its permitted assign(s) to purchase from Skye, at any time or from time to time during the Exercise Period (as defined therein), in whole or in part, the Vested Warrant Units (as defined in the Warrant).

"Warrant Units" means (i) all Class A Units of Skye issued or issuable upon the exercise of any Warrant, and (ii) any securities issued or issuable by Skye with respect to units referred to in the foregoing clause (i) by way of a dividend or stock split or in connection with a combination or subdivision of units, reclassification, merger, consolidation or other reorganization of Skye.

**1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03    Accounting Terms.** (a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall

17

WAT-001497

be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Lender shall so request, the Lender and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Lender), provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding.**  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    References to Agreements and Laws.**  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**1.06    Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II.
## THE COMMITMENT AND LOANS

**2.01    Loans.**  Subject to the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "Loan") to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed the amount of the Commitment. The Commitment is not revolving and principal amounts repaid or prepaid may not be reborrowed.

**2.02    Borrowings of Loans.**

(a)    Each borrowing shall be made upon the Borrower's irrevocable notice to the Lender in the form of a written Loan Request, appropriately completed and signed by a Responsible Officer of the Borrower.  Each such notice must be received by the Lender not later than 1:00 p.m. three Business Days prior to the requested date of such borrowing. The initial

18

                                        WAT-001498

borrowing shall be in the principal amount of $15,000,000 (the "**Initial Loan**") and each subsequent borrowing of a Loan shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof.

(b)     Upon satisfaction of the applicable conditions set forth in <u>Section 4.02</u> (and, if a borrowing is the initial Loan, <u>Section 4.01</u>), the Lender shall make the proceeds of each Loan available to the Borrower by wire transfer of such proceeds to the Project Account.

### 2.03    Project Account.

(a)     On or prior to the Closing Date, the Project Account shall be established with the Account Bank.  From time to time after the Closing Date, there shall be deposited into the Project Account the following funds: (i) all proceeds of capital contributions to the Borrower or issuances of non-redeemable common equity by the Borrower or Permitted Preferred Equity made to finance Project Costs (such contributions or issuances "**Equity Contributions**"), (ii) all proceeds of the Loans and Permitted Project Debt, (iii) all amounts received by the Borrower prior to the Project Completion Date in respect of liquidated or other damages under the Project Documents, (iv) all condemnation and casualty proceeds (including casualty insurance proceeds) received in respect of the Project prior to the Project Completion Date net of costs, expenses and taxes relating thereto, (v) amounts paid under any payment and performance bonds delivered to the Borrower under the Project Documents  (other than amounts directly applied to the payment of Project Costs), if any, (vi) investment income and interest from investments in the Project Account, and (vii) such other amounts that the Borrower elects to deposit in the Project Account.

(b)     Upon delivery to the Lender of a Disbursement Request duly completed and signed by a Responsible Officer of the Borrower, the Borrower  shall be permitted from time to time to draw checks on and otherwise withdraw amounts on deposit in the Project  Account to pay Project Costs then or becoming due and payable and reflected in the applicable Disbursement Request; provided that at its option the Borrower may include its Disbursement Request in a Loan Request and direct that proceeds of Loans be used directly to pay Project Costs then or thereafter becoming due and payable and reflected in the applicable Disbursement Request included in such Loan Request. The Lender may request such reasonable information, materials and/or other items with respect to any disbursements from, or expenses or costs paid with, the Project Account from time to time.

### 2.04    Prepayments.

The Borrower may, upon notice to the Lender, at any time or from time to time voluntarily prepay any Loan in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Lender not later than 1:00 p.m. three Business Days prior to any date of prepayment of a Loan and (ii) any prepayment of a Loan shall be in a principal amount of  $250,000 or a whole multiple of $100,000 in excess thereof; or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Loan shall be accompanied by all accrued interest

19

WAT-001499

thereon. Each prepayment of the outstanding Loans pursuant to this <u>Section 2.04</u> shall be applied to ratably reduce each future unpaid installment of the Loans.

**2.05    Termination of Commitment.** The Borrower may, upon notice to the Lender, terminate the Commitment prior to the last day of the Availability Period, but only after the Project Completion Date has occurred.

**2.06    Repayment of Loans.** The Borrower shall repay to the Lender the aggregate principal amount of all Loans made during the Availability Period (plus Capitalized Interest) in equal monthly installments on the first Business Day of each calendar month commencing with the first calendar month following the first anniversary of the Closing Date (which installments shall be reduced pro-rata as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.04); provided, that the final principal repayment installment of the Loans shall be repaid on the Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Loans outstanding on such date. Any repayment of Loans shall be accompanied by all accrued interest on the amount prepaid.

**2.07    Interest.**

(a)    Subject to the provisions of subsection (b) below, each Loan (including Capitalized Interest thereon) shall bear interest on the outstanding principal amount thereof for each day from the applicable borrowing date at a rate per annum equal to LIBOR <u>plus</u> Margin.

(b)    If any amount payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Furthermore, while any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date and at such other times as may be specified herein; *provided* that the Borrower may, at its option on any Interest Payment Date occurring on or prior to the first anniversary of the Closing Date, elect to pay interest on the Loans entirely by increasing the outstanding principal amount of the Loans by the amount of interest payable on such date ("<u>Capitalized Interest</u>"). Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.

20

                                                    WAT-001500

**2.08    Evidence of Debt.**  The Loans shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lender to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  Upon the request of the Lender, the Borrower shall execute and deliver to the Lender a Note, which shall evidence the Lender's Loans in addition to such accounts or records.  The Lender may attach schedules to the Note and endorse thereon the date, amount and maturity of each Loan and payments with respect thereto.

**2.09    Payments Generally.**

(a)      All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Lender at the applicable Lending Office in Dollars and in immediately available funds not later than 3:00 p.m. on the date specified herein.  All payments received by the Lender after 3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)      Nothing herein shall be deemed to obligate the Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by the Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.10    Taxes.**

(a)      Any and all payments by the Borrower to or for the account of the Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto, <u>excluding</u> taxes imposed on or measured by its overall net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Lender is organized or maintains a lending office (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities being hereinafter referred to as "<u>Taxes</u>").  If the Borrower shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section), the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days

21

CONFIDENTIAL

after the date of such payment, the Borrower shall furnish to the Lender the original or a certified copy of a receipt evidencing payment thereof.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "Other Taxes").

(c)      If the Borrower shall be required to deduct or pay any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to the Lender, the Borrower shall also pay to the Lender, at the time interest is paid, such additional amount that the Lender specifies is necessary to preserve the after-tax yield (after factoring in all taxes, including taxes imposed on or measured by net income) that the Lender would have received if such Taxes or Other Taxes had not been imposed.

(d)      The Borrower agrees to indemnify the Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section) paid by the Lender, (ii) amounts payable under Section 2.10 and (iii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Payment under this subsection (d) shall be made within 30 days after the date the Lender makes a demand therefor.

(e)      A certificate of the Lender claiming compensation under this Section 2.10 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error.  In determining such amount, the Lender may use any reasonable averaging and attribution methods.

(f)      All of the Borrower's obligations under this Section 2.10 shall survive termination of the Commitment and repayment of all other Obligations hereunder.

**2.11    Warrants.**

(a)      In connection with the borrowing of the Loans by the Borrower and as an inducement to the Lender to make the Loans, Skye has agreed to authorize the issuance to the Lender its warrants in the form of Exhibit F attached hereto (the "**Warrants**").  Notwithstanding anything to the contrary set forth herein, the Loans and the Warrants will be immediately separable and separately transferable (subject in the case of Warrants to the applicable restrictions set forth in the Warrant and Skye's Organizational Documents on the date hereof).

(b)      Subject to the terms and conditions set forth in this Agreement and the terms, conditions and adjustments set forth in the Warrant, on the Closing Date Skye will issue and sell the Warrants to the Lender, and the Lender shall purchase from Skye the Warrants for an aggregate purchase price of $1.00.  On the Closing Date, subject to satisfaction of the conditions set forth herein, Skye will deliver to the Lender a Warrant registered in the Lender's name or Warrants in the name of its nominee, such Warrants to be duly executed and dated the Closing

22

CONFIDENTIAL

Date, against the Lender's delivery to Skye of immediately available funds in the amount of the aggregate purchase price of the Warrants.

(c)      It is hereby agreed that, for purposes of Treasury Regulations § 1.1273-2(h), (i) the aggregate "**issue price**" of the Loans and Warrants on the Closing Date is equal to 100% of the principal amount of the Loans and (ii) the aggregate fair market value and aggregate purchase price of the Warrants to be issued on the Closing Date to the Lender is $1.00. Each of the Borrower, Skye and the Warrant Purchasers agrees to use the foregoing issue price, purchase prices and fair market values for U.S. federal income tax purposes with respect to the transactions contemplated hereby (unless otherwise required by a final determination by the Internal Revenue Service or a court of competent jurisdiction) and for all other financial accounting purposes.

**ARTICLE III.**
**COLLATERAL**

**3.01    Grant of Security Interest.**

As collateral security for the prompt and complete payment and performance of the Obligations, the Borrower hereby grants to the Lender a security interest in and Lien upon all of its personal property, tangible or intangible, and whether now owned or hereafter acquired, or in which it now has or at any time in the future may acquire any right, title, or interest, including all of the following property in which it now has or at any time in the future may acquire any right, title or interest: all Accounts (other than Accounts arising from the sale of magnetite); all Deposit Accounts, all other bank accounts and all funds on deposit therein; all money, cash and cash equivalents; all Investment Property; all Equity Interests; all Goods (including Inventory, Equipment, Fixtures and minerals and other as extracted collateral (other than magnetite)); all Chattel Paper, Documents and Instruments; all Books and Records; all General Intangibles (including all Intellectual Property, contract rights, choses in action, Payment Intangibles and Software); all Letter-of-Credit Rights; all Supporting Obligations; and to the extent not otherwise included, all Proceeds, tort claims, insurance claims and other rights to payment not otherwise included in the foregoing and products of all and any of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing, in each case subject to and excluding the Excluded Collateral (all of the foregoing, together with any other collateral pledged to the Lender pursuant to any other documents, collectively, the "**UCC Collateral**").

**3.02    Representations, Warranties and Covenants.**

The Borrower and the Lender agree that the Security Documents create, and are intended to create, valid and continuing Liens upon the UCC Collateral in favor of the Lender. The Borrower represents, warrants and promises to the Lender that: (i) the Borrower has rights in and the power to transfer each item of the UCC Collateral upon which it purports to grant a Lien pursuant to this Agreement, free and clear of any and all Liens or claims of others, other than Liens permitted by the terms of the Loan Documents (including Permitted Liens); (ii) the security interests granted pursuant to this Agreement, upon completion of the filings and other actions required to perfect such security interests (which, in the case of all such filings and other

23

CONFIDENTIAL                                                                                    WAT-001503

documents, are delivered to the Lender in duly executed form) will constitute valid perfected security interests in all of the UCC Collateral in favor of the Lender as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof against any and all creditors of and purchasers from the Borrower (other than purchasers of Inventory in the ordinary course of business) and such security interests are prior to all other Liens on the UCC Collateral in existence on the date hereof other than Liens permitted to have priority by the terms of the Loan Documents (including Permitted Liens); and (iii) no effective security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the UCC Collateral is or will be on file or of record in any public office, except those permitted under the Loan Documents. The Borrower promises to defend the right, title and interest of the Lender in and to the UCC Collateral against the claims and demands of all Persons whomsoever (other than persons permitted to have Liens, interests or priority by the terms of the Loan Documents), and shall take such actions, including (x) all actions necessary to grant the Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or electronic Chattel Paper owned by the Borrower, with any agreements establishing control to be in form and substance reasonably satisfactory to the Lender, the prompt delivery of all original Instruments, Chattel Paper and certificated Equity Interests owned by the Borrower, (y) upon the occurrence and continuance of an Event of Default, notification of the Lender's interest in UCC Collateral at the Lender's request, and (z) the institution of litigation against third parties as shall be prudent in the Borrower's business judgment in order to protect and preserve the Borrower's and the Lender's respective and several interests in the UCC Collateral. The Borrower shall mark its Books and Records pertaining to the UCC Collateral to evidence this Agreement and the Liens granted under this Agreement. If the Borrower retains possession of any Chattel Paper or Instrument with the Lender's consent, such Chattel Paper and Instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of Noble Americas Corp. and its successor and assigns." The Borrower shall promptly, and in any event within five (5) Business Days after the same is acquired by it, notify the Lender of any commercial tort claim (as defined in the Uniform Commercial Code) of more than $1,000,000 acquired by it and unless otherwise consented by the Lender, the Borrower shall enter into a supplement to this Agreement granting to the Lender a Lien in such commercial tort claim.

### 3.03    Further Assurances.

Upon the reasonable request of the Lender, the Borrower shall promptly (i) execute and deliver any and all security agreements as specified by and in form and substance satisfactory to the Lender to evidence the Lender's security interest on the Collateral and (ii) promptly take whatever action that may be necessary or advisable in the opinion of the Lender to vest in the Lender valid and perfected Liens on the Collateral, enforceable against third parties.

### 3.04    Bank Accounts.

The Borrower shall notify the Lender if it establishes any depository or other bank account of any kind with any financial institution other than any depository or other bank account that (i) is maintained solely for the purpose of processing and paying the employee payroll, benefit and related withholding obligations of the Borrower or (ii) has a balance at all

24

times of less than $500,000.  Borrower shall not be required to put in place an account control agreement with Lender for its bank accounts other than the Project Account.

### 3.05    Remedies.

Upon the occurrence and continuance of an Event of Default, the Lender shall have all the rights and remedies of a secured party provided in the Uniform Commercial Code.  The UCC Collateral is granted as security only and shall not subject the Lender to, or in any way affect or modify, any obligation or liability of the Borrower with respect to any of the Collateral or any transaction in connection therewith.

### 3.06    Financing Statements.

The Borrower agrees that it will, at the Borrower's expense and in such manner and form as the Lender may reasonably require, execute, deliver, file and record any financing statement, specific assignment or other paper, enter into a control agreement with respect to the UCC Collateral and take any other action that may be reasonably necessary or desirable, or that the Lender may reasonably request, in order to create, preserve, perfect or validate any security interest or to enable the Lender to exercise and enforce its rights hereunder with respect to any of the UCC Collateral.  To the extent permitted by applicable law, the Borrower hereby authorizes the Lender to execute and file, in the name of the Borrower or otherwise, Uniform Commercial Code financing statements (which may be carbon, photographic, photostatic or other reproductions of this Agreement or of a financing statement relating to this Agreement) which the Lender in its reasonable discretion may deem necessary or appropriate to further perfect its security interest in the UCC Collateral.  The Borrower will not (i) change its name or place of incorporation or (ii) change its location (determined as provided in Uniform Commercial Code Section 9-307) except to the extent that any actions necessary to perfect the security interests of the Lender have been taken.

### 3.07    Power-of-Attorney.

The Borrower hereby irrevocably appoints the Lender as its true and lawful attorney, with full power of substitution, in the name of the Borrower, the Lender or otherwise, for the sole use and benefit of the Lender, but at the expense of the Lender, to the extent permitted by law to exercise, at any time and from time to time while an Event of Default has occurred and is continuing, all or any of the following powers with respect to all or any of the UCC Collateral:

(a)    to demand, sue for, collect, receive and give acquittance for any and all monies due to become due upon or by virtue thereof,

(b)    to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto,

(c)    to sell, transfer, assign or otherwise deal in or with the same or the proceeds or avails thereof, as fully and effectually as if the Lender were the absolute owner thereof, and

(d)    to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto;

25

WAT-001505

*provided* that the Lender shall give the Borrower not less than ten days' prior written notice of the time and place of any sale or other intended disposition of any of the UCC Collateral. The Lender and the Borrower agree that such notice constitutes "reasonable notification" within the meaning of Sections 9-611 and 9-612 of the UCC.

**3.08    Release.**

Upon the repayment in full of all amounts owed hereunder, the security interest, deeds of trust and Liens created by the Security Documents, shall terminate and all rights to the Collateral shall revert to the Borrower. Upon such terminations, the Lender will execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such terminations on the Collateral created pursuant to the Security Documents. If the Lender agrees pursuant to Section 7.01(j) and as specified in Schedule 3.01 to permit Liens on assets described in items 1, 2, 3, 4, 12 or 13 of Schedule 3.01 then to the extent so agreed such assets will become "Excluded Collateral" and the Lender will execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such terminations on the Collateral created pursuant to the Security Documents in such assets.

**3.09    Inter-Creditor Agreements Prior to Full Facility Funding.**

(a)    Existing Credit Agreement. If the Existing Credit Agreement will remain outstanding after the Closing Date, the Lender and the lender under the Existing Credit Agreement ("Existing Lender") shall enter into an inter-creditor agreement (the "Existing Lender Inter-Creditor Agreement") in form acceptable to such parties to be effective from the Closing Date, providing for (a) the release or subordination by the Existing Lender of the Lender Priority Collateral, (b) the subordination by the Lender of its Lien on the Collateral (other than Lender Priority Collateral) to the Lien of the Existing Lender on the Collateral, (c) upon the earlier of the Project Completion Date and the first date on which the principal amount of the Loans (exclusive of Capitalized Interest) equals $30,000,000 to fully convert the balance owed under the Existing Credit Agreement into equity of Skye and release the liens on the collateral securing the Existing Credit Agreement, and (d) such other notice provisions and other terms and conditions agreed by the parties.

(b)    Skye Credit Agreement. If the Skye Credit Agreement shall remain outstanding after the Closing Date, the Lender and Skye shall enter into an inter-creditor agreement (the "Skye Inter-Creditor Agreement", and together with the Existing Lender Inter-Creditor Agreement, and any intercreditor agreement relating to the Permitted Project Debt, the "Inter-Creditor Agreements") to be effective from the Closing Date providing for full subordination of the Skye Credit Agreement and the Liens thereunder to this Agreement and the Liens hereunder, and such other notice provisions and other terms and conditions agreed by the parties.

## ARTICLE IV.
### CONDITIONS PRECEDENT TO BORROWINGS OF LOANS; CERTAIN POST-INITIAL CLOSING OBLIGATIONS

**4.01    Conditions of Initial Loan.** The obligation of the Lender to make its Initial Loan hereunder is subject to satisfaction of the following conditions precedent:

26

WAT-001506

(a)      The Lender's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Lender and its legal counsel:

(i)      executed counterparts of this Agreement, the Warrant and the Deed of Trust;

(ii)      if requested by the Lender, a Note executed by the Borrower;

(iii)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Lender may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(iv)      such documents and certifications as the Lender may reasonably require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in Utah;

(v)      a favorable opinion of Fennemore Craig, P.C., counsel to the Loan Parties, addressed to the Lender, as to the matters set forth in Exhibit E-1 and a favorable opinion of Smith Knowles P.C., special Utah counsel to the Loan Parties, addressed to the Lender, as to the matters set forth in Exhibit E-2;

(vi)      a certificate of a Responsible Officer of each Loan Party either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(vii)      a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied;

(viii)      evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and evidence that the Lender has been named as additional insured and loss payee of such insurance as its interests may appear;

(ix)      amendments to the Existing Credit Agreement and the Skye Credit Agreement satisfactory to the Lender and consistent with the Inter-Creditor Agreements, permitting the Loan Documents, the Cathode Agreement, the Concentrate Agreement and the transactions contemplated thereby, and in case of the Skye Credit Agreement, extending the maturity thereof beyond the Maturity Date, in each case executed by the parties and in full force and effect as of the Closing Date contemporaneously with the Initial Loan, or notice and evidence that the obligations under the Existing Credit

27

WAT-001507

Agreement and Skye Credit Agreement have been or will be as of Closing converted into equity of the Borrower or Skye, as applicable;

(x)     a budget of Project Costs in the form of Schedule 4.01(a)(x)(i) ("Project Budget"), 10-year financial projections (including a capital expenditure forecast) in the form of Schedule 4.01(a)(x)(ii) (the "Projections") and schedule for completion and testing of the Project in each case in form and substance satisfactory to the Lender; and

(xi)    such other assurances, certificates, documents, consents or opinions as the Lender reasonably may require.

(b)     The Project Account has been established with the Account Bank and the Borrower, Lender and Account Bank shall have entered into an account control agreement with respect to the Project Account and other account required to be subject to and account control agreement pursuant to Section 3.04.

(c)     The Borrower shall have paid all Attorney Costs of the Lender to the extent invoiced prior to or on the Closing Date, plus such additional amounts of Attorney Costs as shall constitute its reasonable estimate of Attorney Costs incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Lender) , provided, however, that in no event shall such Attorney Costs reimbursable by Borrower exceed $175,000.00, and that such Attorney Costs may be paid out of the Initial Loan proceeds.

(d)     The Cathode Agreement and Concentrate Agreement shall have been executed by the Borrower and the Lender and shall be in full force and effect and the Borrower shall be in compliance with its obligations thereunder.

(e)     The Lender shall have received, in proper form for filing, registration or recordation, each document required by the Security Documents or under law or reasonably requested by the Lender, to be filed registered or recorded in order to evidence or perfect the Liens granted to the Lender in the Security Documents.

(f)     The Lender shall have received (i) the results of recent lien and judgment searches in each of the jurisdictions or offices in which financing statements, registrations or other filings or recordations should be made to evidence or perfect Liens on all Collateral, which results shall reveal no Liens on any of the property of the Borrower or on the Project, other than Liens permitted hereunder (including Permitted Liens) or Liens to be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Lender and (ii) title reports, surveys, property, royalty and easement descriptions or agreements, opinions and other documentation reasonably satisfactory to the Lender relating to the property described in and made subject to the Deed of Trust.

**4.02    Conditions to all Loans.** The obligation of the Lender to make any Loan is subject to the following conditions precedent:

(a)     The representations and warranties of the Borrower and Skye contained in Article V or any other Loan Document, or which are contained in any document furnished at any time

28

CONFIDENTIAL                                                      WAT-001508

under or in connection herewith or therewith, shall be true and correct on and as of the date of such Loan in all material respects, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b)     No Default shall exist, or would result from such proposed Loan, including pro forma compliance with the financial covenants set forth in Section 7.11.

(c)     With respect to any Loan that would result in the aggregate outstanding principal of the Loans (excluding Capitalized Interest) exceeding $15,000,000, the In-Balance Test shall be satisfied.

(d)     The Lender shall have received a Loan Request in accordance with the requirements hereof.

Each Loan Request submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Loan.

**4.03    Post-Initial Loan Closing Obligations.** Following the Initial Loan closing:

(a)     If not delivered prior to or in connection with Initial Loan closing, Borrower shall, no later than August 22, 2014, cause First American Title Insurance Company to issue to Lender, at Lender's sole cost and expense (as to premium only but not search costs and other charges), a standard policy of Lender's title insurance in substantially the form of the previously delivered title commitment (No. NCS-590998-SLC1) dated March 28, 2014, as updated by First American Title Insurance Company as of August 12, 2014, with coverage in the amount of $30,000,000, and subject to no Liens other than those reasonably acceptable to Lender or that are not material to the Project or the business of the Borrower.

(b)     Borrower shall deliver to Lender the quotes that it receives from its insurance Broker with respect to the following insurance policies or increases: (i) builder's risk insurance, (ii) delay in start-up associated with "(i)", from those insurers willing to offer such product, and (iii) increase in excess blanket coverage for up to $20,000,000 (or such lesser amount that the relevant bidding insurance companies are willing to offer) (the "Insurance Quotes"). Following the receipt of the Insurance Quotes, Borrower and Lender shall determine which insurance policies or increases to obtain based upon the Insurance Quotes and satisfactory to Lender, not to be unreasonably withheld and taking into account the Borrower's insurance budgets set forth in the Projections.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that:

29

WAT-001509

**5.01    Existence, Qualification and Power; Compliance with Laws.** Each Loan Party (a) is a limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, and (d) is in compliance with all Laws; except in each case referred to in clause (b)(i), (c) or (d), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.02    Authorization; No Contravention.** The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, (i) any Contractual Obligation to which such Person is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law; except in each case referred to in clause (b) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.03    Governmental Authorization; Other Consents.** No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document.

**5.04    Binding Effect.** This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms subject to the Enforceability Exceptions.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited consolidated financial statements of the Borrower dated December 31, 2013, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with

30

                                                                      WAT-001510

GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**5.06     Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default.** The Borrower is not in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08     Ownership of Property; Liens.**

(a)     The Borrower either (i) owns and has good, legal and marketable title to, and, in respect of real property, a lawful and valid fee simple ownership interest in, or valid leasehold or mining claims to, all property necessary or used in the ordinary conduct of its business, including in those parcels of land comprising the Project site, or (ii) has a lawful, valid, exclusive and irrevocable right of use, or valid leasehold or mining claims to, all real property necessary or used in the ordinary conduct of its business, including in those parcels of land comprising the Project Site, free and clear of all Liens, other than Permitted Liens. The Borrower has a lawful, valid, exclusive and irrevocable right of use and a possessory interest in all necessary easements and other rights of ingress to and egress from all real property necessary or used in the ordinary conduct of its business, including in the Project site and lawfully possesses a valid and subsisting leasehold estate in and to all of its leased property (if any) used in the ordinary conduct of its business, including in those parcels of land comprising the Project site, in each case free and clear of all Liens, other than Permitted Liens. Other than the rights referred to in the preceding sentences, no property rights (including easements or other rights of ingress or egress) are required or to the Borrower's knowledge can reasonably be expected to be necessary for the design, development, construction, supply, start-up, commissioning, testing, financing, implementation, operation or maintenance of the Project. The provisions of this representation and warrant shall exclude defects that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     As of the Initial Loan closing, the Property (as defined in the Project Deed of Trust) comprises all material properties upon which the Project is to be built, where the

31

CONFIDENTIAL                                                           WAT-001511

Intermediate Tailings Dam will be constructed, and certain properties (as specified in the Project Deed of Trust) projected to be mined pursuant to the Projections (all of which properties are as identified and specified on Schedule 3.09 to the Loan Agreement) and all fixtures, assets and minerals located on, in or under such properties.

(c)     As of the Initial Loan closing, the Property (as defined in the All Assets Deed of Trust) comprises all material properties, assets, mining claims and other interests in real property or minerals in which the Trustor has an interest, including the properties upon which the Project are built, where the Intermediate Tailings Dam will be constructed, and the properties currently projected to be mined pursuant to the Projections (all of which properties are as identified and specified on Schedule 3.09 to the Loan Agreement) and all fixtures, assets and minerals located on, in or under such properties.

**5.09    Environmental Compliance.**  The Borrower and its Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Borrower has reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**5.10    Insurance.**  The properties of the Borrower is insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as have been provided and disclosed to the Lender in writing prior to the Closing Date.

**5.11    Taxes.**  The Borrower has filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of the Borrower, there is no proposed tax assessment against the Borrower that would, if made, have a Material Adverse Effect.

**5.12    ERISA Compliance.**

Neither the Borrower nor any ERISA Affiliate has ever maintained or contributed to (or had an obligation to contribute to) any Plan, Pension Plan or Multiemployer Plan.

**5.13    Subsidiaries.**  The Borrower has no Subsidiaries and has no equity investments in any other corporation or entity.

**5.14    Margin Regulations; Investment Company Act; Public Utility Holding Company Act.**

(a)     The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning

32

of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Borrower, any Person Controlling the Borrower (i) is a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, or (ii) is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure.** The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16    **Compliance with Laws.** The Borrower is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.17    **Applicable Permits, Utilities, Etc.**

All utility and other services, means of transportation, facilities, other materials, and other rights that are or can reasonably be expected to be necessary for the Project in accordance with Applicable Law and the Project Documents have been procured or will be procured when needed or are commercially available to the Project. No Applicable Permits or material licenses, trademarks, patents, or other similar agreements are necessary for the Project or to mine as assumed in the initial 6-years of the Projections except for those set forth on Schedule 5.17. The provisions of this representation and warrant shall exclude defects that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.18    **Environmental, Health and Safety Matters.**

The Borrower has duly complied, and its business, operations, and assets, and the Project, are materially in compliance, with all Applicable Laws regarding the environment and health and safety, except where the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. With respect to air emissions, discharges to surface water or ground water, noise emissions, solid or liquid waste

33

CONFIDENTIAL                                                    WAT-001513

disposal, the use, generation, storage, transportation, or disposal of toxic or hazardous substances or wastes, or other environmental, health, or safety matters, the Borrower (A) has been issued and will maintain all required Permits, (B) has received no complaint, order, directive, claim, citation, or notice by any Governmental Authority, and (C) has received no written complaint or claim from any Person seeking damages, contribution, indemnification, cost recovery, compensation, or injunctive relief.

### 5.19   Project Cost and Completion.

(a)      The Borrower's estimate of total Project Costs (including the contingency specified therein) is $45,300,000 based on and as specified in the Project Budget. The Borrower estimates that the aggregate proceeds of the Loan, together with Equity Contributions or Permitted Project Debt of $15,000,000, will be sufficient to achieve the Project Completion Date no later than the date that is fifteen (15) months following the closing of the Initial Loan.

(b)      The Project Budget provides the Borrower's reasonable estimate of all Project Costs anticipated by the Borrower to be incurred prior to the Project Completion Date to construct, finance and implement the Project.  The Project Budget, (i) is based on reasonable assumptions as to all legal and factual matters material to the estimates set forth therein, (ii) is consistent with the provisions of the Project Documents in all material respects, (iii) have been prepared in good faith and with reasonable care, and (iv) fairly represent the Borrower's expectations as to the matters covered thereby as of their respective dates.

### 5.20   Security Documents.

(a)      Each of the Security Documents is effective to create in favor of the Lender a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof and, in the case of UCC Collateral, when financing statements and other filings specified in the perfection certificate referred to therein are filed with the Secretary of State of Delaware, the Lender shall have a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such UCC Collateral and, subject to Section 9-315 of the New York Uniform Commercial Code, the proceeds thereof, as security for the Obligations to the extent perfection in such UCC Collateral can be obtained by filing Uniform Commercial Code financing statements, in each case prior and superior in right to the Lien of any other person (except for Liens permitted to have priority by the Loan Documents including Permitted Liens).

(b)      The Deed of Trust is effective to create in favor of the Lender a legal, valid and enforceable Lien on all of the Borrower's right, title and interest in and to the Mortgaged Property, as defined and described therein, and the proceeds thereof, and when the Deed of Trust is filed or recorded in the proper real estate filing or recording offices, and all relevant mortgage taxes and recording charges are duly paid, the Lender shall have a perfected Lien on, and security interest in, all right, title, and interest of the Borrower in such Mortgaged Property and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, as security for the Obligations to the extent perfection in such Mortgaged Property can be obtained by filing a deed of trust in each case prior and superior in right to the Lien of any other person (except for Liens permitted to have priority by the Loan Documents including Permitted Liens).

34

                                                          WAT-001514

(c)     The Account Control Agreements, together with this Agreement, are effective to create in favor of Lender, a legal, valid, binding and enforceable security interest in the Accounts described therein and the proceeds and products thereof.  Upon the full execution of this Agreement and each Account Control Agreement, each such Account Control Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Lender in the accounts described therein and the proceeds and products thereof, as security for the Obligations, in each case subject only to Permitted Liens.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as the Commitment shall be in effect, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall:

**6.01    Financial Statements.**  Deliver to the Lender, in form and detail reasonably satisfactory to the Lender:

(a)     as soon as available, but in any event within 150 days after the end of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Lender, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit; and

(b)     as soon as available, but in any event within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower as at the end of such fiscal quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of the Borrower in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

**6.02    Certificates; Other Information.**  Deliver to the Lender, in form and detail reasonably satisfactory to the Lender:

(a)     concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)     promptly after any request by the Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit

35

committee of the board of directors) of the Borrower by independent accountants in connection with the accounts or books of the Borrower, or any audit of any of them; and

(c)      promptly, such additional information regarding the business, financial or corporate affairs of the Borrower or Skye, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request.

6.03   **Notices.** Promptly notify the Lender after gaining knowledge:

(a)      of the occurrence of any Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, Contractual Obligation of the Borrower; (ii) any dispute, litigation, investigation, proceeding or suspension between the Borrower and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower, including pursuant to any applicable Environmental Laws; and

(c)      of any material change in accounting policies or financial reporting practices by the Borrower.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04   **Payment of Obligations.** Pay and discharge as the same shall become due and payable, all its material obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower; (b) all lawful claims which, if unpaid, would by law become a Material Lien upon its property; and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Material Indebtedness.

6.05   **Preservation of Existence, Etc.** (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

6.06   **Maintenance of Properties.** (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals

36

                                                       WAT-001516

and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**  Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice to the Lender of termination, lapse or cancellation of such insurance.

**6.08    Compliance with Laws.**  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, write, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records.**  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower.

**6.10    Inspection Rights.**  (a)      Permit representatives and independent contractors of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower and in accordance with applicable health and safety Laws and safety related requirements or rules of the Borrower, but no more than once (1) every three (3) months without the consent of Borrower; provided, however, that when an Event of Default exists the Lender (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours with reasonable advance notice but always in accordance with applicable health and safety Laws and safety related requirements and rules of the Borrower.

(b)      Permit the Construction Observer (acting as a representative for the Lender) to (i) meet periodically at reasonable times during customary business hours and at reasonable intervals with representatives of the Borrower and the Contractors and such other employees, consultants or agents thereof as the Lender or the Construction Observer shall reasonably request to be present for such meetings (it being understood that the parties intend, so far as reasonably practicable, to coordinate such meetings to coincide with any schedule of regular meetings established between the Borrower and the Construction Contractors), (ii) subject to any safety-related requirements, (x) perform such on-site inspections of the Project as the Construction Observer deems reasonably necessary or appropriate in the performance of its duties on behalf of the Lender, (y) at reasonable times during customary business hours upon prior notice, to the extent it deems reasonably necessary to permit it to perform its duties, review and examine the

37

                                                                 WAT-001517

plans and specifications and all shop drawings relating to a Project, and all information
(including Construction Contracts) supporting the material amendments to a Project Budget,
material amendments to any Construction Contracts (involving greater than $300,000), any
Disbursement Request and any certificates in support of any of the foregoing and to inspect
materials stored at any Project, and (z) review the insurance required pursuant to the terms of the
Loan Documents; (iii) contact any payee of the Borrower for purposes of confirming receipt of
progress payments represented as being made by the Borrower (and the Construction Observer
and Lender are so authorized); *provided* that the Lender and the Construction Observer shall
have no obligation to contact any such payee to so confirm; and (iv) examine, copy and make
extracts of the books, records, accounting data and other documents of the Borrower relating to
the construction of a Project, including, without limitation, bills of sale, statements, receipts,
Lien releases and waivers, contracts or agreements, to the extent related to any materials, fixtures
or articles incorporated into the  Project (excluding each of the foregoing which is subject to
attorney client privilege, attorney work product or subject to confidentiality restrictions binding
on the Borrower), (c) from time to time, at the reasonable request of the Lender or the
Construction Observer, deliver to the Lender or the Construction Observer, as applicable, an
updated project schedule for the  Project, (d) subject to any restrictions imposed by safety-related
requirements, reasonably cooperate with the Construction Observer in assisting the Construction
Observer to perform its duties and exercising its review and inspection rights hereunder to take
such further steps as the Lender or the Construction Observer may request as are reasonably
necessary in order to accomplish the performance of such obligations or the exercise of such
rights

     **6.11    Use of Proceeds.**  Use the proceeds of the Loans to pay Project Costs and
Borrower's reasonable closing and Attorney Costs not to exceed $100,000.; provided that if after
the Project Completion Date the Borrower determines that all of the proceeds of the Loans were
not required for such uses then the Borrower shall be entitled to use such excess proceeds for
general corporate purposes in a manner consistent with the requirements of this Agreement.

**ARTICLE VII.**
**NEGATIVE COVENANTS**

     So long as the Commitment shall be in effect, any Loan or other Obligation hereunder
shall remain unpaid or unsatisfied, the Borrower shall not:

     **7.01    Liens.**  Create, incur, assume or suffer to exist any Material Lien upon any of its
property, assets or revenues, whether now owned or hereafter acquired, other than the following
(each a "**Permitted Lien**" and collectively the "**Permitted Liens**"):

     (a)    Liens pursuant to any Loan Document;

     (b)    Liens existing on the date hereof and listed on <u>Schedule 7.01</u> and any renewals or
extensions thereof, <u>provided</u> that the property covered thereby is not increased and any renewal
or extension of the obligations secured or benefited thereby is permitted by <u>Section 7.03(b)</u>;

38

    WAT-001518

(c)     Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)     easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h) or securing appeal or other surety bonds related to such judgments;

(i)     Liens securing Indebtedness permitted under Section 7.03(e); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower in the Borrower's reasonable determination, of the property being acquired on the date of acquisition; and

(j) Liens on Excluded Collateral securing Permitted Project Debt or, following the Project Completion Date, other Indebtedness permitted by the terms of this Agreement.

**7.02    Investments.** Make any Investments, except:

(a)     Investments held by the Borrower in the form of cash equivalents;

(b)     advances to officers, directors and employees of the Borrower and Subsidiaries in an aggregate amount not to exceed $100,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and

CONFIDENTIAL

WAT-001519

Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(d)     Joint ventures formed for the purpose of exploring and developing Exploration Properties pursuant to which the Borrower will contribute Exploration Properties to the joint venture but will expressly not be obligated to fund or be responsible for any capital or operating costs of, or borrowings or other obligations of, the joint venture, unless otherwise agreed by Lender; and

(e)     other Investments not exceeding $100,000 in the aggregate in any fiscal year of the Borrower.

Other than joint ventures described in (d) above, the Borrower shall not form or acquire any Subsidiary without the Lender's consent, such consent not to be unreasonably withheld.

**7.03    Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents;

(b)     Indebtedness outstanding on the date hereof and listed on Schedule 7.03 (including Indebtedness outstanding on the date hereof under the Existing Credit Agreement and the Skye Credit Agreement) and any refinancings, refundings, renewals or extensions thereof; provided that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder, and Indebtedness subordinated to the Obligations may not be refinanced except on subordination terms at least as favorable to the Lender and no more restrictive on the Borrower than the subordinated Indebtedness being refinanced, and in an amount not less than the amount outstanding at the time of refinancing.

(c)     obligations (contingent or otherwise) of the Borrower existing or arising under any Swap Contract with counterparties acceptable to the Lender, acting reasonably, provided that (i) such obligations are (or were) entered into by the Borrower in the ordinary course of business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by the Borrower, or changes in the value of securities issued by the Borrower, and not for purposes of speculation or taking a "market view;" and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(d)     Indebtedness in respect of capital leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i) if before and after the incurrence thereof the Borrower is in compliance with Section 7.11; provided, however, that the aggregate amount of all such capital leases, Synthetic Lease Obligations and/or purchase money obligations, at any one time outstanding shall not exceed $7,000,000;

40

                                                                 WAT-001520

(e)      unsecured Indebtedness in an aggregate principal amount not to exceed $5,000,000 at any time outstanding, if before and after the incurrence thereof the Borrower is in compliance with Section 7.11; and

(f)      Permitted Project Debt.

**7.04    Fundamental Changes.**  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom.

**7.05    Dispositions.**  Make any sale, transfer or other disposition by Borrower of the Borrower's business or property (a **"Disposition"**) or enter into any agreement to make any Disposition, except:

(a)      Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)      Dispositions of inventory in the ordinary course of business; and

(c)      Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)      Permitted Liens; and

(e)      Other Dispositions of assets having an aggregate fair market value not exceeding $500,000 per annum.

**7.06    Restricted Payments.**  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

**7.07    Change in Nature of Business.**  Engage in any material line of business substantially different from those lines of business conducted by the Borrower on the date hereof or any business substantially related or incidental thereto.

**7.08    Transactions with Affiliates.**  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided, that the Borrower may comply with its obligations under the Existing Credit Agreement and the Skye Credit Agreement and issue common equity and Permitted Preferred Equity; provided, further that the Existing Credit Agreement and the Skye Credit Agreement shall not be amended, or any provision thereunder waived, in a manner adverse to the Borrower or the Lender, without the consent of the Lender.

41

CONFIDENTIAL                                                                          WAT-001521

**7.09    Burdensome Agreements.**  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of the Borrower to create, incur, assume or suffer to exist Liens on Collateral in favor of Lender; provided, however, that this clause shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.03(e) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness

**7.10    Use of Proceeds.**  Use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**7.11    Financial Covenants.**

(a)    Debt to Equity Ratio.  Permit the Debt to Equity Ratio as of any date to be greater than 1.50 to 1.00.

(b)    Leverage Ratio.  Permit the Leverage Ratio at any time during any period of four fiscal quarters of the Borrower ending at least one full fiscal quarter after the Project Completion Date to be greater than 2.75 to 1.00.

(c)    Cash Available for Debt Service to Debt Service Ratio.  Permit the Cash Available for Debt Service to Debt Service Ratio (measured as of the last day of each fiscal quarter of the Borrower ending at least one full fiscal quarter after the Project Completion Date) to be less than 1.30 to 1.00.

**7.12    Capital Expenditures.**  Make or become legally obligated to make any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding for Project Costs and normal replacements and maintenance which are properly charged to current operations), except for capital expenditures in the ordinary course of business not greater than 105% of amounts provided for in the Projections for the relevant annual period.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.**  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within seven (7) days after the same becomes due, any interest on any Loan, or (iii) within ten (10) days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  The Borrower fails to perform or observe, in all material respects, any term, covenant or agreement contained in any of Section 6.03(a), 6.05 or 6.11 or Article VII (except for Sections 7.11 and 7.12) and any such failure is not promptly (and in any event within ten (10) days) remedied or cured; provided that such cure period shall not apply to

42

CONFIDENTIAL

WAT-001522

any such failure that is not susceptible to cure or the existence of which has resulted in a Material Adverse Effect ; or

(c)      Financial Covenants.  The Borrower fails to perform or observe the covenants or agreements contained in Sections 7.11 and 7.12 and:

(i) with respect to Section 7.11(a), the Borrower does not submit a detailed plan to cure such default within 15 days or such Debt to Equity Ratio is not restored to the required level within 30 days;

(ii) with respect to Section 7.11(b), the Borrower does not submit a detailed plan to cure such default within 15 days or the Leverage Ratio is not restored to the required level within 30 days;

(iii) with respect to Section 7.11(c), the Borrower does not submit a detailed plan to cure such default within 15 days or the Cash Available for Debt Service to Debt Service Ratio is not restored to the required level within 30 days;

(iv) with respect to Section 7.12, the Borrower does not submit a detailed plan to cure such default within 15 days or such failure is not reversed within 30 days or an equity contribution is not made to the Borrower within 30 days to provide for the cost of the relevant expenditure; or

(a)      (c)      Other Defaults.  Any Loan Party fails to perform or observe any other material covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days provided that, (A) if such failure does not involve the payment of money to any Person and is not susceptible to cure within such 30 days, (B) such Person is proceeding with diligence and good faith to cure such default and such default is susceptible to cure and (C) the existence of such failure has not resulted in a Material Adverse Effect, such 30 day period shall be extended as may be necessary to cure such failure, such extended period not to exceed 45 days in the aggregate (inclusive of the original 30-day period); or

(d)      Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made, provided that, if (i) if the Borrower and the Lender agree, acting reasonably, that the Borrower could not have been aware that such representation or warranty was false or incorrect at the time such representation or warranty was made, (ii) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied, and (iii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied within 30 days (or if such incorrect representation or warranty is not susceptible to cure within 30 days, and the Borrower is proceeding with diligence and in good faith to cure such default and such default is susceptible to cure, such 30 day cure period shall be extended as may be necessary to cure such incorrect representation or warranty, such extended period not to exceed 90 days in the aggregate

43

                                                                                    WAT-001523

(inclusive of the original 30-day period)) from the date a Responsible Officer of the Borrower obtains knowledge thereof, then such false or incorrect representation or warranty shall not constitute a Default or an Event of Default for purposes of the Loan Documents; or

(e)     Cross-Default. (i) The Borrower (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness or Material Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or Material Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of such Material Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Material Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Material Indebtedness to be made, prior to its stated maturity, or such Material Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract that constitutes Material Indebtedness an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Borrower is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Borrower is an Affected Party (as so defined), in each of the foregoing cases such payment failure is not cured within 10 days; provided that such cure period shall not apply to any such failure that is not susceptible to cure or the existence of which has resulted in a Material Adverse Effect; or

(f)     Insolvency Proceedings, Etc. Any Loan Party institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)     Inability to Pay Debts; Attachment. (i) The Borrower becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 45 days after its issue or levy; or

(h)     Judgments. There is entered against the Borrower (i) a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent

44

WAT-001524

not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 15 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    Invalidity of Loan Documents. Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests or any other Person validly contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document, and in each of the foregoing cases is not promptly (and in any event within ten (10) days) remedied or cured; provided that such cure period shall not apply to any such failure that is not susceptible to cure or the existence of which has resulted in a Material Adverse Effect; or

(j)    Permits. Any suspension or violation of any Applicable Permit issued to the Borrower with respect to, the Borrower or the Project that results in the cessation or suspension of operations or construction of the Project for 30 calendar days; or

(k)    Project Completion Date; Conditions Subsequent. (i) The Project Completion Date shall not have occurred on or prior to November 30, 2015 (subject to extension for Force Majeure to, but not beyond, February 28, 2016) or (ii) the Conditions Subsequent described in clauses (a), (c) and (d) of the definition thereof shall not have been satisfied on or prior to the date which is 90 days after the Closing Date, or the Conditions Subsequent described in clause (b) of the definition thereof shall not have been satisfied on or prior to the date which is 150 days after the Closing Date or (iii) the aggregate amount of Equity Contributions (or, to the extent compliance with the In-Balance Test permits, Permitted Project Debt) deposited in the Project Account within six months after the Closing Date does not equal or exceed $15,000,000; or

(l)    Commercial Agreement Default. The Borrower uses or sells copper ore produced from the properties to be mined as set forth on Schedule 3.09 for purposes other than to produce product to be sold under the Concentrate Agreement or the Cathode Agreement or fails to comply with (i) any of its material obligations under the Concentrate Agreement or the Cathode Agreement or (ii) any other obligation that could reasonably be expected to lead to the termination (other than termination by the Borrower based on a default by the Lender or its Affiliates) of the Concentrate Agreement or the Cathode Agreement, as applicable, for (a) thirty (30) days following notice thereof or (b) such longer period as is reasonable under the circumstances, provided that Borrower continues to diligently pursue such cure; provided, however, that (i) Borrower shall not have such cure period, or such cure period shall terminate, in the event that (x) the relevant breach or failure to comply is not capable of cure, (y) the relevant breach or failure to comply has resulted in a Material Adverse Effect, or (z) postponement of Lender's remedies during such cure period would result in a material waste or reduction in value to Lender's Collateral, and (ii) the relevant breach or failure to comply was caused by Force Majeure, then such cure period shall be (subject to clause (i)) for a period of one hundred and twenty (120) days; or

45

CONFIDENTIAL                                                          WAT-001525

(m)      Agreements Not Enforceable. Any Loan Document, the Concentrate Agreement or the Cathode Agreement or any material provision thereof at any time for any reason (other than a termination by the Borrower permitted by the terms thereof based upon a default by the Lender or its Affiliates) (i) ceases to be in full force and effect, (ii) is declared to be void or is repudiated by Borrower or Skye, (iii) is suspended (other than for reasons of Force Majeure) or revoked, or a notice of termination thereof is delivered (other than a notice of termination by the Borrower permitted by the terms thereof based upon a default by the Lender or its Affiliates or upon expiration in accordance with its terms when fully performed), (iv) the validity or enforceability thereof is at any time contested by the Borrower or Skye or (v) ceases to give or provide the respective rights, titles, remedies, powers, or privileges intended to be created thereby; or

(n)      Security Default. (i) Any Security Document, once executed and delivered, ceases at any time for any reason to provide the Liens or material rights, titles, interests, remedies, powers or privileges created thereby, (ii) any Lien created in any material portion of the Security shall cease to be effective or fail to have the priority originally created under the Security Documents, (iii) the validity of the Security Documents or the applicability thereof to the obligations of the Borrower hereunder or any part thereof, shall be disaffirmed by or on behalf of the Borrower, or (iv) the Lender's security interest or other rights in any portion of the Collateral shall terminate in any manner other than that contemplated by the Financing Documents, and in each of the foregoing cases is not promptly (and in any event within ten (10) days) remedied or cured; provided that such cure period shall not apply to any such failure that is not susceptible to cure or the existence of which has resulted in a Material Adverse Effect; or

(o)      Event of Loss Default. All or substantially all of the Collateral is damaged as a result of an Event of Loss; or

(p)      Change of Ownership Default. (i) Until the Project Completion Date, (x) the members of Skye on the Closing Date cease to retain management control (as such term is defined in the definition of "Affiliate") of the Borrower or (y) Skye at any time sells or otherwise transfers its management control of the Borrower or (ii) at any time (x) either Loan Party is controlled by a direct competitor of the Lender or (y)  the Borrower issues or has outstanding any equity other than non-redeemable common equity or Permitted Preferred Equity; or

(q)      Abandonment Default. An Event of Abandonment shall have occurred.

**8.02    Remedies Upon Event of Default.** If any Event of Default occurs and is continuing, the Lender may take any or all of the following actions:

(a)      declare the Commitment to be terminated, whereupon the Commitment shall be terminated;

(b)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

46

WAT-001526

(c)    exercise all rights and remedies available to it under the Loan Documents or applicable law;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States, the Commitment shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, without further act of the Lender.

**8.03    Application of Funds.** After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable, any amounts received on account of the Obligations shall be applied by the Lender in such order as it elects in its sole discretion.

# ARTICLE IX.
## MISCELLANEOUS

**9.01    Amendments; Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Lender and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**9.02    Notices and Other Communications; Facsimile Copies.**

(a)    General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the address, facsimile number or (subject to subsection (c) below) electronic mail address specified for notices to the applicable party on Schedule 9.02; or to such other address, facsimile number or electronic mail address as shall be designated by such party in a notice to the other party.  All notices and other communications expressly permitted hereunder to be given by telephone shall be made to the telephone number specified for notices to the applicable party on Schedule 9.02, or to such other telephone number as shall be designated by such party in a notice to the other party.  All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (c) below), when delivered; provided, however, that notices and other communications to the Lender pursuant to Article II shall not be effective until actually received by the Lender.  In no event shall a voicemail message be effective as a notice, communication or confirmation hereunder.

(b)    Effectiveness of Facsimile Documents and Signatures. Loan Documents may be transmitted and/or signed by facsimile.  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and

47

CONFIDENTIAL                                                                    WAT-001527

shall be binding on all Loan Parties and the Lender. The Lender may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(c)     Limited Use of Electronic Mail. Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 6.02, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

(d)     Reliance by Lender. The Lender shall be entitled to rely and act upon any notices (including telephonic Loan Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Lender, its Affiliates, and their respective officers, directors, employees, agents and attorneys-in-fact from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other communications with the Lender may be recorded by the Lender, and the Borrower hereby consents to such recording.

**9.03   No Waiver; Cumulative Remedies.** No failure by the Lender to exercise, and no delay by the Lender in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.04   Attorney Costs, Expenses and Taxes.** The Borrower agrees (a) to pay or reimburse the Lender for all costs and expenses incurred in connection with the development, preparation, negotiation and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated, but for the avoidance of doubt not Attorney Costs associated with the development, preparation, negotiation and execution of the Cathode Sales Agreement and the Concentrate Sales Agreement), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs, and (b) to pay or reimburse the Lender for all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any Debtor Relief Law), including all Attorney Costs. The foregoing costs and expenses shall include all search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses incurred by the Lender and the cost of independent public accountants and other outside experts retained by the Lender. All amounts due under this Section 9.04 shall be payable within ten Business Days after demand therefor. The agreements in this Section shall survive the termination of the Commitment and repayment, satisfaction or discharge of all other Obligations.

48

CONFIDENTIAL

WAT-001528

**9.05    Indemnification by the Borrower.**  Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless the Lender, its Affiliates, and their respective directors, officers, employees, counsel, agents and attorneys-in-fact (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) the Commitment, any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Affiliate or any other Loan Party, or any Environmental Liability related in any way to the Borrower, any Affiliate or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall have any liability for any indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). All amounts due under this Section 9.05 shall be payable within ten Business Days after demand therefor. The agreements in this Section shall survive the termination of the Commitment and the repayment, satisfaction or discharge of all the other Obligations.

**9.06    Payments Set Aside.**  To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

**9.07    Successors and Assigns.**

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender and the Lender may not assign or otherwise transfer any

49

WAT-001529

of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (c) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (c) of this Section and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    The Lender may at any time with prior notice to the Borrower, assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Commitment and the Loans at the time owing to it) pursuant to documentation acceptable to the Lender and the assignee. From and after the effective date specified in such documentation, such Eligible Assignee shall be a party to this Agreement and, to the extent of the interest assigned by the Lender, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest so assigned, be released from its obligations under this Agreement (and, in the case of an assignment of all of the Lender's rights and obligations under this Agreement, shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 2.10</u>, <u>9.04</u> and <u>9.05</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver new or replacement Notes to the Lender and the assignee, and shall execute and deliver any other documents reasonably necessary or appropriate to give effect to such assignment and to provide for the administration of this Agreement after giving effect thereto.

(c)    The Lender may at any time, without the consent of, but with prior notice to, the Borrower, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans); <u>provided</u> that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the Borrower for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. Subject to subsection (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 2.10</u> to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 9.09</u> as though it were the Lender.

(d)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.10</u> than the Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code shall not be entitled to the benefits of <u>Section 2.10</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to provide to the Lender such tax forms prescribed by the

50

                                        WAT-001530

IRS as are necessary or desirable to establish an exemption from, or reduction of, U.S. withholding tax.

(e)    The Lender may at any time without the consent of, but with prior notice to, the Borrower pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure obligations of the Lender; provided that no such pledge or assignment shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto and any pledgee or assignee shall agree to be bound by this Section 9.07.

(f)    As used herein, the following terms have the following meanings:

"Eligible Assignee" means  (a) an Affiliate of the Lender and (b) any other Person (other than a natural person) approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that no such approval shall be required if an Event of Default has occurred and is continuing.

**9.08    Confidentiality.** The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Lender on a nonconfidential basis from a source other than the Borrower.  For purposes of this Section, "Information" means all information received from any Loan Party relating to any Loan Party or any of their respective businesses, other than any such information that is available to the Lender on a nonconfidential basis prior to disclosure by any Loan Party, provided that, in the case of information received from a Loan Party after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**9.09    Set-off.** In addition to any rights and remedies of the Lender provided by law, upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time, without prior notice to the Borrower or any other

CONFIDENTIAL                                                                        WAT-001531

Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party) to the fullest extent permitted by law, to set off and apply any and all indebtedness or other amounts at any time owing by, the Lender or any of its Affiliates to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to the Lender hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable indebtedness or other amounts. The Lender agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. Without limiting the foregoing, Borrower expressly authorizes the Lender and its Affiliates to, without prior notice or judicial action, setoff (by way of setoff, recoup, net, offset, combination of accounts, retention, or withholding) any sum, amount, or obligation (whether fixed, matured, unmatured, liquidated, unliquidated, or contingent) owed by the Lender or its Affiliates to the Borrower under the Cathode Sales Agreement or the Concentrate Sales Agreement against any sum, amount, or obligation (whether fixed, matured, unmatured, liquidated, unliquidated, or contingent) owed by the Borrower to the Lender under the Loan Documents. The foregoing is in addition to, and not in limitation of, any other right or remedy available to the Lender or its Affiliates (including any other right of setoff), whether arising by this Agreement or any other agreements, or under applicable law, equity, or otherwise

**9.10    Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**9.11    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**9.12    Integration.** This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Lender in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

52

CONFIDENTIAL
WAT-001532

**9.13    Survival of Representations and Warranties.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**9.14    Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.15    Governing Law.**

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE; PROVIDED THAT THE LENDER SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN THE CITY OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER AND THE LENDER EACH CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. THE BORROWER AND THE LENDER EACH IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO. THE BORROWER AND THE LENDER EACH WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

**9.16    Waiver of Right to Trial by Jury.** EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY

53

                                                                 WAT-001533

LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

CONFIDENTIAL                                                                           WAT-001534

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

CS MINING, LLC

By: _____

Name:  Russell D. Alley

Title:    Chief Executive Officer

[Signature Page to Noble Credit Agreement-CS Mining, LLC]

CONFIDENTIAL

WAT-001535

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

NOBLE AMERICAS CORP.

By: _____

Name: Joseph Limone

Title: Secretary & General Counsel

[Signature Page to Loan and Security Agreement-Noble Americas Corp.]

#86193505v3

CONFIDENTIAL

WAT-001536

*SCHEDULE 3.01*

**EXCLUDED COLLATERAL**

1.  If the Lender, acting reasonably, so agrees, Variah patented mining claim, comprising a portion of Mineral Survey No. 5474, Township 27 South, Range 11 West, Beaver Lake Mining District, City of Milford, Beaver County, State of Utah, and all fixtures, property and assets located thereon. (Flotation Mill)

2.  If the Lender, acting reasonably, so agrees, Pronoun patented mining claim, comprising a portion of Mineral Survey No. 5474, Township 27 South, Range 11 West, Beaver Lake Mining District, City of Milford, Beaver County, State of Utah, and all fixtures, property and assets located thereon. (Flotation Mill)

3.  If the Lender, acting reasonably, so agrees, Maud patented mining claim, comprising a portion of Mineral Survey No. 5474, Township 27 South, Range 11 West, Beaver Lake Mining District, City of Milford, Beaver County, State of Utah, and all fixtures, property and assets located thereon. (Existing Tailings Pond)

4.  If the Lender, acting reasonably, so agrees, Noun patented mining claim, comprising a portion of Mineral Survey No. 5474, Township 27 South, Range 11 West, Beaver Lake Mining District, City of Milford, Beaver County, State of Utah, and all fixtures, property and assets located thereon. (Existing Tailings Pond)

5.  Two (2) Caterpillar 777 Haul Trucks Serial No.'s RDR00131 and RDR00145 (vendor financed by Caterpillar Financial Services).

6.  Cash or other cash investments posted with Smith Manus or its affiliates in connections with the Borrower's bonding obligations with regulatory agencies, and the resulting bonds posted with the relevant regulatory agencies.

7.  One (1) 2012 Manitou M50-4T Forklift, S/N 796173 (H & E Equipment Services, Inc.);

8.  One (1) 2012 JG-JLG 600AJ BOOM, S/N 0300154821 (H & E Equipment Services, Inc.);

9.  HP-Laser Jet M601n Workgroup Printer SN:Cnbl312yz HP-Laser Jet M601n Workgroup Printer SN:Cnbc312yx Sharp Mx-B402s Digital Copier SN:19009249 Sharp Mx-Ds14 Stackable Cabinets Sharp Mx-Ds13 Base Sharp Mx-Fxx3 Fax Expansion Sharp Mx-2610 Digital Color Copier Sn:15088158 Sharp Mx-De12 Paper Feed Desk (Revo Leasing Company); and

10. The following equipment:
   - Caterpillar® 14G Motor Road Grader (1985), S/N: 96U06420
   - Caterpillar® 16G Motor Road Grader (1988-1989), S/N: 93U02885
   - Caterpillar® 330CL Track Hoe, S/N: DKY02492
   - Caterpillar® 385BL Excavator (2003), S/N: ANS00295
   - Caterpillar® 773B Haul Truck (1995), S/N: 63W03899
   - Caterpillar® 773B Haul Trucks (1995), S/N: 63W04504
   - Caterpillar® 773B Haul Trucks (1995), S/N: 63W04509
   - Caterpillar® 773B Haul Trucks (1995), S/N: 63W04374
   - Caterpillar® 966G Wheel Loader (2000), S/N: 3SW00823
   - Caterpillar® 988G Loader (2002), S/N: BNH00506
   - Caterpillar® 992C Wheel Loader (1991), S/N: 49Z01839
   - Caterpillar® D10R Track Dozer (1999), S/N: 3KR01362
   - Caterpillar® D8H Dozer, (1974), S/N: 46A34012
   - S70 Bobcat Skid-Steer Loader
   - Magnetite Circuit Screens, Machine: Model 2SG48-60W-5STK Stack-Sizer™ of carbon steel construction
   - Flow Divider: 72" Diameter 10-Way Flow Divider of carbon steel construction and vulcanized rubber lining
   - Single Rougher Wet Drum Magnetic Separator
   - Double Cleaner Wet Drum Magnetic Separator

CONFIDENTIAL

11. Other vendor-financed equipment or property acquired by the Borrower wherein the applicable vendor-financing terms prohibit the placement of liens on such equipment, or leased equipment or property.

12. If the Lender, acting reasonably, so agrees, the Exploration Properties, or in connection with any joint venture or exploration transaction with respect to such Exploration Properties, Lender consents, such consent not to be unreasonably withheld.

13. Magnetite and accounts receivable and the proceeds thereof arising from the sale of magnetite, new magnetite processing equipment installed or vendor financed, and if the Lender, acting reasonably, so agrees other equipment used to process and refine magnetite.

CONFIDENTIAL

WAT-001539

*SCHEDULE 3.09*

### LENDER PRIORITY COLLATERAL

1.   The properties upon which the Phase II project (the "**Project**") described in the "Project Budget" set forth as an attachment to this Agreement, the SX/EW and leaching plant, are built, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

2.   The properties upon which that certain new intermediate tailings dam for the Project to be constructed with Loan proceeds as specified in the Project Budget, will be constructed, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

BEN HARRISON MINE, BEN HARRISON FRACTION, CHALCOPRITE, KLONDYKE NO. 2, GALVESTON MINE, GALVESTON MINE NO. 2, GALVESTON MINE NO. 3, MARY I NO. 1, MARY I NO. 2, TROJAN, WANDERING JEW-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

3.   A fifty percent (50%) interest in Borrower's interests and rights in the Copper Ranch and Niagara Hill deposits (it being the intention of the parties that the intercreditor agreement (the "WUMI Intercreditor Agreement") of even date between the Lender and the lender under the Existing Credit Agreement ("WUMI") is to share proceeds of collateral and not limit the liens or claims of either creditor and that both the Lender and WUMI shall have a lien on and security interest in 100% of all of the property and assets listed in this item 3, with the proceeds of such collateral being applied <u>first</u>, equally to the Noble Obligations (as defined in the WUMI Intercreditor Agreement) and the WUMI Obligations (as defined in the WUMI Intercreditor

CONFIDENTIAL                                                                                              WAT-001540

Agreement) until the Noble Obligations or the WUMI Obligations shall have been paid in full and _second_ if and when the Noble Obligations or the WUMI Obligations shall have been paid in full the balance of the proceeds shall be applied 100% to the Noble Obligations or the WUMI Obligations, as the case may be, until paid in full):

**Niagara Hill**

| McCulley-Wood Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Colorado Boom, Sarault, Montreal, Niagara Falls | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| Consolidated Montreal #1, Albert, Annex, Contact, | 3446 | 1008 | Rocky | Sec. 22 T27S R11W |
| Dundee, Fraction, George, Tip Top | 6253 | 1008 | Rocky | Sec. 22 T27S R11W |

**Copper Ranch**

| AJL (John Bogdanich) Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Jewel | 5476 | 36623 | Rocky | Sec. 22 T27S R11W |
| Marguerite #15 | 5476 | 36624 | Rocky | Sec. 22 T27S R11W |

| **Unpatented Claims** | | | | |
|---|---|---|---|---|
| Serial No | Claim Name/Number | Mc Lead Case Ser Nr | Claim Type | Disposition |
| UMC355012 | ROCKY # 58 | UMC354981 | LODE | ACTIVE |
| UMC355013 | ROCKY # 59 | UMC354981 | LODE | ACTIVE |
| UMC355014 | ROCKY # 61 | UMC354981 | LODE | ACTIVE |
| UMC355015 | ROCKY # 62 | UMC354981 | LODE | ACTIVE |
| UMC355016 | ROCKY # 63 | UMC354981 | LODE | ACTIVE |

| **State Lease** | | | | |
|---|---|---|---|---|
| SITLA Lease # | County | Twp./Range/Sec. | Legal Description | Status |
| ML-49556 | Beaver | T27S R11W Sec. 16 | LOT 1(35.33), N2, NE4SW4, S2SW4, SE4, S16 (ALL) | Active |

4.    The Project bank account for deposits and expenditures associated with the Project and Project Budget, as required pursuant to this Agreement;

5.  The Cathode Agreement, the Concentrate Agreement and all rights, entitlements and receivables of the Borrower thereunder;

6.  All properties and assets purchased with proceeds of the Noble Loan or with amounts required hereby to be deposited in the Project Account and applied to pay Project Costs pursuant to this Agreement; and

7.  All proceeds of the foregoing items 1-6 (subject to the sharing required as described under item 3 above as to the collateral described in item 3 above).

CONFIDENTIAL

WAT-001542

*SCHEDULE 4.01(a)(x)(i)*

**PROJECT BUDGET**

*Attached.*

| Capital Expenditures | PHASE I FUNDS | | | PHASE II FUNDS | | MONTHLY USE OF FUNDS | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Budget | 1 Draw | Remaining | 1 Draw | Remaining | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **RESOURCE DEVELOPMENT & EXPLORATION** | | | | | | | | | | | | | | | | | |
| **Development and Permitting** | | | | | | | | | | | | | | | | | |
| Site Layout Earthworks | | | | | | | | | | | | | | | | | |
| Mag/Waste removal of major rocks | | | | | | | | | | | | | | | | | |
| Topsoil removal & Stockpiling | | | | | | | | | | | | | | | | | |
| Tailings Dam Expansion | | | | | | | | | | | | | | | | | |
| Tailings Dam Engineering | | | | | | | | | | | | | | | | | |
| Intermediate Tailings Dam | | | | | | | | | | | | | | | | | |
| Monitor and metal track wells | | | | | | | | | | | | | | | | | |
| Intermediate Tailings Dam Engineering | | | | | | | | | | | | | | | | | |
| Other permitting & met testing | | | | | | | | | | | | | | | | | |
| Exploration Standard - Drilled | | | | | | | | | | | | | | | | | |
| **Total Development and Permitting** | | | | | | | | | | | | | | | | | |
| **Exploration Program** | | | | | | | | | | | | | | | | | |
| Field additives | | | | | | | | | | | | | | | | | |
| Digital field notebook | | | | | | | | | | | | | | | | | |
| AMC field mapper | | | | | | | | | | | | | | | | | |
| Resource Development & Exploratory Drilling / RC | | | | | | | | | | | | | | | | | |
| **Exploration Program** | | | | | | | | | | | | | | | | | |
| **TOTAL RESOURCE DEVELOPMENT & EXPLORATION** | | | | | | | | | | | | | | | | | |
| **PHASE II** | | | | | | | | | | | | | | | | | |
| **Development Costs** | | | | | | | | | | | | | | | | | |
| Met Testing | | | | | | | | | | | | | | | | | |
| Geo Modeling | | | | | | | | | | | | | | | | | |
| Environmental Costs | | | | | | | | | | | | | | | | | |
| Engineering & Costing | | | | | | | | | | | | | | | | | |
| Permitting | | | | | | | | | | | | | | | | | |
| Reclamation Bonding | | | | | | | | | | | | | | | | | |
| Drill Program | | | | | | | | | | | | | | | | | |
| 43-101 Feasibility | | | | | | | | | | | | | | | | | |
| **Total Development Costs** | | | | | | | | | | | | | | | | | |
| **EPCM** | | | | | | | | | | | | | | | | | |
| Agitated Leach | | | | | | | | | | | | | | | | | |
| CCD Circuit | | | | | | | | | | | | | | | | | |
| Solvent Extraction Plant (incl. Tank Farm) | | | | | | | | | | | | | | | | | |
| Electrowinning Plant | | | | | | | | | | | | | | | | | |
| Raffinate and Acid Pump/Pipes/Pipe | | | | | | | | | | | | | | | | | |
| Tailings Reclaim System (Design) | | | | | | | | | | | | | | | | | |
| Engineering | | | | | | | | | | | | | | | | | |
| Construction Equip Rentals | | | | | | | | | | | | | | | | | |
| Construction Sub-contract | | | | | | | | | | | | | | | | | |
| Transportation Insurance | | | | | | | | | | | | | | | | | |
| Construction Labor | | | | | | | | | | | | | | | | | |
| Construction Management | | | | | | | | | | | | | | | | | |
| Sump Reclaim Tank, Pond and Pumps | | | | | | | | | | | | | | | | | |
| Senior and SOX Upgrade | | | | | | | | | | | | | | | | | |
| 3 MW Substation | | | | | | | | | | | | | | | | | |
| Commissioning | | | | | | | | | | | | | | | | | |
| **Total EPCM** | | | | | | | | | | | | | | | | | |
| **Total Phase II** | | | | | | | | | | | | | | | | | |
| **TOTAL CAPITAL EXPENDITURES** | | | | | | | | | | | | | | | | | |

CONFIDENTIAL

WAT-001544

# EXHIBIT 3

Execution Version

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("**Agreement**") is made and entered into as of August 12, 2014, by and among CS MINING, LLC, a Delaware limited liability company ("**Borrower**"), DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**WUMI**"), and NOBLE AMERICAS CORP., a Delaware corporation ("**Noble**"). Each of WUMI and Noble may be referred to herein as a "**Party**", and together they may be referred to as the "**Parties**."

## RECITALS

WHEREAS, WUMI has extended credit to Borrower pursuant to that certain Loan and Security Agreement originally dated as of August 10, 2012, (as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time after the date hereof, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, the "**WUMI Loan Agreement**");

WHEREAS, Borrower desires Noble to extend credit and loans to Borrower pursuant to and on the terms set forth in that certain Loan and Security Agreement between Noble and Borrower dated August 12, 2014 (as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time after the date hereof, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, the "**Noble Loan Agreement**", and together with the WUMI Loan Agreement, the "**Loan Agreements**");

WHEREAS, Noble desires to have WUMI subordinate its rights to repayment and liens under the WUMI Loan to all obligations now or hereinafter owing from the Borrower to Noble under or pursuant to the Noble Loan; and

WHEREAS, WUMI anticipates to benefit directly from the Noble Loan as well as benefits flowing to Borrower.

## AGREEMENT

NOW, THEREFORE, in consideration of the good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Noble to

*Intercreditor Agreement*

WUMI003693

Execution Version

extend credit to Borrower, which Noble would not have done but for this Agreement, the parties agree as follows:

1.   **Acknowledgements and Consents**.   Each of WUMI and Noble (including for purposes of their respective Loan Agreements on the date hereof): (a) acknowledges and consents to the Borrower having entered into the Loan Agreements in their respective forms on the date hereof; and (b) consents to the Borrower granting to the other Party security interests in the Collateral pursuant to the applicable security documents and the terms hereof.

2.   **Subordination Agreements**.

2.1.   <u>Subordination of Noble Collateral by WUMI</u>.   WUMI hereby subordinates any lien, security interest, mortgage or deed of trust (each, a "**Lien**") that WUMI may now have or hereafter acquire in those certain properties, assets and/or equipment set forth on <u>Exhibit A</u> hereto (the "**Noble Priority Collateral**"), in favor of any Lien that Noble now has or hereafter acquires in the Noble Priority Collateral. All Noble Obligations shall at all times be senior and prior to the WUMI Obligations in right to receive cash payment from or with respect to the Noble Priority Collateral and sale or proceeds thereof, and WUMI's Liens in the Noble Priority Collateral, regardless of the time or order of creation, grant, attachment, or perfection and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Loan Agreements or any defect or deficiencies in, or failure to perfect any such Liens or any other circumstance whatsoever (including any non-perfection of any Lien purporting to secure the Noble Obligations and/or the WUMI Obligations).

"**Noble Obligations**" means all "Obligations" (as such term is defined in the Noble Loan Agreement) and all other obligations of the Borrower to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Creditor Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Noble Loan Agreement and the performance of all other Obligations of the Borrower thereunder to Noble under the Noble Loan Agreement, according to the respective terms thereof.

"**WUMI Obligations**" means all obligations of the Borrower to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Creditor Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the WUMI Loan Agreement and the performance of all other Obligations of the Borrower thereunder to WUMI under the WUMI Loan Agreement, according to the respective terms thereof.

2.2.   <u>Subordination of Other Collateral by Noble</u>.   Noble acknowledges that it is subordinate to WUMI with respect to, and to the extent necessary hereby subordinates, any Lien that Noble may now have or hereafter acquire in the properties of Borrower that do not constitute Noble Priority Collateral (the "**WUMI Priority Collateral**", and collectively with the Noble

*Intercreditor Agreement*

WUMI003694

Execution Version

Priority Collateral, the "**Collateral**"), in favor of any Lien that WUMI now has or hereafter acquires in the WUMI Priority Collateral. The WUMI Obligations shall at all times be senior and prior to the Noble Obligations in right to receive cash payment from or with respect to the WUMI Priority Collateral and sale or proceeds thereof, and Noble's Liens in the WUMI Priority Collateral, regardless of the time or order of creation, grant, attachment, or perfection and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Loan Agreements or any defect or deficiencies in, or failure to perfect any such Liens or any other circumstance whatsoever (including any non-perfection of any Lien purporting to secure the Noble Obligations and/or the WUMI Obligations).

2.3.     Agreement Priorities Control.  The priority set forth in this Section 2 shall apply regardless of the time or order of attachment or perfection of the respective interests of Noble and WUMI to the relevant Collateral, the time of sequence in which any financing statements, mortgages, deeds of trust or similar perfection filings or documents are or were filed or the time of giving or failure to give notice of the acquisition of purchase money or other security interests.

3.      **Payments; Other Agreements and Restrictions**.  Each of the Parties agrees that:

3.1.     Prior to taking any Enforcement Action, each Party shall provide the other Party with at least three business days' prior notice and the Parties agree to consult in good faith and in a timely manner with each other with respect thereto.

3.2.     Nothing contained herein shall be construed as restricting the right of any Party to take any Unrestricted Enforcement Action or otherwise deal with its Loan Agreement in a manner that does not constitute an Enforcement Action.

3.3.     The Noble Priority Collateral listed as item number 3 on the attached Exhibit A includes the Borrower's interest and rights in the Copper Ranch and Niagra Hills deposits as further described therein (the "Deposits"). WUMI Priority Collateral includes the identical collateral , resulting in WUMI and Nobel, combined, both having a secured interest in all of the Deposits. Nobel and WUMI agree that any Enforcement Action by a Party with respect to the Deposits shall be as an agent for, and on behalf of the other Party and proceeds of the Deposits shall be shared equally as described further under item 3 of the attached Exhibit A

4.      **Representations of the Parties**.  Each Party hereby warrants to the other that: (a) except in connection with the Loan Agreements and the Skye Loan Agreement, it has neither given nor executed any prior subordination, security agreement, or assignment which is presently effective with respect to any of Collateral; (b) there are no other debts or loan amounts owing from Borrower to such Party except as provided under the Loan Agreements and that such Party will not enter into any other loans with Borrower unless such loan is subject to this Agreement; (c) the execution, delivery, and performance by such Party of this Agreement and the

3

WUMI003695

Execution Version

consummation of the transactions contemplated hereby do not contravene any law or any contractual restriction binding on or affecting such Party; (d) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by such Party of this Agreement; (e) such Party has duly executed and delivered this Agreement; (f) this Agreement is the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting such Party's rights or insolvent corporations, generally; and (e) there is no pending or, to the best of its knowledge, threatened action or proceeding affecting such Party, or any basis therefor, which questions the validity, binding effect or enforceability hereof, any action taken or to be taken pursuant hereto, or any of the transactions contemplated hereby. Each Party further agrees that it shall not assign or otherwise transfer any of his right, title and interest in its Loan, without the prior written consent of the other Party; provided that no consent shall be required in the event the assignee or transferee of the Loan agrees in writing to be bound by the terms hereof.

5. **Conversion of WUMI Loan**.

5.1. <u>Optional Conversion</u>. Notwithstanding any provision of this Agreement or in any Loan Documents (as defined in the Noble Loan Agreement), Noble agrees that WUMI shall continue have the right to convert the WUMI Obligations, in full but not in part, into equity of Skye Mineral Partners, LLC, a Delaware limited liability company ("**Skye**"), pursuant to the terms of the WUMI Loan Agreement and the Loan Conversion and Participation Rights Agreement referenced therein and part thereof, as amended, at any time and without notice to or consent from Noble, and that this Agreement shall not apply in any way to the equity interests issued upon such conversion; provided that the WUMI Obligations are extinguished and the Liens held by WUMI on the Collateral released.

5.2. <u>Mandatory Conversion</u>. In the event that the Project Completion Date (as defined in the Noble Loan Agreement) occurs or Noble loans the Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, and there are no existing defaults under the Noble Loan Agreement or that occur in connection with lending the Full Facility Amount, WUMI hereby agrees to promptly (but in any event within 5 business days) convert the WUMI Obligations in full into the equity of Skye, pursuant to the terms of the WUMI Loan Agreement (and the parties agree that by the terms of the WUMI Loan Agreement and the Loan Conversion and Participation Rights Agreement referenced therein and part thereof, as amended WUMI shall then be entitled to so convert the WUMI Obligations).. In connection with such conversion, the WUMI Obligations will be extinguished all Liens held by WUMI on Collateral shall be released.

6. **No Additional Commitment Regarding Noble Loan.** It is understood and agreed that this Agreement shall in no way be construed as any additional commitment or agreement by Noble to continue financing arrangements with the Borrower pursuant to the Noble Loan Agreement.

4

*Intercreditor Agreement*

WUMI003696

Execution Version

7.     **No Contest.**  Each Party agrees not to contest (or support any other Person in contesting), the validity, perfection, priority or enforceability of the other Party's Loan Agreement or its security interest in any of its Collateral, as specified hereunder or the provisions of this Agreement (including in any Creditor Proceeding).  Each Party acknowledges and agrees that (a) neither Party shall have any duties or other obligations to the other Party with respect to any Collateral, other as herein specified, including to transfer to the other Party any proceeds of any such Collateral in accordance with the priority herein specified or duty or obligation first to marshal or realize upon any type of Collateral (or any other collateral securing the its obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Collateral, in any manner that would maximize the return to the other Party, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received from such realization, sale, disposition or liquidation, (b) it waives any claim it may now or hereafter have against the other Party (or its representatives) arising out of any actions which such Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the obligations of the Borrower from any account debtor, guarantor or any other party) or to the collection of the obligations of the Borrower or the valuation, use, protection or release of any security for the obligations of the Borrower and (c) that it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the other Party. The foregoing provisions of this section shall not be construed to prevent a Party from enforcing the terms of this Agreement against the other Party or release either Party from its obligations hereunder. For the avoidance of doubt, nothing herein shall limit Borrower or the ability of the managers or principals of Borrower (including those who serve as officers or managers of WUMI) to cause Borrower to enforce its rights and remedies under the Loan Agreements.

8.     **Creditor Proceedings; Clawback.**  Whether or not any Creditor Proceeding has been commenced by or against Borrower, any Collateral or proceeds thereof received by a Party (including by way of set off) in connection with any Enforcement Action in contravention of this Agreement (to the extent in excess of its entitlements hereunder) shall be segregated and held in trust and forthwith paid over to the other Party in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.   If any payment or other proceeds of the Collateral received by any Party for its own account under this Agreement shall be required pursuant to applicable law to be repaid or returned, in whole or in part, by such Party to the payor thereof, or to any trustee, agent or other representative of such payor, or such payment shall have been otherwise rescinded, in whole or in part, pursuant to applicable law, the other Party that shall have received all or part of such payment or proceeds shall promptly, upon written demand by the first Party, acting on a direction, certificate, order or other demand occurring pursuant to applicable law, return to the first Party all or the ratable part, as the case may be, of the portion of such payment or proceeds so received by such other Party (and any interest thereon to the extent the same is required to be paid by the other Party originally receiving such payment or proceeds in respect of the return of such payment or proceeds) in order to equitably adjust for the return of all or part of such payment or proceeds.  In addition, in

5

WUMI003697

Execution Version

the event that any such payment is required to be returned or repaid or is otherwise rescinded, an amount of the Loan equal to the amount of such returned, repaid or rescinded payment shall be deemed to be reinstated and the Parties hereto shall be restored to their original position as if such payment had not been made.

9.   **Miscellaneous.**

9.1.   <u>Termination</u>.  This Agreement shall terminate and be of no further force or effect upon the repayment in full, or full conversion to equity, of the Noble Obligations or WUMI Obligations.

9.2.   <u>Further Assurances</u>.  Each Party agrees, upon the other Party's reasonable request, to execute all such documents and instruments and take all such actions as such Party shall deem reasonably necessary or advisable in order to carry out the purposes of this Agreement (but this Agreement shall remain fully effective notwithstanding any failure to execute any additional documents or instruments).

9.3.   <u>Rights and Remedies Cumulative</u>.  All of each Party's rights and remedies hereunder and under applicable law are cumulative and not exclusive.  If a Party, in violation of this Agreement, shall institute or participate in any suit, action or proceeding against Borrower, Borrower may interpose as a defense or dilatory plea this Agreement and each Party is irrevocably authorized to intervene and to interpose such defense or plea in such Party's or Borrower's name.  If a Party attempts to enforce or realize upon any the Collateral in violation of this Agreement, Borrower or the affected Party (in Borrower's or such Party's name) may by virtue of this Agreement, restrain such realization or enforcement.

9.4.   <u>Entire Agreement</u>.   This Agreement sets forth in full the terms of agreement between the parties with respect to the subject matter hereof, and may not be modified or amended, nor may any rights hereunder be waived, except in a writing signed by the Parties.

9.5.   <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of the Parties and Borrower and shall inure to the benefit of and be binding upon the successors and assigns of each Party.

9.6.   <u>Governing Law; Jurisdiction; Venue</u>.  This Agreement shall be construed in accordance with, and governed by, the laws of the State of New York. Each party consents to the jurisdiction of courts located within New York, and agrees that the exclusive venue for all actions and proceedings relating directly or indirectly to this Agreement shall be within the courts of the State of New York, and each party waives any and all rights the party may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding, including, without

6

WUMI003698

Execution Version

limitation, any objection to venue or request for change in venue based on the doctrine of forum non conveniens.

9.7.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the exchange of signature pages electronically, each to be effective as the original.

9.8.    <u>Certain Definitions</u>. For the purposes of this Agreement (including the recitals), unless the context otherwise requires, each of the following terms shall have the following meanings:

9.8.1. "**Creditor Proceedings**" means:

(a)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, compromise, arrangement with creditors, plan of arrangement, proposal or similar proceedings under Insolvency Laws of or with respect to Borrower or its property or liabilities, in each case under Insolvency Laws;

(b)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, compromise, arrangement with creditors, plan of arrangement or similar proceedings under the arrangement provisions of any applicable corporate law (in any case which involves the alteration, amendment, conversion, compromise, satisfaction or discharge of obligations owing to any or all creditors) of or with respect to Borrower or its property or liabilities;

(c)    any bankruptcy, insolvency, receivership, petition or assignment in bankruptcy, or assignment for the benefit of creditors under any Insolvency Laws of or with respect to Borrower;

(d)    any marshalling of assets and liabilities of Borrower under any Insolvency Laws;

(e)    any bulk sale of assets by Borrower; or

(f)    any proceedings in relation to any of the foregoing,

whether any of the foregoing is voluntary or involuntary, partial or complete, and includes any such proceedings initiated or consented to by Borrower.

9.8.2. "**Enforcement Action**" means the exercise of any rights or remedies against any Collateral, including, without limitation, any right to take possession or control of any Collateral under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or

WUMI003699

arrangement, any right of set off or recoupment and any enforcement, collection, execution, levy or foreclosure action or proceeding taken against the Collateral.

9.8.3. "**Insolvency Laws**" means the *Bankruptcy Code of the United States* or any other bankruptcy, insolvency or analogous laws applicable to Borrower or any of its properties or liabilities.

9.8.4. "**Unrestricted Enforcement Action**" means any of: (i) the provision of any notice of default or event of default under any Loan Agreement; (ii) termination of any commitments to provide the loans; (iii) the acceleration of any loans; (iv) the making of a demand with respect to any loans (including any guarantee thereof); (v) the filing of a proof of claim or similar instrument with respect to any loans after the occurrence of any Creditor Proceedings; (vi) the voting of a claim with respect to any loans after the occurrence of any Creditor Proceedings in a manner not inconsistent with the terms of this Agreement; (vii) the institution of a default rate of interest; (viii) the taking of any action required to preserve the validity, efficacy or priority of the loans, including the commencement or initiation of any action required to comply with statutory limitation periods (provided that such proceeding is then stayed) and (ix) the exercise by Noble of set-off right against amounts owed by it under the Cathode Agreement or the Concentrate Agreement.

9.8.5. The defined terms Cathode Agreement, Concentrate Agreement, Project, Project Budget, Project Costs and Project Account shall have the meanings assigned thereto in the Noble Loan Agreement on the date hereof

*[Signature page follows.]*

WUMI003700

The parties have executed this Agreement as of the first date written above.

**WUMI:**

**DAVID J. RICHARDS, LLC d/b/a WESTERN US MINERAL INVESTORS, LLC**

By:_____

     Name:_ Robert Lautz _____

     Title:_ Manager _____

     Date:_ 8/12/2014 _____

**BORROWER:**

**CS MINING, LLC**

By:_____

     Name:_____

     Title:_____

     Date:_____

**NOBLE:**

**NOBLE AMERICAS CORP.**

By:_____

     Name:_____

     Title:_____

     Date:_____

*[Signature Page to Intercreditor Agreement]*

WUMI003701

**BORROWER:**

CS MINING, LLC

By: _____

   Name:  Russell D. Alley

   Title:   Chief Executive Officer

   Date:

   12 AUG 2014

[Signature Page to Intercreditor and Subordination Agreement-CS Mining, LLC]

**NOBLE:**

NOBLE AMERICAS CORP.

By: _____
     Name: Joseph Limone
     Title: Secretary & General Counsel
     Date:

[Signature Page to Noble Intercreditor Agreement-Noble Americas Corp.]

#86193505v3

WUMI003703

## EXHIBIT A

## NOBLE PRIORITY COLLATERAL

The "**Noble Priority Collateral**" means:

1.   The properties upon which the Phase II project (the "**Project**") described in the "Project Budget" set forth as an attachment to the Noble Loan Agreement, the SX/EW and leaching plant, are built, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

2.   The properties upon which that certain new intermediate tailings dam for the Project to be constructed with Noble Loan proceeds as specified in the Project Budget, will be constructed, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

BEN HARRISON MINE, BEN HARRISON FRACTION, CHALCOPRITE, KLONDYKE NO. 2, GALVESTON MINE, GALVESTON MINE NO. 2, GALVESTON MINE NO. 3, MARY 1 NO. 1, MARY 1 NO. 2, TROJAN, WANDERING JEW-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

3.   A **fifty percent (50%) interest** in Borrower's interests and rights in the Copper Ranch and Niagara Hill deposits (it being the intention of the parties that this is an agreement to share proceeds of collateral and not limit the liens or claims of either creditor and that both Noble and WUMI shall have a lien on and security interest in 100% of all of the property and assets listed in this item 3, with the proceeds of such collateral being applied first, equally to the Noble Obligations and the WUMI Obligations until the Noble Obligations or the WUMI Obligations shall have been paid in full and second if and when the Noble Obligations or the WUMI

A-1

WUMI003704

Obligations shall have been paid in full the balance of the proceeds shall be applied 100% to the Noble Obligations or the WUMI Obligations, as the case may be, until paid in full):

**Niagara Hill**

| McCulley-Wood Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Colorado Boom, Sarault, Montreal, Niagara Falls | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| Consolidated Montreal #1, Albert, Annex, Contact, | 3446 | 1008 | Rocky | Sec. 22 T27S R11W |
| Dundee, Fraction, George, Tip Top | 6253 | 1008 | Rocky | Sec. 22 T27S R11W |

**Copper Ranch**

| AJL (John Bogdanich) Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Jewel | 5476 | 36623 | Rocky | Sec. 22 T27S R11W |
| Marguerite #15 | 5476 | 36624 | Rocky | Sec. 22 T27S R11W |
|  |  |  |  |  |
| **Unpatented Claims** |  |  |  |  |
| Serial No | Claim Name/Number | Mc Lead Case Ser Nr | Claim Type | Disposition |
| UMC355012 | ROCKY # 58 | UMC354981 | LODE | ACTIVE |
| UMC355013 | ROCKY # 59 | UMC354981 | LODE | ACTIVE |
| UMC355014 | ROCKY # 61 | UMC354981 | LODE | ACTIVE |
| UMC355015 | ROCKY # 62 | UMC354981 | LODE | ACTIVE |
| UMC355016 | ROCKY # 63 | UMC354981 | LODE | ACTIVE |
|  |  |  |  |  |
| **State Lease** |  |  |  |  |
| SITLA Lease # | County | Twp./Range/Sec. | Legal Description | Status |
| ML-49556 | Beaver | T27S R11W Sec. 16 | LOT 1(35.33), N2, NE4SW4, S2SW4, SE4, S16 (ALL) | Active |

    4.   The Project bank account for deposits and expenditures associated with the Project and Project Budget, as required pursuant to the Noble Loan Agreement;

    5.   The Cathode Agreement, the Concentrate Agreement and all rights, entitlements and receivables of the Borrower thereunder;

A-2

6.   All properties and assets purchased with proceeds of the Noble Loan or with amounts required hereby to be deposited in the Project Account and applied to pay Project Costs pursuant to the Noble Loan Agreement; and

7.   All proceeds of the foregoing items 1-6 (subject to the sharing required as described under item 3 above as to the collateral described in item 3 above).

A-3

WUMI003706

# EXHIBIT 4

## TENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This TENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "**Amendment**") is made as of the 10ᵗʰ day of March, 2015 ("**Effective Date**"), by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**Lender**") and CS MINING, LLC, an Delaware limited liability company ("**Borrower**").

### RECITALS

A.      Lender and Borrower entered into that certain Loan and Security Agreement dated as of August 10, 2012, as amended by that certain First Amendment to Loan and Security Agreement dated as of December 1, 2012, that certain Second Amendment to Loan and Security Agreement dated as of January 4, 2013, that certain Third Amendment to Loan and Security Agreement dated as of April 24, 2013, that certain Fourth Amendment to Loan and Security Agreement dated as of May 14, 2013, that certain Fifth Amendment to Loan and Security Agreement dated as of July 9, 2013, that certain Omnibus Amendment to Loan Agreement dated as of January 28, 2014, that certain Loan Conversion and Participation Rights Agreement dated as of January 28, 2014, that certain Seventh Amendment to Loan and Security Agreement dated as of February 4, 2014, that certain Eighth Amendment to Loan and Security Agreement dated as of March 4, 2014, and that certain Ninth Amendment to Loan and Security Agreement dated July 21ˢᵗ, 2014 (the "**Agreement**"). Capitalized terms utilized herein but not defined herein shall have the meanings assigned to such terms in the Agreement.

B.      Lender and Borrower desire to amend the Agreement and the Loan Documents as more specifically set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Lender and the Borrower agree as follows:

1.      **Accrual of Interest.**  Notwithstanding anything to the contrary in the Agreement or Loan Documents (as defined in the Agreement), Lender and Borrower agree that (a) the monthly payments owed under the Loan Documents beginning with the monthly payment payable on February 1, 2015, shall accrue and be capitalized into the Loan under the Agreement, and shall not be payable in cash, through December 31, 2015 and (b) if the Loan is not converted into the equity of Borrower's parent, Skye Mineral Partners, LLC, prior to December 31, 2015, then the monthly cash payments due pursuant to the Loan and Agreement shall resume on January 1, 2016, with such monthly payments consisting of equal payments of principal and interest on the amount owed as of December 31, 2015, amortized over forty eight (48) months.

2.      **Drawdown of Noble Loan.**  Prior to drawing down more than $29,750,000 of the loan facility pursuant to that certain Loan and Security Agreement between Borrower and Noble Americas Corp. dated August 12, 2014, as amended, Borrower shall notify Lender at the following address and obtain Lender's consent and approval from the following, not to be unreasonably withheld:

> David J. Richards, LLC d/b/a Western US Mineral Investors, LLC
> c/o St. Cloud Capital Partners II, L.P. (St. Cloud)
> Attn: Robert Lautz, Kevin Tom
> 10866 Wilshire Blvd, Suite 1450
> Los Angeles, CA 90024

*Tenth Amendment to Loan and Security Agreement*

WUMI002232

Fax: (310) 475-0550
Email: rlautz@stcloudcapital.com, ktom@stcloudcapital.com

3.    **Miscellaneous.**  Except as set forth in this Amendment, the Agreement, all Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect.  This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Amendment shall be governed by the laws of the State of Ohio.  In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control.  This Amendment may be executed in counterparts by the exchange of signature pages electronically.  Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**BORROWER:**

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name:  ROBERT LAUTZ
Title:  Manager  PARTNER

By: _____
Name:  David McMullin
Title:   President & Chief Executive Officer

*Tenth Amendment to Loan and Security Agreement*

WUMI002233

Fax: (310) 475-0550
Email: rlautz@stcloudcapital.com, ktom@stcloudcapital.com

3.    **Miscellaneous.** Except as set forth in this Amendment, the Agreement, all Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect.  This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Amendment shall be governed by the laws of the State of Ohio.  In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control.  This Amendment may be executed in counterparts by the exchange of signature pages electronically.  Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**BORROWER:**

**DAVID J. RICHARDS, LLC**
**d/b/a WESTERN US MINERAL**
**INVESTORS, LLC,**
an Ohio limited liability company

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name:  David McMullin
Title:    President & Chief Executive Officer

By: _____
Name:
Title:   Manager

*Tenth Amendment to Loan and Security Agreement*

WUMI002234

# EXHIBIT 5



November 10, 2015

CS Mining LLC
1208 South 200 West
Milford, Utah 84751

Re:  **Reservation of Rights under Loan and Security Agreement**

Ladies and Gentlemen:

We refer to the Loan and Security Agreement (as amended, the "Agreement") entered into as of August 12, 2014 by and between CS MINING LLC, a Delaware limited liability company (the "Company") and NOBLE AMERICAS CORP., a Delaware corporation (the "Lender"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Agreement.

We hereby notify you that the failure by the Company to pay interest in cash within seven (7) days of the date when due pursuant to Section 2.07 of the Agreement constitutes Events of Default under the Agreement.

The fact that the Lender has not, as of the date hereof, taken action to terminate its Commitment under the Agreement, to accelerate any Loans outstanding under the Agreement, or to exercise any other rights or remedies under the Agreement or any other Loan Document (including any right or remedy with respect to any collateral) does not constitute a waiver of the Event of Default described above or any other Event of Default or of any rights or remedies under the Agreement or any other Loan Document.

Further, as a consequence of and since the occurrence of the Event of Default described above or any other Event of Default (i) interest accruing in respect of the Obligations under the Agreement shall be calculated based on the Default Rate and (ii) we are entitled to sell or assign all or any portion of the Loans to one or more Eligible Assignees without the consent of the Company.

We may elect in our sole discretion to enter into discussions with the Company and/or any of its shareholders or third parties concerning our exposure under the Agreement, including the sale or assignment of the Loans. Any such discussions may or may not result in an agreement relating to the Company or the sale or assignment of

Noble Americas Corp
A member of the Noble Group
Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA
Tel +1 203 324 8555  Fax +1 203 324 8565
www.thisisnoble.com

**CONFIDENTIAL**



our Loans, and will be continued only for so long as we, in our sole discretion elect, but in no event do any such discussions constitute a waiver of the Event of Default described above or any other Event of Default or a waiver or deferral or forbearance of any rights or remedies under the Agreement or any other Loan Document, all of which are hereby expressly reserved.

Very truly yours,

Noble Americas Corp.,
as Lender

Name:  Josh Kaplan
Title:   Legal Counsel

Noble Americas Corp
A member of the Noble Group
Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA
Tel +1 203 324 8555  Fax +1 203 324 8565
www.thisisnoble.com

**CONFIDENTIAL**

NAC010774

# EXHIBIT 6



CS Mining LLC                                                December 30, 2015
1208 South 200 West
Milford, Utah 84751

Re:     **Reservation of Rights under Loan and Security Agreement**

Ladies and Gentlemen:

We refer to the letter dated December 30, 2015 from Clinton W. Walker, SMP Manager, Manager of CS Mining LLC, Skye Mineral Partners LLC Clarity Copper LLC and David J Richards, SMP Manager, Manager of CS Mining LLC and Skye Mineral Partners, LLC Skye Mineral Investors, LLC relating, *inter alia*, to the Loan and Security Agreement (as amended, the "Agreement") entered into as of August 12, 2014 by and between CS MINING LLC, a Delaware limited liability company (the "Company") and NOBLE AMERICAS CORP., a Delaware corporation (the "Lender"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Agreement.

You are aware that Events of Default have occurred and as of this date are continuing under the Agreement. As we pointed out to the Company in our letter of November 10, 2015 (copy attached), one of the consequences thereof is that the Lender is entitled to, and in our November 10, 2015 letter we expressly reserved our right to, sell or assign all or any portion of the Loans to one or more Eligible Assignees without the consent of the Company.

All of our rights and remedies under the Agreement or any other Loan Document, including the right to accelerate any Loans outstanding under the Agreement, to exercise any other rights or remedies under the Agreement or any other Loan Document (including any right or remedy with respect to any collateral) and/or to sell or assign all or any portion of the Loans to one or more Eligible Assignees without the consent of the Company, are all hereby expressly reserved.

Regards,

Josh Kaplan
Legal Counsel

Noble Americas Corp
A member of the Noble Group
Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA
Tel +1 203 324 8555  Fax +1 203 324 8565
www.thisisnoble.com

WUMI003077



cc:

Clinton W. Walker, SMP Manager, Manager of CS Mining LLC, Skye Mineral
Partners LLC Clarity Copper LLC

David J Richards, SMP Manager, Manager of CS Mining LLC and Skye Mineral
Partners, LLC Skye Mineral Investors, LLC

Noble Americas Corp
A member of the Noble Group
Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA
Tel +1 203 324 8555  Fax +1 203 324 8565
www.thisisnobie.com

WUMI003078



November 10, 2015

CS Mining LLC
1208 South 200 West
Milford, Utah 84751

Re:  **Reservation of Rights under Loan and Security Agreement**

Ladies and Gentlemen:

We refer to the Loan and Security Agreement (as amended, the "Agreement") entered into as of August 12, 2014 by and between CS MINING LLC, a Delaware limited liability company (the "Company") and NOBLE AMERICAS CORP., a Delaware corporation (the "Lender"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Agreement.

We hereby notify you that the failure by the Company to pay interest in cash within seven (7) days of the date when due pursuant to Section 2.07 of the Agreement constitutes Events of Default under the Agreement.

The fact that the Lender has not, as of the date hereof, taken action to terminate its Commitment under the Agreement, to accelerate any Loans outstanding under the Agreement, or to exercise any other rights or remedies under the Agreement or any other Loan Document (including any right or remedy with respect to any collateral) does not constitute a waiver of the Event of Default described above or any other Event of Default or of any rights or remedies under the Agreement or any other Loan Document.

Further, as a consequence of and since the occurrence of the Event of Default described above or any other Event of Default (i) interest accruing in respect of the Obligations under the Agreement shall be calculated based on the Default Rate and (ii) we are entitled to sell or assign all or any portion of the Loans to one or more Eligible Assignees without the consent of the Company.

We may elect in our sole discretion to enter into discussions with the Company and/or any of its shareholders or third parties concerning our exposure under the Agreement, including the sale or assignment of the Loans. Any such discussions may or may not result in an agreement relating to the Company or the sale or assignment of

Noble Americas Corp

A member of the Noble Group

Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA

Tel +1 203 324 8555  Fax +1 203 324 8565

www.thisisnoble.com

WUMI003079



our Loans, and will be continued only for so long as we, in our sole discretion elect, but in no event do any such discussions constitute a waiver of the Event of Default described above or any other Event of Default or a waiver or deferral or forbearance of any rights or remedies under the Agreement or any other Loan Document, all of which are hereby expressly reserved.

Very truly yours,

Noble Americas Corp.,
as Lender

Name: Josh Kaplan
Title:   Legal Counsel

Noble Americas Corp
A member of the Noble Group
Four Stamford Plaza, 107 Elm Street Stamford, CT 06902, USA
Tel +1 203 324 8555  Fax +1 203 324 8565
www.thisisnoble.com

WUMI003080

# EXHIBIT 7

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



| **LIPPO LIMITED** | **LIPPO CHINA RESOURCES LIMITED** |
|---|---|
| 力寶有限公司 | 力寶華潤有限公司 |
| *(Incorporated in Hong Kong with limited liability)* | *(Incorporated in Hong Kong with limited liability)* |
| **(Stock Code: 226)** | **(Stock Code: 156)** |

# JOINT ANNOUNCEMENT

# DISCLOSEABLE TRANSACTION

# ACQUISITION OF SALE SHARE IN, AND SHAREHOLDER'S LOAN OF, WATERLOO STREET LIMITED

The respective Boards of Lippo and LCR wish to inform their shareholders that on 1 January 2016 (Hong Kong time), the Buyer (an indirect wholly-owned subsidiary of LCR, which in turn is an approximate 71.24% indirect subsidiary of Lippo) entered into the Sale and Purchase Agreement with the Seller pursuant to which the Seller agreed to sell, and the Buyer agreed to purchase, the Sale Share, representing the entire issued share capital of the Target Company, and the Seller also agreed to assign, and the Buyer agreed to acquire, all the rights, benefits and interests of the Shareholder's Loan. Completion took place immediately after the signing of the Sale and Purchase Agreement.

Since one or more of the applicable percentage ratios in respect of the Acquisition exceeds 5% but is less than 25%, the Acquisition constitutes a discloseable transaction for each of Lippo and LCR under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements as set out in Chapter 14 of the Listing Rules. The Acquisition, when aggregated with the investments made by the LCR Group in the Project Company subsequent to the acquisition referred to in the joint announcement of Lippo and LCR dated 28 February 2012, shall continue to constitute a discloseable transaction for each of Lippo and LCR.

## INTRODUCTION

The respective Boards of Lippo and LCR wish to inform their shareholders that on 1 January 2016 (Hong Kong time), the Buyer (an indirect wholly-owned subsidiary of LCR which in turn is an approximate 71.24% indirect subsidiary of Lippo) entered into the Sale and Purchase Agreement with the Seller pursuant to which the Seller agreed to sell, and the Buyer agreed to purchase, the Sale Share, representing the entire issued share capital of the Target Company, and the Seller also agreed to assign, and the Buyer agreed to acquire, all the rights, benefits and

WUMI003971

interests of the Shareholder's Loan. Completion took place immediately after the signing of the Sale and Purchase Agreement.

## PRINCIPAL TERMS OF THE SALE AND PURCHASE AGREEMENT

A summary of certain material terms of the Sale and Purchase Agreement is as follows:

| | |
|---|---|
| Parties: | 1.  Sincere Wish Global Limited, as the Buyer; and |
| | 2.  Malimbu Limited, as the Seller. |
| Transaction: | The Seller sold, and the Buyer acquired, the Sale Share, representing the entire issued share capital of the Target Company, and the Shareholder's Loan pursuant to the Sale and Purchase Agreement. |
| Consideration: | The Consideration amounted to US$22,990,266 (equivalent to approximately HK$178.2 million) and was payable in cash. |
| | The Consideration was determined after arms' length negotiations between the Buyer and the Seller by reference to the value of the Loans owned by the Target Company. |

## INFORMATION ON THE TARGET COMPANY

The Target Company is a company incorporated in the British Virgin Islands and its principal business activity is investment holding. Its sole investments are the Loans to the Borrower, which is a majority owned subsidiary of the Project Company.

As at the date of this announcement, the total amount owed by Borrower under the Loans amounted to approximately US$33.15 million (equivalent to approximately HK$257 million), representing the aggregate principal amount of US$29.75 million (equivalent to approximately HK$230.6 million) together with accrued interest of approximately US$3.4 million (equivalent to approximately HK$26.4 million). Interest on the Loans accrues at a rate based on US$ LIBOR plus a margin varying from 6% to 10% and the Loans are secured by, inter alia, certain properties and assets and mining deposits owned by the Borrower. The Loans are repayable by monthly instalments.  The final maturity date will be 30 October 2019.

## REASONS FOR AND BENEFITS OF THE ACQUISITION

The LCR Group has been investing indirectly in the Project Company since 2011. Through the Borrower, the Project Company owns and controls a number of copper ore deposits located in the United States. The Borrower is engaged in the business of mining and processing primarily copper ore. From all the drilling and geology work that has been done to date, it is believed that the Project Company has good mining deposits.

The acquisition of the Target Company which owns the Loans represents further investment into the Project Company. Such investments generally are not without risks, including the risk that the Borrower may not meet its repayment obligations on the Loans, or otherwise default on its obligations under the relevant loan agreements. As far as the LCR Group is aware, the Borrower is currently in default under the existing loan agreements; however, the defaults were caused in part by a delay in completion of the Borrower's new leach processing facility, which

2

was originally scheduled for completion by November 2015, but is now anticipated to be completed in January 2016.  Nonetheless, there will remain a continuing risk that Borrower may not be able to meet its payment obligations in the future, for reasons that may include: difficulty in raising additional equity capital if and when needed; further delays in completion of the Borrower's leach processing facility or any failure of such facility to perform as expected once completed; a further decline in the market price of commodities including copper; an increase in the Borrower's operating costs; or a decline in the quality of the copper ore produced by the Borrower's mining operations.

Despite these possible risks, the Boards of each of Lippo and LCR consider that, on balance, the Acquisition is beneficial to the Lippo Group and the LCR Group, as the Acquisition allows the Buyer to purchase the Target Company at a consideration representing a substantial discount to the face value of the Loans. In addition, the Loans are secured by, *inter alia*, certain properties and assets and mining deposits owned by the Borrower which will reduce the risks associated with the Acquisition. The Boards of Lippo and LCR understand that the Borrower has good copper deposits based on the prevailing market prices, which is an important factor when deciding on further investments in the Project Company. The new leach processing facility, once completed, is expected to greatly improve the efficiency of copper processing and increase production yields, thereby enhancing the performance of the business.

The Boards of each of Lippo and LCR believe that the Acquisition provides an opportunity for Lippo Group and LCR Group to increase its participation in the Project Company and potentially enhance expected investment returns with only a modest increase in risk. The respective Boards of Lippo and LCR believe that the terms of the Acquisition are fair and reasonable and in the interest of the shareholders of each of Lippo and LCR as a whole.

## INFORMATION ON LIPPO, LCR AND THE BUYER

LCR is an approximate 71.24% indirect subsidiary of Lippo. The principal business activity of LCR is investment holding. The principal activities of the subsidiaries, associates, joint ventures and joint operations of LCR include investment holding, property investment, property development, food business, property management, mineral exploration, extraction and processing, securities investment, treasury investment and money lending.

The principal business activity of Lippo is investment holding. The principal business activities of the subsidiaries, associates, joint ventures and joint operations of Lippo are investment holding, property investment, property development, hotel operation, food business, property management, project management, mineral exploration, extraction and processing, fund management, underwriting, corporate finance, securities broking, securities investment, treasury investment, money lending, banking and other related financial services.

The principal business activity of the Buyer is investment holding.

## INFORMATION ON THE SELLER

To the best knowledge of the Boards of Lippo and LCR, the principal business activity of the Seller is investment holding.

To the best of the knowledge, information and belief of the respective Boards of Lippo and LCR having made all reasonable enquiries, the Seller and its ultimate beneficial owners are independent of each of Lippo and LCR and their respective connected persons.

WUMI003973

## LISTING RULES IMPLICATIONS

Since one or more of the applicable percentage ratios in respect of the Acquisition exceeds 5% but is less than 25%, the Acquisition constitutes a discloseable transaction for each of Lippo and LCR under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements as set out in Chapter 14 of the Listing Rules. The Acquisition, when aggregated with the previous investments made by the LCR Group in the Project Company subsequent to the acquisition referred to in the joint announcement of Lippo and LCR dated 28 February 2012, shall continue to constitute a discloseable transaction for each of Lippo and LCR.

## DEFINITIONS

In this announcement, unless the context otherwise requires, the following terms and expressions shall have the following meanings:

| | |
|---|---|
| **"Acquisition"** | the acquisition of the Sale Share and the Shareholder's Loan pursuant to the Sale and Purchase Agreement; |
| **"Board"** | the board of directors of the applicable company or group; |
| **"Borrower"** | CS Mining, LLC, a Delaware (U.S.) limited liability company and a majority owned subsidiary of the Project Company; |
| **"Buyer"** | Sincere Wish Global Limited, a company incorporated in the British Virgin Islands with limited liability and an indirect wholly-owned subsidiary of LCR; |
| **"connected person(s)"** | has the meaning ascribed to such term under the Listing Rules; |
| **"Consideration"** | US$22,990,266 (equivalent to approximately HK$178.2 million); |
| **"Hong Kong"** | the Hong Kong Special Administrative Region of the PRC; |
| **"LCR"** | Lippo China Resources Limited 力寶華潤有限公司, a company incorporated in Hong Kong with limited liability whose shares are listed on the Main Board of the Stock Exchange and an approximate 71.24% indirect subsidiary of Lippo; |
| **"LCR Group"** | LCR and its subsidiaries; |
| **"LIBOR"** | London Interbank Offered Rate; |
| **"Lippo"** | Lippo Limited 力寶有限公司, a company incorporated in Hong Kong with limited liability whose shares are listed on the Main Board of the Stock Exchange; |
| **"Listing Rules"** | the Rules Governing the Listing of Securities on the Stock Exchange; |

WUMI003974

| | |
|---|---|
| **"Loans"** | the loans owed by the Borrower to the Target Company in the aggregate principal amount of US$29,750,000 (equivalent to approximately HK$230.6 million) together with interest accrued of approximately US$3.4 million (equivalent to approximately HK$26.4 million); |
| **"Project Company"** | Skye Mineral Partners, LLC, a Delaware (U.S.) limited liability company; |
| **"Sale and Purchase Agreement"** | the agreement entered into between the Buyer and the Seller in respect of the sale and purchase of the Sale Share and the Shareholder's Loan; |
| **"Sale Share"** | one share of US$1.00 in the Target Company, representing the entire issued capital of the Target Company; |
| **"Seller"** | Malimbu Limited, a company incorporated in the British Virgin Islands with limited liability; |
| **"Shareholder's Loan"** | the sums advanced by the Seller to the Target Company and any sums outstanding which are owed by the Target Company to the Seller as referred to in the Sale and Purchase Agreement; |
| **"Stock Exchange"** | The Stock Exchange of Hong Kong Limited; |
| **"Target Company"** | Waterloo Street Limited, a company incorporated in the British Virgin Islands with limited liability; |
| **"United States"** | the United States of America (including its territories and dependences, any state of the United States of America and the District of Columbia); |
| **"HK$"** | Hong Kong dollar, the lawful currency of Hong Kong; |
| **"US$"** | United States dollar, the lawful currency of the United States; and |
| **"%"** | per cent. |

By Order of the Board
**LIPPO LIMITED**
**John Luen Wai Lee**
*Managing Director and*
*Chief Executive Officer*

By Order of the Board
**LIPPO CHINA RESOURCES LIMITED**
**John Luen Wai Lee**
*Chief Executive Officer*

Hong Kong, 1 January 2016

WUMI003975

Note: For use in this announcement and for illustration purposes only, conversion of US$ into HK$ is based on an approximate exchange rate of US$1.00 to HK$7.7506. No representation is made that any amount in US$ or HK$ could be converted at such rate or any other rates.

As at the date of this announcement, the board composition of each of Lippo and LCR is as follows:

| **Lippo** | **LCR** |
|---|---|
| *Executive Directors:* | *Executive Directors:* |
| Dr. Stephen Riady *(Chairman)* | Dr. Stephen Riady *(Chairman)* |
| Mr. John Luen Wai Lee | Mr. John Luen Wai Lee |
| (*Managing Director and* | (*Chief Executive Officer*) |
| *Chief Executive Officer*) | Mr. James Siu Lung Lee |
| | |
| *Non-executive Directors:* | *Non-executive Director:* |
| Mr. Jark Pui Lee | Mr. Leon Nim Leung Chan |
| Mr. Leon Nim Leung Chan | |
| | |
| *Independent Non-executive Directors:* | *Independent Non-executive Directors:* |
| Mr. Edwin Neo | Mr. Edwin Neo |
| Mr. King Fai Tsui | Mr. King Fai Tsui |
| Mr. Victor Ha Kuk Yung | Mr. Victor Ha Kuk Yung |

6

WUMI003976

# EXHIBIT 8

January 7, 2016

*Via [Messenger Service]*

CS Mining LLC
P.O. Box 608
1208 South 200 West
Milford, Utah 84751

**Re.: Assignment of Loan and Security Agreement; Reservation of Rights**

Ladies and Gentlemen:

We refer to the Loan and Security Agreement dated August 12, 2014, as amended (the "Loan Agreement"), originally entered into by CS Mining, LLC, a Delaware limited liability company ("Borrower") and Noble Americas Corp., a Delaware corporation (the "Original Lender"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Loan Agreement.

As you are aware, pursuant to the Notice of Assignment from Original Lender dated December 31, 2015, Original Lender sold and assigned all of Original Lenders' interest in, and all Original Lender's rights and obligations under, the Loan Agreement and the other Loan Documents (other than the Warrant) effective as of December 31, 2015, to Waterloo Street Limited, a British Virgin Islands limited company ("New Lender").

Accordingly, and until further written notice by New Lender:

1.    All notices and correspondence pursuant to or relating to the Loan Agreement and other Loan Documents should hereafter be addressed to New Lender as follows:

Waterloo Street Limited
c/o Rooms 2302 and 2303,
23rd Floor, Tower One
Lippo Centre, 89 Queensway,
Hong Kong
Fax:  (852) 25229842
Email: alexau@lippo-hongkong.com/davylee@lippo-hongkong.com

2.    The "Lending Office" (as such term is used in the Loan Agreement) shall hereafter be the offices of new Lender at the address set forth in paragraph 1 above.  All payments in respect of the Loans shall be made to the bank account of New Lender to be notified to you in due course.

3.    By separate letter, you will receive the original Note evidencing Loans outstanding under the Loan Agreement with an aggregate principal amount of $29,750,000, together with a Notice of Assignment of such Note.  Upon receipt, please promptly reissue the Note in the name of the New Lender, and send the new Note to New Lender at the address set forth above by recognized international courier.

CONFIDENTIAL

Furthermore, this letter will serve as notice that one or more Events of Default have occurred and are continuing, as Borrower was previously notified by Original Lender in its letters of November 10, 2015 and December 30, 2015. The fact that Original Lender and New Lender have not, as of the date hereof, taken action to accelerate the Loans outstanding under the Loan Agreement, or to exercise any of their other rights and remedies under the Loan Documents and under applicable law (including any rights and remedies with respect to any collateral), does not constitute a waiver of any such Event of Default, or a waiver, deferral or forbearance of any such rights and remedies of New Lender under the Loan Documents or under applicable law. All such rights and remedies are expressly reserved.

In addition, as a result of the occurrence and continuance of the Events of Default, please be aware that interest on the Loans continues to accrue under the Agreement based on the Default Rate.

Very truly yours,

Waterloo Street Limited

By: _____

Name: Au Siu Leung, Alex
Title:  Director

- 2 -

CONFIDENTIAL

WAT-001229

# EXHIBIT 9



Reed Smith LLP
1901 Avenue of the Stars
Suite 700
Los Angeles, CA 90067-6078
Tel +1 310 734 5200
Fax +1 310 734 5299
reedsmith.com

**Stuart A. Shanus**
Direct Phone:  +1 310 734 5240
Email:  sshanus@reedsmith.com

January 13, 2016

*Via Email - drichards@empireadvisorsllc.com
& Messenger*

David J. Richards, LLC
500 S. Front Street, Suite 1200
Columbus, Ohio 43215
Attn.:  David J. Richards

### Re:  Demand for Conversion of CS Mining, LLC Loan

Gentlemen:

Our firm represents Waterloo Street Limited, a British Virgin Islands limited company ("Lender").

We refer to the Intercreditor Agreement dated August 12, 2014 (the "Intercreditor Agreement") by and among CS Mining, LLC ("CS"), David J. Richards, LLC, dba Western US Mineral Investors, LLC ("WUMI") and Noble Americas Corp. ("Noble").  Capitalized terms used and not otherwise defined in this letter have the meanings assigned to them in the Intercreditor Agreement.

As you are aware pursuant to the Notice of Assignment dated December 31, 2015 to you from Noble, Noble transferred and assigned all of its rights and title in and pursuant to the Intercreditor Agreement to Lender effective as of December 31, 2015.

On behalf of Lender, we demand that WUMI immediately (and in any event by no later than Monday, January 18, 2016) convert the WUMI Obligations in full into equity of Skye Mineral Partners, LLC, pursuant to the terms Loan and Security Agreement dated as of August 10, 2012 between CS and WUMI, as amended, and the terms of the Conversion and Participation Rights Agreement dated January 28, 2014 among CS, WUMI and the other parties thereto, as amended (the "Loan Conversion").

The Loan Conversion is required to be completed pursuant to Section 5.2 of the Intercreditor Agreement when Noble loans CS $30 million.  This condition was satisfied as of July 8, 2015, when CS had drawn down all but $250,000 of the available facility – a trivial amount withheld at your direction, in an apparent attempt to circumvent your obligations to convert under the Intercreditor Agreement.

Moreover, the balance outstanding under the Loan Agreement – even excluding permitted Capitalized Interest – is now well over $30,000,000, as a result of CS' failure to make all required loan payments on the facility since November 2015.

David J. Richards, LLC
January 13, 2016
Page 2

**ReedSmith**

To reiterate, this letter serves as notice to WUMI of breach of Section 5.2 of the Intercreditor Agreement. We demand that the breach be cured immediately.  All rights and remedies are reserved on behalf of our clients.

Very truly yours,

REED SMITH LLP

Stuart A. Shanus

cc:     Sanjiv Noronha (sanjiv.noronha@lippo-hongkong.com)
        David McMullin (dmcmullin@csmining.com)
        Marshall Cooper (javama@icloud.com)
        David V. Richards (dvrichards@empireadvisorsllc.com)
        Robert Lautz (rlautz@stcloudcapital.com)
        Ramsey Hanna, Esq.(rhanna@reedsmith.com)

# EXHIBIT 10

January 15, 2016

**VIA EMAIL AND COURIER SERVICE**

CS Mining LLC
1208 South 200 West
Milford, Utah 84751
Attn: David McMullin, dmcmullin@csmining.com

Waterloo Street Limited
c/o Lippo Group
Room 2301, Tower One
Lippo Centre, 89 Queensway, Hong Kong
Attn:  Sanjiv Noronha,
        Marshall Cooper,

Reed Smith LLP
Attn:   Stuart A. Shanus,
        Ramsey Hanna,
1901 Avenue of the Stars, Suite 700
Los Angeles, California

Re:  Reservation of Rights under Loan and Security Agreement and Intercreditor Agreement

Ladies and Gentlemen:

We refer to the following agreements:

1.      Loan and Security Agreement (as amended, the "Loan Agreement") entered into as of August 10, 2012 by and between CS MINING LLC, a Delaware limited liability company (the "Company") and DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US MINERAL INVESTORS, LLC (the "Lender").

2.      Loan and Security Agreement (as amended, the "Noble Loan Agreement") entered into as of August 12, 2014 by and between CS MINING LLC, a Delaware limited liability company (the "Company") and NOBLE AMERICAS CORP., a Delaware corporation ("Noble").

3.      Intercreditor Agreement (the "Intercreditor Agreement") between the Lender and Noble dated August 12, 2014.

Capitalized terms used but not defined in this letter have the meanings assigned to them in the referenced or applicable agreement.

Existing Defaults

We hereby notify you that:

WUMI003090

1.       The failure by the Company to pay amortizing payments when due pursuant to the Loan Agreement, commencing on January 1, 2016 pursuant to the Loan Agreement, as amended, constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b) thereof;

2.       The failure by the Company to satisfy the Financial Covenants of the Loan Agreement as specified in Section 5.1 thereof and Section 5 of Schedule 1 thereof, constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(d) thereof;

3.       As you know, and noted and referenced, letters from Noble to the Company dated November 10, 2015 and December 30, 2015, the letter from Waterloo to the Company dated January 7, 2016, the Company is in default pursuant to the Noble Loan Agreement, and the Lippo China Resource Limited press release dated January 3, 2016 found at http://www.lcr.com.hk/file/announcement/eng/E_Ann_20160103.pdf, the Company is in default pursuant to the Noble Loan Agreement. This default under the Noble Loan Agreement also constitutes a default pursuant to the Loan Agreement pursuant to Sections 3.2.7, 7.1(d) and 7.1(n) thereof.

4.       As you know, the foregoing matters also constitute a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and the Company is also in default pursuant to the Noble Loan Agreement on this basis.

The fact that the Lender has not, as of the date hereof, taken action to accelerate any Loans outstanding under the Agreement, or to exercise any other rights or remedies under the Agreement or any other Loan Document (including any right or remedy with respect to any collateral) does not constitute a waiver of the Event of Default described above or any other Event of Default or of any rights or remedies under the Agreement or any other Loan Document.

Further, as a consequence of and since the occurrence of the Event of Default described above or any other Event of Default interest accruing in respect of the Obligations under the Agreement shall be calculated based on the Default Rate, among other matters specified in the Loan Agreement.

We may elect in our sole discretion to enter into discussions with the Company and/or any third parties concerning our exposure under the Agreement and what may be required to protect our interests thereunder. Any such discussions may or may not result in an agreement or accommodation relating to the Company, and will be continued only for so long as we, in our sole discretion elect, but in no event do any such discussions or actions constitute a waiver of the Event of Defaults described above or any other Event of Default or a waiver or deferral or forbearance of any rights or remedies under the Loan Agreement or any other Loan Document, all of which are hereby expressly reserved.

Mandatory Conversion Pursuant to Intercreditor Agreement

We direct you to Section 5.2 of the Intercreditor Agreement:

"5.2 Mandatory Conversion. In the event that the Project Completion Date (as defined in the Noble Loan Agreement) occurs or Noble loans the Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, **and there are no existing defaults under the Noble Loan Agreement** or that occur in connection with lending the Full Facility Amount, WUMI hereby agrees to promptly (but in any event within 5 business days) convert the WUMI Obligations in full into the equity of Skye, pursuant to the terms of the WUMI Loan Agreement (and the parties agree that by the terms of the WUMI Loan Agreement and the Loan Conversion and Participation Rights Agreement referenced therein and part thereof, as amended WUMI shall then be entitled to so convert the WUMI Obligations)."

2

WUMI003091

As noted above, there are, and have been at all times relevant to any mandatory conversion requirement pursuant to the Intercreditor Agreement, multiple existing defaults pursuant to the Noble Loan Agreement. Thus, the Lender is not required to convert its Loans to the Company into the equity of Skye Mineral Partners, LLC at this time, or any time unless and until the foregoing defaults pursuant to the Noble Loan Agreement are fully cured.

We remain willing to meet and negotiate a resolution to the above matters with Waterloo, the Company, PacNet, and any other necessary parties that would mutually benefit them and their investments, but in no event should any such discussions or negotiations be construed as a waiver or affecting any of our rights and remedies.

Sincerely,

Robert Lautz
Manager
David J. Richards, LLC d/b/a Western US Mineral Investors, LLC, as Lender

Cc:     Clinton W. Walker,
        David J. Richards,
        David V. Richards,
        PacNet Capital (U.S) Limited
        Room 2301, Tower One, Lippo Centre
        89 Queensway, Hong Kong
        Attn: Sanjiv Noronha,
        Marshall Cooper

3

WUMI003092

# EXHIBIT 11

February 2, 2016

**VIA EMAIL AND COURIER SERVICE**


Waterloo Street Limited
c/o Lippo Group
Attn: Sanjiv Noronha
      Marshall Cooper
Room 2301, Tower One
Lippo Centre, 89 Queensway, Hong Kong

Reed Smith LLP
Attn: Stuart A. Shanus
      Ramsey Hanna
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067


Re:     Coordination of Secured Creditors

Sanjiv and Marshall:

     As you are aware, CS Mining LLC ("CS") defaulted on its payments to DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US MINERAL INVESTORS, LLC ("WUMI") and has been in violation of financial covenants specified in Section 5 of Schedule #1 within the WUMI loan and security agreement.  A reservation of rights letter was sent to CS on January 15, 2016.

     We think it is in the interests of the secured creditors to work out a plan in partnership. The Intercreditor Agreement by and among WUMI, CS and Noble Americas Corp. ("Noble") dated August 12, 2014 requires that we consult with you and provide a three business day notice period prior to taking any enforcement action.

     Although you have indicated that you believe the WUMI debt should be converted, we disagree.  The Intercreditor Agreement provides that the WUMI debt facility need not be converted as long as there is a default on the Noble debt facility even if project production requirements are met.   This is a protective provision for WUMI to prevent it from having to convert when CS is unable to meet its commitments.   Therefore, Waterloo Street Limited as successor to Noble, is prohibited from attempting to force such a conversion when <u>both secured creditors have defaulted loans</u>.

     As you know, and noted and referenced by Noble in letters to the Company dated November 10, 2015 and December 30, 2015, and a press release dated January 7, 2016, the Company is in default pursuant to the Noble Loan Agreement.  This default under the Noble Loan Agreement also constitutes a default pursuant to pursuant to <u>Sections 3.2.7</u>, <u>7.1(d)</u> and

STCL.130.605439.1

     

7.1(n) of the Loan Agreement between CS and WUMI.   This presumably constitutes a cross default under the Noble Loan Agreement.

Contact me at your earliest convenience to discuss how best to proceed to protect all of the parties involved.

Sincerely,

Robert Lautz
Manager
David J. Richards, LLC d/b/a/ Western US Mineral Investors, LLC, as Lender

Cc:   CS MINING LLC
      Attn: David McMullin, dmcmullin@csmining.com
      1208 South 200 West
      Milford, UT 84751

2

STCL.130.605439.1

CONFIDENTIAL

WAT-001356

# EXHIBIT 12

## DECLARATION OF ROBERT LAUTZ

Robert Lautz, upon oath, declares and states as follows:

1.     I am a manager of David J. Richards, LLC, d/b/a Western U.S. Minerals Investors ("WUMI").

2.     I am familiar with the Loan and Security Agreement between WUMI and CS Mining, LLC, dated August 10, 2012, and the various amendments to that loan agreement (collectively, the "WUMI Loan Agreement").

3.     CS Mining is in default under the WUMI Loan Agreement.  Among other things, as of January 1, 2016, CS Mining defaulted on the WUMI Loan Agreement by failing to make payments according to the terms of the loan.

4.     I understand that, on or about February 3, 2012, CS Mining drew down the last installment under a $30 million loan agreement it had with Waterloo Street Limited.

5.     CS Mining did not provide notice to WUMI or seek WUMI's approval prior to drawing down that final installment on the Waterloo loan.

6.     I testify under oath and under penalty of perjury that the foregoing is true and correct to the best of my information and knowledge.

Dated this 16th day of June, 2017.

_____
Robert Lautz

4817-9586-5418, v. 1

# EXHIBIT 13

# WAIVER

### February 3, 2016

**Waterloo Street Limited**, a British Virgin Islands limited company ("**Lender**"), hereby takes the actions set forth below as of the date set forth above. All capitalized terms used and not defined herein shall have the meanings ascribed to such terms in that certain Loan And Security Agreement dated as of August 12, 2014 (the "**Loan Agreement**"), by and between CS Mining, LLC, a Delaware limited liability company ("**Borrower**"), and Noble Americas Corp., a Delaware corporation ("**Original Lender**").

WHEREAS, on December 31, 2015, Original Lender assigned all its rights and obligations under the Loan Agreement to Lender;

WHEREAS, Lender has been informed that certain Events of Default have occurred and are continuing;

WHEREAS, Lender is willing to provide a limited waiver of Events of Default, subject to the terms, conditions and limitations set forth herein;

NOW, THEREFORE, the undersigned hereby agrees as follows:

1.    <u>Waiver of Events of Default</u>. Pursuant to the request of the Borrower and in reliance upon the representations and warranties of the Borrower set forth in the Loan Agreement and the other Loan Documents, the Lender hereby waives any and all Events of Default that may exist as of the date hereof (such Events of Default being the "<u>Existing Defaults</u>"), including without limitation each failure by the Borrower to date to pay principal and interest pursuant to Section 8.01(a) of the Loan Agreement and the Project Completion Date shall not have occurred on or prior to November 30, 2015 pursuant to Section 8.01(k) of the Loan Agreement for a period up to March 1, 2016; provided, however, that nothing herein, nor any communications among any Loan Party or the Lender, shall be deemed a waiver with respect to any Events of Default other than the Existing Defaults, or any future failure of the Loan Parties to comply fully with any provision of the Loan Agreement or any provision of any other Loan Document, and in no event shall this waiver be deemed to be a waiver of enforcement of any of the Lender's rights or remedies under the Loan Agreement and the other Loan Documents, at law (including under the Uniform Commercial Code), in equity, or otherwise including, without limitation, the right to declare all Obligations immediately due and payable pursuant to Section 8.01 of the Loan Agreement, with respect to any other Defaults or Events of Default hereafter arising (including any future failure by Borrower to make payments of principal and/or interest on March 1, 2016 and thereafter or the Project Completion Date shall not have occurred on or prior to March 1, 2016), and in no event shall this waiver be deemed to be cancellation or forgiveness of the indebtedness due but unpaid by the Borrower to the Lender as of the date hereof and such amount should be payable by the Borrower to the Lender on or before March 1, 2016. Except as expressly provided herein, the Lender hereby reserves and preserves all of its rights and remedies against the Borrower and each other Loan Party under the Loan Agreement and the other Loan Documents, at law (including under the Uniform Commercial Code), in equity, or otherwise.



CONFIDENTIAL

2.    <u>No Other Waiver or Amendment</u>.  This Waiver shall be effective only in this specific instance and for the specific purposes set forth herein and does not allow for any other or further departure from the terms and conditions of the Loan Agreement or any other Loan Document, which terms and conditions shall remain in full force and effect.

3.    <u>Construction</u>.  This Waiver shall be construed in accordance with the laws of the State of New York, excluding conflicts of laws principles.

US_ACTIVE-112831523

CONFIDENTIAL

WAT-001378

IN WITNESS WHEREOF, the undersigned have executed this Waiver as of the date first above written.

**WATERLOO STREET LIMITED**
a British Virgin Islands limited company

By: _____
    Name: Lee Kwok Fai
    Title:  Director

US_ACTIVE-112831523

CONFIDENTIAL

WAT-001379

# EXHIBIT 14

James W. Anderson [9829]
Walter A. Romney [7975]
Victoria B. Finlinson [15103]
CLYDE, SNOW & SESSIONS
One Utah Center, Thirteenth Floor
201 South Main Street
Salt Lake City, Utah  84111
Telephone: (801) 322-2516
Email: jwa@clydesnow.com
         war@clydesnow.com
         vbf@clydesnow.com

*Attorneys for Defendants Noble Americas Corp.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re CS MINING, LLC<br><br>Debtor | |
| CS MINING, LLC, a Delaware Limited Liability Company,<br><br>    Plaintiff,<br><br>vs.<br><br>NOBLE AMERICAS CORP., a Delaware Corporation; WATERLOO STREET LIMITED, a British Virgin Islands Company,<br><br>    Defendants. | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman<br><br>Adv. Pro. No.: 17-02025 |

---

## NOBLE AMERICAS CORP.'S RESPONSES TO WUMI'S 4/7/17 REQUESTS FOR ADMISSION AND INTERROGATORIES

---

{01160115-2 }

Defendant, Noble Americas Corp. ("Noble"), by and through its counsel of record, hereby responds to David J. Richards, LLC d/b/a Western US Mineral Investors, LLC ("WUMI") Requests for Admission ("Requests") and Interrogatories ("Interrogatories") as follows:

## **GENERAL OBJECTIONS**

1.      Without waiving any of its rights, Noble objects to WUMI's discovery requests given the April 25, 2017 Order Staying Claims by and Against Noble Americas Corp.  Noble reserves all rights associated with the Order Staying Claims and the fact that Noble is providing responses to these discovery requests should not be viewed in any way as a waiver by Noble relating to the Order Staying Claims.

2.      Noble objects to WUMI's discovery requests to the extent that they seek information subject to the attorney-client work product or any other recognized privilege against disclosure. Noble further states that in responding to any request, it is not waiving, intentionally or otherwise, its attorney-client privilege, work product doctrine protections, or any other applicable privilege or doctrine protecting communications, transactions or, records from disclosure.

3.      Noble objects to WUMI's discovery requests to the extent that they seek information that is unreasonably cumulative, duplicative, or obtainable from some other source that is more convenient, less burdensome or less expensive.

4.      Noble objects to WUMI's discovery requests to the extent that they seek information that is already known to WUMI or otherwise available to them from documents in their own files or from public records.

5.      Noble objects to WUMI's discovery requests to the extent that they seek confidential business or proprietary information with no evidentiary significance.

6.      Noble objects to WUMI's discovery requests which solicit information that is not relevant to the subject matter of this civil action and/or not likely to lead to the discovery of admissible evidence.

7.      Noble objects to WUMI's discovery requests that are overly broad, vague and ambiguous, or unduly burdensome.

8.      Noble objects to each and every definition, instruction and request to the extent that it purports to impose discovery obligations beyond those permitted by the Utah Rules of Civil Procedure.

9.      To the extent Noble adopts any term or definition presented by WUMI, it is adopted solely for convenience in responding to these discovery requests, and Noble does not accept any terms or definitions or concede that any of them are appropriate, descriptive, or accurate.

10.      Noble reserves the right to amend or supplement its responses as additional responsive information is located and produced, or otherwise as permitted by the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

11. The objections set forth above are incorporated into the responses below and shall
be deemed continuing, even if not specifically referred to in the response.

## REQUESTS FOR ADMISSION

**1.** You sent a letter to the Debtor dated November 10, 2015, in which you informed the
Debtor that one or more Events of Default had occurred under the Noble/Waterloo Loan
Agreement.

**RESPONSE:** Admit.

**2.** You sent a letter to the Debtor dated December 30, 2015, in which you informed the
Debtor that one or more Events of Default had occurred under the Noble/Waterloo Loan
Agreement.

**RESPONSE:** Admit.

**3.** As of December 30, 2015, one or more Events of Default had occurred under the
Noble/Waterloo Loan Agreement.

**RESPONSE:** Admit.

**4.** The Tenth Amendment to the Loan Agreement is a valid contract.

**RESPONSE:** Noble objects to this Response as it calls for a legal conclusion. Without
waiving this specific objection and the general objections outlined above, and despite its
reasonable inquiry, the information it knows or can readily obtain is insufficient to enable
it to admit or deny the Request. Noble therefore denies the same.

**5.** The Tenth Amendment to the Loan Agreement is enforceable by WUMI.

**RESPONSE:** Noble objects to this Response as it calls for a legal conclusion. Without waiving this specific objection and the general objections outlined above, and despite its reasonable inquiry, the information it knows or can readily obtain is insufficient to enable it to admit or deny the Request. Noble therefore denies the same.

**6.** You were aware of the Tenth Amendment to the Loan Agreement as of December 31, 2015.

**RESPONSE:** Deny.

## INTERROGATORIES

**1.** If your response to any of the foregoing Requests for Admission is anything other than an unqualified admission, state the following for each Request for Admission not unconditionally admitted:

    (a) State all facts on which you base your qualification or denial.

    (b) Identify every person having knowledge of facts supporting or otherwise relating to your respond to subpart (a) of this Interrogatory and state the basis for such knowledge;

    (c) Identify with specificity all documents referring or relating in any way to your response to subparts (a) and (b) of this Interrogatory.

**RESPONSE:** Noble objects to this Interrogatory in that the responses to Requests 4 and 5 call for legal conclusions to which no response is necessary. Noble further objects to Requests 4, 5, and 6 as this Interrogatory seeks to have Noble prove a negative in that

Noble denies that it had any knowledge of the Tenth Amendment to the Loan Agreement

prior to December 31, 2015.  As a result, Noble is not aware of any facts, individuals,

and/or documents or otherwise that would be responsive to Requests 4, 5, and 6.

DATED this 8th day of May, 2017.

CLYDE SNOW & SESSIONS

/s/  Walter A. Romney, Jr.
James W. Anderson
Walter A. Romney, Jr.
Victoria B. Finlinson

*Attorneys for Defendants Noble Americas, Corp.*

# EXHIBIT 15

Page 1

1                    ROUGH DRAFT DISCLAIMER

2

3          THE STENOGRAPHIC NOTES TAKEN IN THIS

4    DEPOSITION ARE BEING TRANSLATED INSTANTANEOUSLY

5    INTO THEIR ENGLISH EQUIVALENT THROUGH AN AUTOMATED

6    PROCESS CALLED REAL-TIME TRANSLATION.   THIS

7    TRANSCRIPT HAS BEEN NEITHER EDITED NOR PROOFREAD

8    BY THE COURT REPORTER.   THE REAL-TIME DRAFT IS

9    UNEDITED AND UNCERTIFIED AND MAY CONTAIN

10   UNTRANSLATED STENOGRAPHIC SYMBOLS, AN OCCASIONAL

11   REPORTER'S NOTE, A MISSPELLED PROPER NAME AND/OR

12   NONSENSICAL WORD COMBINATIONS.

13              ALL SUCH ENTRIES WILL BE CORRECTED ON

14   THE FINAL CERTIFIED TRANSCRIPT, WHICH WILL BE DELIVERED

15   TO YOU IN ACCORDANCE WITH STANDARD DELIVERY TERMS

16   OR ON AN EXPEDITED BASIS, AS REQUESTED.

17              DUE TO THE NEED TO CORRECT ENTRIES PRIOR

18   TO CERTIFICATIONS, THIS ROUGH REAL-TIME DRAFT

19   CAN ONLY BE USED FOR THE PURPOSE OF AUGMENTING

20   COUNSEL'S NOTES, AND NOT TO BE USED IN ANY COURT

21   PROCEEDING OR TO DISTRIBUTE TO OTHER PARTIES, PURSUANT

22   TO GOVERNMENT CODE SECTION 69954(D).

23

24

25

Page 2

1          IN THE UNITED STATES BANKRUPTCY COURT
2              DISTRICT OF UTAH, CENTRAL DIVISION
3
4
5    In re CS MINING, LLC              )
                                       )
6              Debtor                  )
     _____)
7                                      )
     CS MINING, LLC, a Delaware        )
8    limited liability company,        )
                                       )   Bankruptcy Case No.
9              Plaintiff,              )     16-24818
                                       )   Adversary Pro. No.:
10                VS.                   )     17-02024
                                       )
11   DAVID J. RICHARDS, LLC d/b/a a    )
     WESTERN US MINERAL INVESTORS,     )
12   LLC, an Ohio Limited Liability    )
     Company.                          )
13                                      )
               Defendant.              )
14   _____)
15
16              R O U G H    D R A F T
17      30(b)(6) Deposition of Waterloo Street Limited
18                 Testimony of
19                Sanjiv Noronha
20            Los Angeles, California
21            Wednesday, May 31, 2017
22
23
     REPORTED BY:
24   KIMBERLY WILDISH
     CSR NO. 8078
25   FILE NO.:  123930

Page 139

1          Q.      Thank you.                                    14:10

2                  Go to Waterloo 4.  This was previously

3     marked.  Just for the record, the waiver you previously

4     testified was a waiver of default letter.  And you said

5     that you were familiar with this document, is that        14:11

6     correct?

7          A.      Um-hmm.

8          Q.      And paragraph one talked about an

9     existing default.  Is that accurate?

10         A.      Um-hmm.  Yes.                                 14:11

11         Q.      So as of February 3, 2016, there was an

12    existing default in the Noble loan Noble Waterloo loan.

13         MS. SOTO:  Objection; form.  Foundation.  Calls

14    for a legal conclusion.

15         THE WITNESS:  I spoke to lawyers.                     14:11

16    BY MR. COX:

17         Q.      Do you as Waterloo assert that prior to

18    February 3rd, 2016, there was a default in the Noble

19    Waterloo loan?

20         MS. SOTO:  Objection; form.  Foundation.  Calls       14:11

21    for a legal conclusion.

22         THE WITNESS:  I spoke to my lawyers.

23         MR. COX:  Let me ask that one again.

24         Q.      Does Waterloo Street Limited assert a

25    default in the Noble Waterloo loan prior to February 3,   14:12

Page 140

1   2016?                                                    14:12

2        MS. SOTO:  Same objections.

3        THE WITNESS:  There was a default.

4        MR. COX:  Okay.

5        Q.     And this letter purports to waive that    14:12

6   default as of February 3, 2016?

7        A.     That's correct.

8        Q.     And if you look at it, it only waives

9   that default until March 1, 2016.  Is that accurate?

10       A.     Um-hmm.                                       14:12

11       Q.     So after March 1, 2016...

12       A.     Yes.

13       Q.     ... those defaults...  Is the loan in

14   default now?

15       MS. SOTO:  Objection; calls for a legal            14:12

16   conclusion.  Form.  Foundation.

17       THE WITNESS:  I cannot comment on that.  I have

18   no comment.

19   BY MR. COX:

20       Q.     Does Waterloo Street Limited assert after 14:13

21   March 1, 2016 there was a default or there is a

22   continuing default in the Noble Waterloo loan?

23       MS. SOTO:  Objection.  Same objections.

24       THE WITNESS:  No comment.

25

ROUGH DRAFT

Page 141

1    BY MR. COX:                                              14:13

2        Q.     So you're not answering that?

3        A.     I'm not answering that.

4        Q.     So I take that...  So...

5    MS. SOTO:  Just let me.                                  14:13

6             If you have no comment because the only

7    information you have regarding this issue comes from

8    your attorneys, you have to state that as opposed to

9    just saying no comment.

10        THE WITNESS:  Oh, okay.                              14:13

11        MS. SOTO:  I was just trying to help so he would

12    give a correct response.

13        THE WITNESS:   Okay.

14             No comment because I spoke with the

15    lawyers.                                                 14:13

16    BY MR. COX:

17        Q.     I understand you spoke to the lawyers.

18    But the company has to have a position as to whether

19    their loan is in default.

20             Does the company assert today that the   14:13

21    loan is in default?

22        MS. SOTO:  Just objection.  Legal conclusion.

23             Are you asking have we noticed a default

24    or do we have a position?

25

Page 142

1   BY MR. COX:                                              14:14

2        Q.     Do you have a position?

3        A.     Whether the loan is in default?

4        Q.     Yes.

5        A.     The Noble loan?                              14:14

6        Q.     Yes.

7        A.     Yes.

8        Q.     Go to Waterloo 3.  In the second page,

9   Bates number Waterloo WAT 1366.  Page Waterloo WAT 1366.

10   A loan requests?                                         14:14

11        A.     1365, right?

12        MS. SOTO:  Turn to the next page.

13   BY MR. COX:

14        Q.     Can you generally explain what this

15   document is?                                            14:15

16        MS. SOTO:  Objection; asked and answered.

17        THE WITNESS:  Answer?

18        MS. SOTO:  Yeah.

19        THE WITNESS:  This is the last draw down of the

20   request from CS Mining to Noble for the Noble/Waterloo  14:15

21   loan.

22   BY MR. COX:

23        Q.     So this draw request was made on or about

24   February 3, 2016?

25        A.     It says 2nd of February.                    14:15